# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. CR2-06-129** |
| **vs.** | : | |
| | : | **JUDGE MARBLEY** |
| LANCE K. POULSEN, *et al.* | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

## I. INTRODUCTION

This matter comes before the Court on the government's Notice to the Court Regarding Apparent Conflict of Interest and Motion for a Hearing on Disqualification of Counsel for Defendant Poulsen. Despite Defendant, Lance K. Poulsen's ("Poulsen") objections, the Court **GRANTED** the government's request for a hearing on the conflict of interest issue. For the reasons set forth herein, the Court **DENIES** the government's motion to disqualify, and allows Attorney Dale Crawford and his firm, Shumaker, Looper & Kendrick, LLP, to continue to serve as Poulsen's counsel in this case.

## II. STATEMENT OF FACTS

### A. Background

### 1. National Century Financial Enterprises, Inc. ("NCFE")

In 1991, Poulsen, along with co-Defendants Parrett and Ayers, founded NCFE, an Ohio corporation headquartered in Dublin, Ohio. Until filing for bankruptcy in November 2002, NCFE was one of the largest healthcare finance companies in the United States. NCFE provided accounts receivable financing to a wide variety of healthcare providers, including hospitals, clinics, nursing

homes, and other businesses and professionals (collectively, "providers").  NCFE purchased providers' accounts receivable, and held back a portion of the purchase amount for program purposes.  This arrangement gave the providers cash earlier than the time they otherwise would have collected on those accounts receivable.  Following these purchases, NCFE was then entitled to receive the cash collections on the purchased accounts receivable from the insurance companies and government payors, such as Medicare and Medicaid.

NCFE raised the funds to purchase accounts receivable through the offer and sale of healthcare securitization program notes issued by two of its wholly-owned subsidiaries, NPF VI, Inc. ("NPF VI") and NPF XII, Inc. ("NPF XII"), both of which had their principal places of business in the Southern District of Ohio.  Through entities such as NPF VI and NPF XII, NCFE would represent to potential investors and others that the funds raised through its note offerings were to be used for a specific purchase, that is, the purchase of the portion of healthcare accounts receivable arising from healthcare services provided by private medical facilities to specific patients and payable by government-funded programs or insurance companies.  Such accounts receivable, required to be fewer than 180 days old, were known as "eligible receivables," and were to be pledged as collateral to secure what NCFE promoted as a safe and conservative investment.

NCFE offered notes under the NPF VI and NPF XII programs to qualified institutional buyers based upon terms and conditions set forth in documents such as a master indenture and supplemental indentures, and private placement memoranda and supplements ("PPMs"), which were known collectively as "program documents."  The program documents and other related documents informed investors about how the NPF VI and NPF XII programs were set to operate and how investors' funds would be used by NCFE.  Based on representations made both in program

-2-

documents and in statements by NCFE principals and others, the NPF VI and NPF XII program notes were promoted as safe and conservative investments.

## 2. The Indictment

On May 19, 2006, the federal grand jury sitting in Columbus, Ohio returned the sixty-count indictment in this case, charging Poulsen and six other individuals[1] (collectively, "Defendants") with multiple fraud, money laundering, and forfeiture offenses against the United States.  According to the indictment, from on or about August 14, 1992 to on or about November 18, 2002, Defendants conspired to defraud the public by preparing materially false and fraudulent documents and records and making materially false and fraudulent representations to banks, rating agencies, investors, auditors and others about NCFE and the asset-backed securities programs offered and operated by the company's wholly-owned subsidiaries.

The government asserts that contrary to the provisions of the program documents, and the representations made to banks, investors, rating agencies, auditors and others, Defendants and others misappropriated, misused, and diverted financing the acquisition of healthcare providers by NCFE and providing unsecured "advances" and loans both to clients and entities in which various Defendants had an ownership interest.  Accordingly, the government contends that from May 1998 through May 2002, NPF VI and NPF XII issued program notes having an aggregate value of approximately $1.5 billion and $2.9 billion, respectively.   Further, as of November 2002, immediately prior to NCFE's filing for bankruptcy, NPF VI and NPF XII owed investors approximately $840 million and $2.2 billion, respectively, on the outstanding notes.

---

[1]The other defendants in the case are Rebecca S. Parrett, Donald H. Ayers, Roger S. Faulkenberry, Randolph H. Speer, James Dierker, and Jon A. Beacham.

### 3. Counsel for Poulsen

Soon after the grand jury handed down the indictment, Attorney Thomas Tyack of Columbus, Ohio entered his appearance as lead counsel for Poulsen. Later, in July 2006, Poulsen requested that Attorney Dale Crawford ("Mr. Crawford") of Columbus, Ohio firm, Shumaker, Looper & Kendrick, LLP (the "Shumaker firm"), also enter an appearance to serve as co-counsel to Mr. Tyack. On July 18, 2006, Mr. Crawford advised the Court of Defendant's request that he enter his appearance, also noting that the government had suggested that the Shumaker firm had a potential conflict because one of its members, Attorney John E. Haller ("Mr. Haller"), was a potential witness in the government's case.

### 4. Mr. Haller's Past Representation of NCFE

#### a. The "Fresenius litigation"

Mr. Haller, currently a partner and a principal at the Shumaker firm, has worked as counsel for NCFE, various NCFE subsidiaries, Poulsen, and the Poulsen family on and off since 1997, and is very knowledgeable about all facets of NCFE's business. *See* Mr. Haller Aff. ¶ 2. Though he was only tangentially involved in NCFE-related matters from 1997 through 1999, beginning in April 2000, while working at Purcell & Scott, Co., L.P.A. ("Purcell & Scott"), Mr. Haller became a principal attorney for NCFE in what is commonly referred to as the "Fresenius litigation."[2, 3] At all

---

[2]In April 2000, Fresenius and National Medical Care ("NMC") sued NCFE and others in connection with a transaction that had closed in July 1998. Mr. Haller Aff. ¶ 2. The initial complaint named six defendants: NCFE, Kachina, Thor Capital, Home Medical of America, Inc. ("HMA"), Chartwell-NY and Homecare Concepts. *Id.* Mr. Haller represented NCFE and NPF VI (collectively, the "NCFE Parties"), Kachina, and Thor Capital. *Id.*

[3]The information relevant to Mr. Haller's role in representing NCFE and its subsidiaries in the Fresenius litigation is not subject to attorney-client or work product privilege because on July 25, 2005, Erwin I. Katz ("Katz"), the Trustee of the Unencumbered Asset Trust ("UAT"),

times during the Fresenius litigation, Mr. Haller's representation of the NCFE Parties was "subject to a joint defense agreement with other defendants in the case, including [HMA], Homecare Concepts of America, Inc., Chartwell Caregivers of New York, Inc. and Craig Porter" (collectively, the "Home Medical Parties"). *See* Mr. Haller Aff. ¶ 6.

One of the principal issues in the Fresenius litigation was whether, when purchasing receivables from NMC, NCFE and HMA had performed adequate due diligence regarding those receivables. The plaintiffs contended that a reasonable due diligence review would have revealed that the receivables at issue did not have the value that NMC had represented in its financial statements. Thus, the plaintiffs claimed that the fact that the receivables were overvalued was the fault of NCFE and HMA.

To gather data regarding the defendants' due diligence efforts, Mr. Haller "conducted extensive investigation and interviews of NCFE employees [and] conducted extensive reviews." *See* Mr. Haller Aff. ¶ 5. On April 16, 2001, "Mr. Haller met with the following individuals: Chuck Jennings, Jim Happ, Dan Davison of Fulbright & Jaworksi, counsel for HMA, and Mike Miller, Tom Malone, and Mike Rahe, part of the NCFE "trend team" that had evaluated the receivables HMA had purchased from NMC and sold to NCFE. *See* Mr. Haller Aff. ¶¶ 7-9. During the hearing, Mr. Haller testified that at that April 16 meeting, he heard Tom Malone comment that NCFE was "aging

_____

the sole director of NCFE and its subsidiaries, and the President of NCFE, formally waived any applicable privilege arising from representation of NCFE through November 2002 by Purcell & Scott among several other law firms. *See* Katz Waiver of Privilege, at 1. The waiver covered both attorney-client privilege as to any communications between NCFE and its affiliates and Purcell & Scott, and attorney work product privilege as to any work performed for NCFE and its affiliates by Purcell & Scott. *Id.*

receivables" in order to "fool" investors and the rating companies into thinking that NCFE shares were a safer investment than they actually were.

On April 18, 2001, Mr. Haller drafted a memorandum regarding the "aged" receivables on NCFE's books (the "April 18 Memo") and contacted various NCFE principals to discuss the issue with them. The April 18 Memo raises a number of questionable aspects of NCFE's bookkeeping, specifically:

- Why were the 181+ day and above receivables moved into the 31-60 day category? Was it because they were rebilled by NMC prior to closing? If so, (a) were they rebilled prior to closing and (b) why does the caption of the report state that the aging is by date of service? Why were they not moved into the 0-30 day bucket? Why was it concluded that rebilled receivables have a collection rate exactly equal to that of the non-rebilled receivables?
- Why were receivables that were not to have been purchased included in the receivable base for purposes of the reports that NCFE prepared? Why were receivables that NCFE's trend team advised were unlikely to have much value nevertheless included at their full value in the receivable base?
- What was the rating agency told regarding the valuation of the receivables? What were the bondholders told about the value of the receivables? Did NCFE's trend team perform the level of due diligence on this credit that NCFE would be proud of?

Mr. Haller Memo at 2-3. Further, according to the April 18 Memo, although the total receivables on NCFE's July 1998 report were $112,777,579, the total net eligible receivable base was $42,113,773, suggesting that the receivables had been *overvalued* by over $70.5 million.

Mr. Haller asserts that after consulting with various NCFE principals regarding the above issues, he determined that NCFE's method of aging receivables was legally sound. According to the government, however, the April 18 Memo raises questions that go to the heart of the alleged NCFE scheme. The government believes that the April 18 Memo suggests that Mr. Haller "put his finger" on the fraud in 2001, a year before NCFE was forced to declare bankruptcy.

### b. Dispute Regarding Whether Mr. Haller Represented NCFE while at the Shumaker Firm in 2003

Mr. Haller left Purcell & Scott in November 2002, and joined the Shumaker firm in March

of 2003.  There is a dispute over whether Mr. Haller was retained by NCFE, NCFE subsidiaries, or

Poulsen, while working at the Shumaker firm.  The government asserts that during the government's

pre-indictment investigation, Mr. Haller neglected to reveal that when he started at the Shumaker

firm, he represented NCFE and various NCFE affiliates in connection with the Fresenius litigation.

They attached to their Reply, an August 24, 2006 declaration by Katz stating:

> 3.    Mr. Haller, while at Purcell & Scott and *later at the Shumaker firm*, provided advice
> to NCFE and its affiliates in connection with the securitization programs, and in
> particular with regard to a large piece of litigation known as the Fresenius litigation.
> Mr. Haller's representation of NCFE and its affiliates began before and *continued
> after NCFE and its affiliates filed for bankruptcy protection in November 2002*.
> Attached to this Declaration are (1) Affidavit in Support of Ordinary Court Retention
> (Exhibit "1") and (2) Report of Payments Made by Debtors and Debtors in
> Possession to Ordinary Course Professionals From July 1, 2003 Through October 31,
> 2003 Pursuant to Order Authorizing Debtors and Debtors in Possession to Retain,
> Employ and Pay Certain Professionals in the Ordinary Course of Their Business
> (Exhibit "2").  Exhibits 1 and 2 are documents filed in the NCFE bankruptcy
> proceedings that reflect that Mr. Haller and the Shumaker firm were providing legal
> advice and services to NCFE at the time of the bankruptcy, and that they continued
> to do so even after the bankruptcy petitions were filed.  These documents also reflect
> that the *Shumaker firm was compensated by the NCFE bankruptcy estates for legal
> services that it provided to them following the bankruptcy filing.*
>
> 4.    Neither Mr. Haller nor the Shumaker firm has approached me to request that they be
> released from the obligations of confidentiality they owe to NCFE, its former
> bankruptcy estates, and their successor, the UAT, in order to permit Mr. Haller or the
> Shumaker firm to represent Mr. Poulsen in defense of the criminal charges against
> him.  The UAT has not released Mr. Haller and the Shumaker firm from their
> obligations of confidentiality for that purpose.

*See* Katz Decl. ¶¶ 3-4 (emphasis added).  One of the attached exhibits states that the Shumaker firm

collected approximately $7,965 from the NCFE bankruptcy estates.  *See id*. Ex. 2.

During the hearing, however, Mr. Haller testified, that Katz's declaration was in error.[4]  He contends that while at the Shumaker firm in 2003, he was not retained by NCFE directly, but was hired by Jones Day as a consultant to help Jones Day in its representation of NCFE during its bankruptcy proceedings.  He claims that his role was to provide Jones Day, Gibson Brunns, Ballard Sparr, and various other firms involved with the NCFE bankruptcy, with background information about the Fresenius litigation.  Further, he asserts that the approximately $7,965 noted in the Report of Payments Made by Debtors and Debtors in Profession was actually paid to him by Jones Day, not by NCFE or its affiliates.

### B. Procedural History

On July 18, 2006, Mr. Crawford entered his appearance to serve as Mr. Tyack's co-counsel in representing Poulsen.  On July 20, 2006, the Court held a telephonic status conference regarding Mr. Crawford's notice of appearance and discussing whether the Shumaker firm was conflicted out of representing Poulsen due to Mr. Haller's status as a potential witness in this case.  The Court

---

[4]In an effort to make this Court aware of its objection to the government's assertion that Mr. Haller had failed to reveal that he represented NCFE and/or its affiliates while at the Shumaker firm before the August 31 hearing, Defendant's Counsel filed a "Response to the Government's Consolidated Reply."  The Response asserts that Mr. Katz's declaration is "simply not accurate" and claims that,

> Mr. Haller never was employed by Mr. Katz or the Unencumbered Assets Trust (UAT), nor was the UAT[, which was created in 2004,] even in existence at the time Mr. Haller provided his legal services.  The legal services were made to the law firm Jones Day.  In addition, the advice given by Mr. Haller to Jones Day was as an independent expert who had knowledge of many aspects of NCFE's litigation, not as an attorney for NCFE.  The documents submitted by the government and Mr. Haller's affidavit evidence that Mr. Haller was specifically advised not to engage in any further legal work on behalf of anyone connected with the bankruptcy.

*See* Def.'s Response to Gov't's Reply at 1-2.

informed the parties that if the government objected to Mr. Crawford serving as counsel for Poulsen, it should file a formal motion to disqualify Mr. Crawford on or before August 4, 2006.

On July 27, 2006, the government served Mr. Haller with a subpoena to appear before the Court on September 3, 2007.  On August 4, 2006, the government filed a Notice to the Court Regarding Apparent Conflict of Interest and Motion for a Hearing on Disqualification of Counsel for Poulsen.  Poulsen  timely responded,[5] and the government timely replied.  On August 30, 2006, Poulsen also filed a Response to the Government's Consolidated Reply to express its objection to the various evidentiary exhibits the Government had attached to its Reply.  *See supra,* note 4.  The parties appeared for a hearing on August 31, 2006, and the matter if now ripe for this Court's review.

### III. DISCUSSION

### A. Motions for Disqualification - Background

The Supreme Court, in *Wheat v. United States*, recognized the difficulties facing a district judge when ruling on a motion for disqualification, explaining:

> Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass ,darkly.  The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials.

*See* 486 U.S. 153, 162-63 (1988).  Courts have long held that in order to determine if a conflict of interest is subject to waiver, courts must investigate the alleged conflict of interest, and determine

---

[5]Defendant's Response to the Government's Motion suggests that the government's motion is not, and should not be regarded as, a true "motion to disqualify," because it is labeled as a "Notice," rather than as a formal motion.  At the August 31 hearing, however, the government stated that it often uses the "Notice" format for issues of disqualification.  The government then stated for the record that it was formally moving to disqualify Mr. Crawford and the Shumaker firm, mooting Defendant's objection to the government's "Notice."

whether it amounts to an *actual* or a *potential* conflict.  *See United States v. Jones*, 381 F.3d 114, 119(2d Cir. 2004) (finding that the possibility that defense counsel might become the subject of a grand jury investigation raised an unwaivable conflict of interest under the facts) (emphasis added). "An *actual* conflict of interest exists when the attorney's and the defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action, or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client." *Id*. at 119 (emphasis added); *see also, United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003).  On the other hand, "[a]n attorney has a *potential* conflict of interest if the interests of the defendant *could* place the attorney under inconsistent duties in the future." *Id*. (citing *United States v. Kliti*, 156 F.3d 150, 153, n.3 (2d Cir. 1998)) (emphasis added).

Some conflicts mandate disqualification under the Sixth Amendment – for instance, when counsel is unlicensed or has engaged in a defendant's crimes.  *Jones*, 381 F.3d at 119; *see also Bellamy v. Cogdell*, 974 F.2d 302, 306 (2d Cir. 1992) (no need to show prejudice when counsel is unlicensed); *United States v. Fulton*, 5 F.3d 605, 611-13 (2d Cir. 1993) (defendant could not waive actual conflict of interest where government witness implicated defense counsel in a related crime).[6] If a court determines, however, that the attorney suffers only from a lesser actual or potential conflict, it may accept the defendant's knowing and intelligent waiver of his right to conflict-free

---

[6]In *Fulton*, the Second Circuit Court of Appeals held that an attorney's conflict was *per se* unwaivable when a government witness implicated the defendant's trial counsel in a heroin importation connected to the charges against defendant.  5 F.3d at 614.  The *Fulton* court believed, logically, that this allegation meant the attorney would be more concerned about his own personal reputation and the possibility that he might be accused of a crime than he would about the interests of the defendant, his client.  *Id*. at 613 (holding that the attorney's self-interest in avoiding criminal charges or harm to attorney's reputation were enough to influence every aspect of attorney's representation of defendant).

counsel. *United States v. Perez*, 325 F.3d 115, 125-28 (2d Cir. 2003) (no mandate to disqualify where potential for attorney to become a witness at trial had been eliminated and attorney represented related party in a separate trial); *United States v. Schwarz*, 283 F.3d 76, 95-96 (2d Cir. 2002) (disqualification mandated where defendant police officer's counsel also had ethical obligations to police union, as well as financial interest in his firm's retainer agreement with police union, where union had divergent interests from defendant). The court retains the discretion to reject that waiver if the attorney's conflict jeopardizes the integrity of the judicial proceedings. *Perez*, 325 F.3d at 125-26.

In considering motions to disqualify trial counsel, district judges must balance the competing policies of a defendant's Sixth Amendment right to counsel and the need to preserve the highest level of professional responsibility. *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982). The Sixth Amendment of the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. The purpose of the Sixth Amendment is simply "to ensure that criminal defendants receive a fair trial," and therefore, the amendment, focuses on guaranteeing an effective advocate for each criminal defendant, rather than ensuring that the defendant is represented by the counsel he prefers. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Wheat*, 486 U.S. at 159. Courts have, nevertheless, consistently recognized that the right of a defendant who retains counsel to be represented by that counsel, "is a right of constitutional dimension," and, therefore, that the "[c]hoice of counsel should not be unnecessarily obstructed by the court." *See Cunningham*, 672 F.2d at 1070 (citations omitted).

-11-

It is equally well settled, however, that the Sixth Amendment right to counsel is not absolute, and while it does create a presumption in favor of the defendant's counsel of choice, it may be overcome by a demonstration of a serious potential for conflict. *See Wheat*, 486 U.S. at 165 ("[T]he district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."). This is because "federal courts have an independent interest in ensuring that criminal trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160.

Moreover, Ohio courts generally hold that when one lawyer is disqualified because he will testify as a witness, his law firm must also be disqualified. *See Omnicare, Inc. v. Provider Servs., Inc.*, 2006 WL 414061, *3-4 (N.D. Ohio Feb. 21, 2006) (citing *Reed Elsevier, Inc. v. THELAW.net Corp.*, 197 F. Supp. 2d 1025, 1027 (S.D. Ohio 2002) (citing *Universal Athletic Sales Co. v. Am. Gym, Rec. & Athletic Equip. Corp., Inc.*, 546 F.2d 530, 538 (3d Cir. 1986))); *Estate of Andrews v. United States*, 804 F. Supp. 820, 830 (E.D. Va. 1992); *Mason & Dixon Lines, Inc. v. Glover*, 1989 WL 135219 (N.D. Ill. Oct. 26, 1989)). But the trial judge retains the discretion to determine to what proceedings the disqualification of the firm should apply, and such disqualification extends only to the firm's partners and associates and does not include the firm's non-professional employees or agents. *See Jones v. City of Chicago*, 610 F. Supp. 350, 363 (N.D. Ill. 1984) (disqualifying defendant's lawyer under the advocate-witness rule and finding that the facts suggested that the entire firm should also be disqualified).

**B. Disqualification of Mr. Haller Based on the Advocate-Witness Rule**

-12-

Since the roles of advocate and witness are typically inconsistent, "it is generally inappropriate for a trial attorney to testify on behalf of [a] client." *Amos v. Cohen*, 806 N.E.2d 492, 495 (Ohio 2004) (citing *Mentor Lagoons, Inc. v. Rubin*, 510 N.E.2d 379, 380 (Ohio 1987)).  The advocate-witness rule is rooted in evidence law, but it is now a matter of legal ethics embodied in Rule 3.7(a) of the MODEL RULES OF PROFESSIONAL CONDUCT, which provides that a lawyer "shall not act as advocate at trial in which the lawyer is likely to be a necessary witness" except where the lawyer's testimony relates to an uncontested issue or the nature and value of legal services rendered in the case, and where the lawyer's disqualification "would work substantial hardship on the client." *See* MODEL RULES OF PROF'L CONDUCT R. 3.7 (2006).[7, 8]

---

[7]Rule 3.7(b) states that, "[a] lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9." *See* MODEL RULES OF PROF'L CONDUCT R. 3.7.

[8]The comments to this rule explain:

Combining the roles of advocate and witness can prejudice the tribunal and can involve a conflict of interest between the lawyer and client.  The tribunal has proper objection where the combination of roles may prejudice that party's right in the litigation.  A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others.  It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof. . . .

*See* MODEL RULES OF PROF'L CONDUCT R. 3.7, cmt. 1-2.

In determining when disqualification of counsel is required under the advocate-witness rule, this Court is guided, though not bound, by the current Ohio Code of Responsibility,[9] which states, in Disciplinary Rules ("DR") 5-102(A) and (B), that:

> (A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B)(1) through (4).
> (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness *other than on behalf of his client*, he may continue the representation *until it is apparent that his testimony is or may be prejudicial to his client*.

*See* DR 5-102 (2006) (emphasis added). Under DR 5-101(B)(1) through (3), a lawyer may continue to represent his client and be a witness on behalf of his client only if his impending testimony relates solely to an uncontested matter, the nature and value of legal services, or a matter of formality, and if there is no reason to believe that substantial evidence will be offered in opposition to the testimony. *See* DR 5-102(B). The lawyer may also continue to be an advocate as well as a witness if disqualification would work a "substantial hardship" on his client. *Id*. at (B)(4).[10]

_____

[9]On August 1, 2006, the Supreme Court of Ohio adopted, effective February 1, 2006, new ethics rules governing attorneys who practice law in the State of Ohio. Aside from a few modifications, the rules are substantially equivalent to the ABA Model Rules of Professional Conduct which have been in effect since 1983. Both in their briefings and during the August 31 hearing, Poulsen's counsel asserted that the recently adopted rules are "more lenient" than those currently in place, and they have asked the Court to adopt the new rules in ruling on the government's motion to disqualify Mr. Crawford and the Shumaker firm. They argue that under the new rules, where a member of a firm must serve as a witness in a case, the rest of his firm may proceed as counsel as long as there is no other unresolvable conflict. The new rules are not effective until February 2007. Accordingly, despite the requests of Poulsen's counsel, the Court declines to adopt the more lenient rules for the purposes of ruling on the government's August 2006 motion.

[10]Ethical Considerations 5-9 and 5-10, which provide aspirational goals for the profession, also shed light on the advocate-witness dilemma:

-14-

Courts have made clear that motions to disqualify counsel made under the advocate-witness rule should be viewed with disfavor because of their potential to interfere with a defendant's right to choose his own counsel and their "strong potential for abuse."  *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988) (noting that the ability to deny one's opponent the services of his chosen counsel is a potent weapon); *Hamrick v. Union Twp.*, 81 F. Supp. 2d 876, 879 (S.D. Ohio 2000)  (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir.

---

EC 5-9: Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate.  If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness.  Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case.  An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility.  The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

EC 5-10: Problems incident to the lawyer-witness relationship arise at different stages; they relate either to whether a lawyer should accept employment or should withdraw from employment.  Regardless of when the problem arises, his decision is to be governed by the same basic considerations.  It is not objectionable for a lawyer who is a potential witness to be an advocate if it is likely that he will be called as a witness because his testimony would be merely cumulative or if his testimony will relate only to an uncontested issue.  In the exceptional situation where it will be manifestly unfair to the client for the lawyer to refuse employment or to withdraw when he will likely be a witness on a contested issue, he may serve as advocate even though he may be a witness.  In making such decision, he should determine the personal or financial sacrifice of the client that may result from his refusal of employment or withdrawal therefrom, the materiality of his testimony and the effectiveness of his representation in view of his personal involvement.  In weighing these factors, it should be clear that refusal or withdrawal will impose an unreasonable hardship upon the client before the lawyer accepts or continues the employment.  Where the question arises, doubts should be resolved in favor of the lawyer testifying and against his becoming or continuing as an advocate.

*See* MODEL RULES OF PROF'L CONDUCT- ETHICAL CONSIDERATIONS 5-9 and 5-10 (2006).

1982) (motions for attorney disqualification should be viewed with extreme caution for they can be misused as techniques of harassment)).

Therefore, although a motion to disqualify is the proper way for a party-litigant to bring an issue of conflict of interest or the breach of an ethical duty to the court's attention, when confronted with such a motion, courts must be sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a party to retain the counsel of his choice. *Hamrick*, 81 F. Supp. 2d at 879 (citing *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir. 1980)); *Kitchen v. Aristech Chem.*, 769 F. Supp. 254, 257 (S.D. Ohio 1991). In order to resolve these competing interests, the courts must balance the interests of the public in the proper safeguarding of the judicial process together against the interests of each party to the litigation. *See General Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 711 (6th Cir. 1982).

In order to succeed on a motion for disqualification under the advocate-witness rule, the movant must demonstrate the *necessity* of the testimony as well as a *substantial likelihood of prejudice* to the defendant should the advocate-witness be allowed to serve as counsel for defendant. *See Amos v. Cohen*, 806 N.E.2d 492, 495 (Ohio 2004) (emphasis added); *Centimark v. Brown Sprinkler Serv., Inc.*, 620 N.E.2d 134, 137 (Ohio App. 1993) ("the court abused its discretion in granting the motion to disqualify without a demonstration of the necessity to disqualify counsel"); *see also*, *Parkins v. St. John*, 2004 WL 1620897, at *6 (S.D.N.Y. July 19, 2004). "Necessity" is determined by consideration of factors such as "the significance of the matters, the weight of the testimony, and the availability of other evidence." *Paramount Communications, Inc. v. Donaghy*, 858 F. Supp. 391, 394 (S.D.N.Y. 1994); *see also*, *Salatin v. Trans Healthcare of Ohio, Inc.*, 208 F. Supp. 2d 862, 863-64 (a party cannot rely on his bald assertions that a witness must testify to

-16-

establish necessity).  "Prejudice," on the other hand, requires that "the testimony be sufficiently adverse to the factual assertions or accounts of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony." *Parke-Hayden, Inc. v. Lowes Theatre Mgmt. Corp.*, 794 F. Supp. 525, 527 (S.D.N.Y. 1992); *see Renner v. Townsend Fin. Servs. Corp.*, 2002 WL 1013234 (S.D.N.Y. May 20, 2002) ("For testimony to be 'prejudicial' within the meaning of the disciplinary rule[s], the projected testimony of a lawyer or firm member must be sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony.");  *Shabbir v. Pakistan Int'l Airlines*, 2005 WL 4652518, at *6 (E.D.N.Y. Dec. 19, 2005) ("The more speculative the potential prejudice, the less likely the court will be to grant a motion to disqualify.").  Moreover, in proving prejudice, the movant "bears the burden of demonstrating how and as to what issues in the case prejudice may occur, and that the likelihood of prejudice occurring is substantial."  *Id*.; *see also, Paramount Communications*, 858 F. Supp. at 395 ("[t]he conjuring of 'perhaps possible' scenarios [by the moving party] is inadequate grounds for a demonstration of the need to call an attorney to testify").

Though the standards governing whether to disqualify counsel are clear, the difficulty lies in their application, which requires a fact-intensive inquiry.  The government notes that Mr. Haller was the drafter of the April 18, Memo, which raises potential problems in NCFE's bookkeeping procedures.  Accordingly, the government argues that Mr. Haller's testimony concerning the April 18 Memo is necessary to establish the NCFE's scheme to "age" its receivables in an effort to defraud investors.  Moreover, the government contends that because Mr. Haller's testimony will likely go directly to the issue of NCFE's alleged fraud, it stands to prejudice Poulsen, one of the founders and

-17-

principals of NCFE. Poulsen counters that Mr. Haller's testimony is unnecessary, and notes that the government's motion is a non-issue because the government has not yet established that it will definitely call Mr. Haller as a witness at trial. Further, Poulsen asserts that because this is a high profile case in which millions of documents are at issue, Mr. Haller is an irreplaceable assert for Defendants and, by extension, for defense counsel.

As a threshold matter, a review of the factors that contribute to a finding of necessity – the significance and weight of the evidence, as well as the availability of other evidence – weighs in the government's favor. While working at Purcell & Scott, Mr. Haller was a principal attorney for NCFE and NCFE affiliates during the Fresenius litigation. Further, Mr. Haller testified that while working on the Fresenius litigation, he became integrally involved with several NCFE principals, and was also made aware of possible flaws in NCFE's bookkeeping – flaws that he publicized in the April 18 Memo. Finally, it is also undisputed that by virtue of Katz's July 2005 waiver, UAT has waived all attorney-client and work product privilege of Purcell & Scott attorneys, such as Mr. Haller who worked for NCFE through the company's November 2002 bankruptcy. Accordingly, any information Mr. Haller learned regarding NCFE's business during his time with Purcell & Scott is not privileged.

Mr. Haller's potential testimony appears to be "necessary" as he is the only identified lawyer to have represented NCFE in the Fresenius litigation responsible for drafting the April 18 Memo, which, according to the government, highlights NCFE's alleged fraud. Also, Haller testified at the hearing that no other attorneys participated in many of his follow-up conversations with NCFE principals (many of whom are Defendants) in regards to the potential issues identified in the April 18 Memo. Further, Mr. Haller's knowledge of NCFE extends from 1998 through 2003, at which

point he asserts that he worked as a consultant for various law firms associated with NCFE's bankruptcy proceedings. Such extensive knowledge is vital to the government's case and Defendants' cases. Finally, the Court notes that the fact that the government may decide *not* to call Mr. Haller during the trial is not relevant to a current assessment of whether his potential testimony is "necessary." Because this case involves an extremely complex and multi-layered fraud, the Court does not expect the government or any of the Defendants to establish their witness lists more than a year before trial is set to commence.

At this stage of the litigation, it is not possible to assess the ultimate persuasiveness of the government's theory that Mr. Haller "put his finger" on NCFE's alleged fraud as early as 2001. At the same time, it does not appear to this Court to be a frivolous or unsupported theory. In any event, regardless of whether the government successfully establishes its theory at trial, it is quite likely that Mr. Haller has relevant testimony that could shed light on the issue of the Defendants' knowledge and/or state of mind as it pertains to their alleged fraud. *See United States v. Gouaz*, 2003 WL 22862653, at *3 (S.D. Fla. Oct. 7, 2003) (citing *United States v. Castellano*, 610 F. Supp. 1151, 1162 (S.D.N.Y. 1985) ("'[i]t is inconceivable that defendant's right to a particular counsel should be permitted to impose . . . artificial disadvantages upon the government,' by restricting whom it can call at trial.")); *see also, Grady v. United States*, 715 F.2d 402, 404 (8th Cir. 1983) ("The government cannot be expected to risk its case by not calling defense counsel if his testimony is important").

With regard to the prejudice element, it is clear that if Mr. Haller testifies about his representation of NCFE during the Fresenius litigation, or in any way provides information that might undermine the Defendants' assertions regarding NCFE's bookkeeping procedures, such

-19-

testimony could prejudice Poulsen.  For instance, should Mr. Haller's testimony indicate that Poulsen knew that NCFE "aged" its accounts receivable in an effort to defraud investors and/or rating companies, Mr. Haller's interests would be directly adverse to Poulsen's.

Further, in such a situation, Mr. Crawford would have an actual conflict of interest in his representation of Poulsen relating to his ability to cross-examine Mr. Haller.  Mr. Crawford has an interest in maintaining the reputation of the Shumaker firm, and an effective cross-examination of an attorney in Mr. Haller's position might include descrediting Mr. Haller's credentials and legal background, and, for all intents and purposes, discrediting the Shumaker firm where Mr. Haller is now a partner.  Accordingly, Mr. Crawford would likely be torn between either effectively cross-examining Mr. Haller and damaging the Shumaker firm's reputation or refraining from effectively cross-examining Mr. Haller and undermining Poulsen's case.  *See United States v. Locascio*, 357 F. Supp. 2d 536, 556 (E.D.N.Y. 2004) (the possibility that a lawyer might have to cross-examine another lawyer in his firm at trial in an effort to undermine the government's argument that the defendant relied on that firm for sound legal advice, would prejudice the defendant); *see also, United States v. Schlesinger*, 335 F. Supp. 2d 379, 384 (E.D.N.Y. 2004) (discussing conflict of interest arising where lawyer is a potential witness and has a personal interest in protecting the reputation of his firm); *United States v. Gotti*, 9 F. Supp. 2d 320, 324 (S.D.N.Y. 1998) (explaining that the attorney-client relationship with a witness or co-defendant can give rise to a continuing obligation of confidentiality that may be breached when confidences are exploited during cross-examination or an ineffective cross-examination may occur if prior confidences are respected).

Other courts have found the potential problems caused by cross-examination of an advocate-witness to be sufficient to support his law partner's disqualification.  *See, e.g., Locascio*, 357 F.

Supp. 2d 555-56; *Schlesinger*, 335 F. Supp. 2d at 384 (because the attorney and firm in question were implicated in defendant's criminal activity, and because they had formerly represented Schlesinger, defendant's alleged co-conspirator, he would be limited in their ability to cross-examine Schlesinger, constraining his representation of defendant).  In *Locascio*, the government brought racketeering and related charges against seven defendants, all alleged members or associates of the "Gambino Family of La Cosa Nostra." *Id*. at 539.  At the same time that multiple defendants filed motions for severance, the government moved to disqualify counsel for defendant Chanes, Mr. Wing, and his firm, Weil Gotshal & Manges LLP ("Weil Gotshal"), citing the existence of an actual conflict of interest.  *Id*.  Specifically, the government asserted that disqualification was necessary because Ms. Jaffe, a partner at Weil Gotshal who had provided legal advice to Chanes in the past, would likely be called as a government witness in the case, and because Mr. Wing had represented another government witness in the past.  *Id*. at 547.

The *Locascio* court engaged in a detailed discussion of the disqualification issue, beginning with the conclusion that if Chanes chose to assert the affirmative defense that he had relied on the advice of counsel in carrying out any allegedly illegal actions, he would waive his attorney-client privilege relating to the application of the Fair Trade Commission ("FTC") standards.  *Id*. at 553. Next, the court considered whether Mr. Wing was subject to disqualification under the advocate-witness rule.  *Id*. at 554.  One of the primary considerations in the court's discussion of whether Chanes could be prejudiced by the representation of Weil Gotshal was whether Mr. Wing would be able to cross-examine Ms. Jaffe effectively at trial.  *Id*. at 555-56.  The court explained:

> An effective cross-examination of Ms. Jaffe might include challenging her competency and credentials in the area of trade practices; the quality of her – and by definition, Weil Gotshal's – prior representation of [defendant].  As a partner of the same firm, Mr. Wing certainly has an interest in maintaining the reputation of his firm; a cross examination in

which a goal will be to undermine the government's contention that his firm provided "ethical, quality legal advice, at a reasonable rate," could certainly present a conflict of interest for Mr. Wing.

*Id*. In the end, the *Locascio* court found that Ms. Jaffe's testimony would likely be prejudicial enough to Chanes to warrant Mr. Wing's, and by extension, Weil Gotshal's, disqualification. *Id*. at 557-58.

Though there are superficial similarities between this cases and *Locascio*, this Court finds that *Locascio* does not control. Both cases involve complex multiple defendant fraud allegations, where the government moved to disqualify a defendant's attorney based, in part, on its plans to call another lawyer from his firm to testify at trial. Mr. Haller's testimony, however, does not appear to be as damaging to Poulsen as the testimony at issue in *Locascio*. In *Locascio*, Chanes contended that he intended to assert the affirmative defense that he had relied on the advice of Ms. Jaffe in determining whether his actions complied with FTC regulations and requirements. *Locascio*, 357 F. Supp. 2d at 556.[11] Thus, Ms. Jaffe's testimony that she gave "good advice" directly contradicted his defense. *Id*. In this case, however, Poulsen has not indicated that he intends to rest on an affirmative defense that his allegedly wrongful actions were carried out in reliance on representations made by NCFE counsel, such as Mr. Haller. Without such an indication, it is unclear whether Mr. Haller's potential testimony will contradict Poulsen's defense at triall. To the Court's

---

[11]The Court notes that the *Locascio* court also chose to disqualify Mr. Wing based on his prior representation of Mr. Caine, Chanes' former co-defendant who the government planned to call as a witness at trial. *See Locascio*, 357 F. Supp. 2d at 557 ("Although it is likely that this conflict, standing alone, would not serve as grounds for disqualification – given Chanes' willingness to waive any conflict of interest, and to accept limitation of Mr. Caines' cross-examination to non-privileged matters – taken in conjunction with the additional conflict of interest discussed in detail above, it further supports this Court's decision to disqualify Weil Gotshal as counsel for Chanes."). In this case, however, the only potential conflict at issue is Mr. Haller's status as a potential advocate-witness.

knowledge at this time, Mr. Haller's testimony could indicate that Poulsen was not directly involved with any alleged wrongdoing relating to NCFE's books, making it *exonerating* rather than *incriminating*. The government has provided no evidence linking knowledge of the alleged fraud, which it asserts was set forth by Haller in the April 18 Memo, to Poulsen. Accordingly, though the Court recognizes that Mr. Haller's status as a potential witness raises possible conflicts, as of now, the government has failed to establish that these conflicts show a substantial likelihood of prejudice to Poulsen should Crawford and the Shumaker firm continue to serve as co-counsel. The existence of a mere possibility of prejudice is not enough, especially where resting on such tenuous, speculative evidence would deprive Poulsen of his Sixth Amendment right to counsel of his choice. *See Shabbir*, 2005 WL 4652518, at *6 (finding disqualification inappropriate in the face of speculative evidence); *Paramount Communications*, 858 F. Supp. at 395 ("[t]he conjuring of 'perhaps possible' scenarios [by the moving party] is inadequate grounds for a demonstration of the need to call an attorney to testify").

The Court also notes that any conflict resulting from Mr. Crawford's cross-examination of Mr. Haller may be overcome by having Poulsen's lead counsel, Mr. Tyack, conduct the cross-examination. Mr. Tyack is not a member of the Shumaker firm, and, therefore, does not have the same vested interest in maintaining that firm's reputation as Mr. Crawford would have. Further, though in *Locascio*, the court found that Ms. Jaffe's testimony was too integral to the litigation to be overcome by having independent counsel conduct the cross-examination, in this case, Mr. Haller's testimony, though certainly helpful in shedding light on the Fresenius litigation, is likely not the lynchpin of this sixty-count case. Thus, should Mr. Haller be forced to testify at trial, and

assuming that Mr. Crawford and the Shumaker firm are still co-counsel with Mr. Tyack, the Court orders Mr. Tyack to cross-examine him.

As a final consideration, this Court notes that in the face of the recent Supreme Court holding in *United States v. Gonzalez-Lopez*, 126 S.Ct. 2557 (2006), it is increasingly wary of disqualifying an attorney in the face of murky evidence. *See United States v. Liszewski*, 2006 WL 2376382 (E.D.N.Y. Aug. 16, 2006) (discussing the changes caused by the Supreme Court's recent decision in *Gonzalez-Lopez*). In *Gonzalez-Lopez*, the Supreme Court held that where a defendant's Sixth Amendment right to counsel of his choice is violated because the disqualification of his chosen counsel was *erroneous*, no additional showing of prejudice is required to make the violation complete, and he is entitled to reversal of his conviction, as the error qualified as a "structural error" not subject to review for harmlessness. *See Gonzalez-Lopez*, 126 S.Ct. at 2557. In other words, pursuant to *Gonzalez-Lopez*, if a district court *wrongly* disqualifies a defendant's chosen counsel, "[that] defendant is granted *automatic* reversal on appeal, notwithstanding the fact that the ensuing trial was by all accounts fair." *See Liszewski*, 2006 WL 2376382, at *8. Accordingly, where past courts have erred on the side of disqualification, *Gonzalez-Lopez* suggests that in this case, the Court should err on the side of permitting Poulsen to hire counsel of his choosing. *See* 126 S.Ct. at 2557.

On the face of the record currently before this Court and after considering the applicable law and precedent in the disqualification of counsel context, the Court is not convinced that the conflict posed by Mr. Haller's potential status as an advocate-witness is so severe that the Court cannot conclude with confidence that Poulsen could not intelligently desire Mr. Crawford's representation. At this time, though Mr. Haller may possess information relevant to the alleged scheme, the

government has failed to meet its burden to show that an actual conflict exists that would give the Court pause in allowing Mr. Crawford and the Shumaker firm to continue to represent Poulsen.

This Court notes, however, that its ruling on the government's motion at this time is not final. *See, e.g. Standard Quimica de Venezuela, C.A. v. Central Hispano Int'l., Inc.*, 179 F.R.D. 64, 65-66 (D. Puerto Rico 1998) (because plaintiffs had not shown the attorney in question was a necessary witness and/or that he was the only individual with the knowledge for which plaintiffs sought his testimony, the court found that a determination of his disqualification was premature, explaining that, "[i]f it later becomes likely that [the attorney] is the only individual with the relevant knowledge, [p]laintiffs' renewal of their motion will be in order, but only to prevent him from acting as advocate at trial . . ."). Should the government renew its motion at a later date with new evidence establishing that Mr. Haller's testimony would substantially prejudice Poulsen, the Court will reconsider the issue. Poulsen is already represented by Mr. Tyack, extremely capable counsel, and Mr. Crawford has indicated that there is substitute counsel waiting to replace him and the Shumaker firm should they be disqualified at any point.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the government's motion to disqualify Mr. Crawford and the Shumaker firm from serving as counsel for Poulsen in this case. In the event that Mr. Haller is called as a witness at trial, and Mr. Crawford and the Shumaker firm are still co-counsel with Mr. Tyack, the Court orders that Mr. Tyack must cross-examine him.

**IT IS SO ORDERED.**

      **s/Algenon L. Marbley**

**ALGENON L. MARBLEY**

**UNITED STATES DISTRICT JUDGE**

**DATED: September 12, 2006**