IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. CR2-06-129 |
| | : | JUDGE ALGENON L. MARBLEY |
| LANCE K. POULSEN, et al., | : | |
| | : | |
| Defendants. | : | |

## I.  INTRODUCTION

Defendant Lance K. Poulsen has been on pretrial release since May 22, 2006, in connection with white-collar fraud charges brought against him.  On October 23, 2007, following Poulsen's arrest on new federal charges of conspiracy to engage in obstruction of justice and witness tampering, the Government moved to revoke Poulsen's pretrial release.  As described more fully below, the Court concludes that there are no conditions of pretrial release that will reasonably ensure that Poulsen will neither interfere with the proceedings of this Court, nor flee.  The Court therefore **GRANTS** the Government's motion and **ORDERS** Poulsen to remain in custody pending trial.

## II.  BACKGROUND

Between 1991 and 2002, Poulsen was the President and Chief Executive Officer of National Century Financial Enterprises ("NCFE"), a healthcare financing company headquartered in Dublin, Ohio.  On May 19, 2006, Poulsen, along with several other NCFE executives, was indicted on numerous counts of securities fraud, wire fraud, and money

laundering in connection with his operation and management of NCFE.  If convicted, Poulsen faces a sentence of 360 months to life in prison.

Following his indictment, a magistrate judge in the Middle District of Florida, the jurisdiction in which Poulsen resides, ordered him released pending trial.  In a written order dated May 22, 2006, the Florida magistrate judge imposed several conditions on Poulsen's release.  The very first of these provided:  "The defendant **shall not commit** any offense in violation of federal, state or local law while on release in this case."  The order advised Poulsen that if he violated any of the conditions of his release, he could be incarcerated pending trial. The order further notified Poulsen of the stiff penalties associated with obstruction of justice and witness tampering, stating: "Federal law makes it a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to obstruct a criminal investigation.  It is a crime punishable by up to ten years of imprisonment, and a $250,000 fine or both to tamper with a witness, victim or informant . . . ."  Poulsen signed the magistrate judge's order, thereby acknowledging his understanding of the conditions of his release.

On October 23, 2007, Poulsen was indicted on charges of conspiring to engage in obstruction of justice and witness tampering in violation of 18 U.S.C. § 371.  The Government alleges that Poulsen sought to persuade a witness, identified in the indictment as "Witness A,"—a former NCFE executive who has pleaded guilty to participating in the fraud conspiracy—to alter her expected testimony to benefit Poulsen.  Poulsen never met or communicated directly with Witness A, but instead used Karl Demmler, a longtime acquaintance, as an intermediary.  Demmler told Witness A that he was contacting her at Poulsen's behest, in order to help Poulson win his criminal case.  In exchange for payment from

Poulsen, Witness A was to provide favorable testimony on his behalf.  Demmler instructed Witness A that she need not lie, but that she should develop "amnesia" and suffer memory lapses in her discussions with prosecutors.  The Government collected incriminating evidence against both Poulsen and Demmler through wire-intercepts and consensual recordings.  In one recorded conversation between Poulsen and Demmler, Poulsen evinced his agreement with the strategy of urging Witness A to feign forgetfulness.  According to the criminal complaint, in a call on September 28, 2007, Poulsen and Demmler

> discussed how Witness A did not have to lie but rather, as Demmler stated, Witness A could have memory loss, to which Poulsen replied 'yep' . . . Demmler told Poulsen that Witness A would be meeting with prosecutors all day so he was going to request that Witness A have a[n] 'amnesia day,' to which Poulsen replied, 'yeah.'

The recordings collected by the Government also capture conversations between Poulsen and Demmler discussing how to arrange payments for Witness A.  They allegedly settled on a scheme whereby Poulsen would give Demmler monthly checks totaling around $5,000, but never exactly $5,000, apparently to avoid detection.  Demmler, in turn, was to withdraw the money from his account and pay Witness A, also taking pains to avoid detection by making sure he did not withdraw the same amount as he deposited from Poulsen.

Finally, the whole plot concocted by Poulsen and Demmler was contingent on Witness A firing her attorney and retaining new counsel identified by Poulsen.  For example, in a phone call on October 11, 2007, Demmler told Poulsen that the Government prosecutors were trying to set up a meeting with Witness A.  According to the criminal complaint, Poulsen responded that, "if Witness A fires her attorney and hires a new one then she does not have to meet with

3

prosecutors. Poulsen also said that if Witness A does that then they will "help" her because "that will definitely win the white collar case."

On October 19, 2007, following the filing of the criminal complaint on the new conspiracy-to-obstruct-justice and witness-tampering charges, Poulson appeared before a federal magistrate judge in the Middle District of Florida. The magistrate judge found that Poulsen represents a significant flight risk owing to the lengthy prison sentence he is facing, which includes not only the 360 months to life applicable to his underlying criminal fraud charges, but an additional term of imprisonment for the new obstruction and witness-tampering charges. Poulsen is presently sixty-four years old. The magistrate judge concluded that, even if Poulsen is sentenced to less than the maximum term of imprisonment for which he is eligible, he still could end up serving a life sentence, given his age. Further, the magistrate judge found that Poulsen's alleged attempts to obstruct justice show that he does not trust the judicial system. Since his obstruction efforts have failed, reasoned the magistrate judge, "there is every reason to think that the defendant would flee in order to avoid the severe sentence that he is facing . . . ." The magistrate judge therefore ordered Poulsen detained pending further order of this Court. On October 23, 2007, the Government moved this Court to revoke Poulsen's release.

### III. ANALYSIS

The Court's authority to order criminal defendants detained pretrial, or to revoke their pretrial release, is governed by the Bail Reform Act, 18 U.S.C. § 3141 *et seq.* Section 3142 embodies a preference for pretrial release; detention may be ordered only when a court concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §

3142(e); *see also United States v. Holloway*, 781 F.2d 124, 125 (8th Cir. 1989) ("The statute favors release over detention for the majority of accused persons . . ."). Under § 3148, however, if a defendant who has been released pretrial violates a condition of his release, a court may revoke his release and order him detained. Even more importantly for our purposes here, § 3148(b) provides that if there is probable cause to believe that a defendant has committed "a Federal, State, or local felony," while on pretrial release, "a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community."

Poulsen concedes that the October 23, 2007 indictment charging him with conspiracy to commit obstruction of justice and witness tampering is sufficient to establish probable cause that he has committed a federal felony while on pretrial release. Poulsen further acknowledges, as he must, that the probable-cause finding triggers the rebuttable presumption that he must be detained pretrial.

The question before the Court, then, is whether Poulsen has succeeded in overcoming the presumption in favor of detention. He makes several arguments, including that: (1) his motives for communicating with Witness A were not nefarious and the Government does not allege that he employed violence or intimidation to compel her to cooperate with him; (2) he was facing a lengthy prison sentence before being charged with obstruction and witness-tampering, such that if he was going to flee, he would have done so already; (3) the month he has spent in jail as a result of the Florida magistrate judge's detention order has been so difficult to bear that he is determined to refrain from any conduct that could again land him behind bars; (4) his conduct in connection with the obstruction and witness-tampering charges is less incriminating than that of

5

his co-defendant, Karl Demmler, who this Court ordered released pretrial; (5) he is a well-respected businessman with strong ties to his community in Florida; and (6) detaining Poulsen pretrial will hamper his defense in the underlying criminal fraud case because it will impair his ability to confer freely with counsel and prevent him from maintaining gainful employment with which to pay for his defense. These considerations, says Poulsen, are sufficient to provide the Court with reasonable assurances that he will not become a fugitive from justice or pose any risk of harm, including harm to the integrity of the judicial process. Poulsen also says that he is prepared to submit to whatever conditions of release the Court deems necessary. He suggests that house arrest, electronic monitoring, and restrictions on the use of his telephone and cellphone, among other things, would be appropriate. The Court will address each of Poulsen's arguments in turn.

**A. Poulsen's Arguments in Support of His Release**

*1. Poulsen's Communications With Witness A*

First, Poulsen argues that the evidence does not show that he sought improperly to influence Witness A's testimony. Far from trying to persuade her to lie, Poulsen claims that his goal was to get Witness A to be more expansive in her description of the facts. Poulsen apparently felt that Witness A ended up hamstrung by providing the Government with a too-limited explanation of events; if she were more thorough, he was confident that he would be cleared of any wrongdoing.

Poulsen supports his argument by submitting excerpts of the Government's recordings. He claims that these excerpts show that he was not motivated by any improper purpose in his dealings with Witness A. Poulsen also has submitted attorney correspondence showing that he

was working with his former counsel to arrange a meeting with Witness A so that she could be interviewed, and presumably offer the complete narrative that Poulsen believed would exonerate him. Poulsen contends that involving his counsel in arranging such a meeting with Witness A is inconsistent with his alleged intent to corruptly influence her testimony.

Of course, the merits of the obstruction and witness-tampering charges are not presently before the Court, nor do they figure into the analysis regarding whether Poulsen's pretrial release should be revoked. The scope of the inquiry before the Court is limited to determining whether there is probable cause to believe that Poulsen committed felony offenses while on release, and even Poulsen concedes that there is. That said, the Government's allegations are nonetheless relevant to whether Poulsen poses a threat to the integrity of the judicial proceedings of this Court. On that score, Poulsen's attempt to portray his actions as benign is an exceedingly difficult pill to swallow. If Poulsen's intent in communicating with Witness A was merely to persuade her to give more robust testimony, one cannot help but wonder why he used an intermediary—Demmler—to communicate with her; why he and Demmler spoke of Witness A in code, referring to her as "our friend," and "Mary," which was not her real name; why he was seeking to structure payments to her; why he sometimes told Demmler that he needed to get to a "secure" line before they could talk, or that he was on a "secure" line; and why he insisted that Witness A fire her attorney and retain a new attorney, approved by him, before they proceeded. These allegations are sufficient to suggest that Poulsen's motives were not pure. They are also sufficient to suggest that Poulsen is not confident that he will be vindicated in a criminal proceeding free of manipulation, and that he is willing to take extraordinary risks to engineer a favorable outcome for himself. In short, the Court concludes that the obstruction and witness-

tampering allegations against Poulsen represent a threat to the impartial administration of justice and that the Court cannot assume, on the bare say-so of Poulsen's counsel, that Poulsen will not engage in such tactics again.

The Court's conclusion is supported by the Second Circuit's decision in *United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000), the facts of which are virtually indistinguishable from those here. LaFontaine, like Poulsen, had been on pretrial release when the Government moved to revoke on the grounds that she had violated the conditions of her release by engaging in witness tampering. The district court granted the Government's motion after finding that the rebuttable presumption of detention applied because there was probable cause to believe that LaFontaine committed federal offenses while on release—again, just like the circumstances here. The Second Circuit affirmed, holding that even though LaFontaine did not use violence or threats of violence in committing witness tampering, the very act of witness tampering may satisfy the "dangerousness" requirement for detaining a defendant pretrial, due to the threat such conduct poses to the integrity of the trial process.

### 2. *The Severity of Poulsen's Possible Sentence*

Poulsen next argues that the enhanced sentence he now faces as a result of the obstruction and witness-tampering charges does not provide grounds to believe that he is a flight risk because he was already facing a lengthy prison term—360 months to life—on the underlying criminal fraud charges. If he was going to flee, insists Poulsen, he would have done so already. This argument is not without persuasive force, but the Court notes, as did the Florida magistrate judge, that now that Poulsen's plans for Witness A have been thwarted, he may feel that his chances for exoneration are so slim as to make escape a much more appealing choice

than it once was. Moreover, Poulsen's contention that if flight was his goal, he would have acted on it already, is undercut by another of his arguments, namely, his eagerness to get out of jail. Poulsen says that his experience of being incarcerated over the last month has left him determined to avoid any missteps that could again jeopardize his liberty. If Poulsen has found the relatively brief period he has spent in jail thus far to be inhospitable, the prospect of 360 months to life in prison might be enough to convince him that flight is his best, indeed only, option. When one further considers the apparently substantial resources that Poulsen has available, which could be used to finance his flight, the conclusion that he poses at least some risk of absconding becomes—no pun intended—inescapable.

*3. Poulsen's Conduct Compared to Demmler's*

Third, Poulsen contends that the Government's allegations in the criminal complaint show that Demmler's conduct was more egregious than his own because only Demmler had direct contact with Witness A and most of the incriminating statements cited by the Government were Demmler's. It follows, says Poulsen, that since this Court declined to detain Demmler pretrial, it should also decline to detain Poulsen. This argument ignores a significant distinction between the two defendants: The rebuttable presumption of detention did not apply to Demmler, but it most assuredly applies to Poulsen. The Government bore the burden of overcoming the statutory preference for release in Demmler's case, whereas here, Poulsen bears the burden of proving that he should not be detained. In addition, there is a critical difference between attempting to obstruct justice for financial gain, as Demmler is accused of doing, and attempting to obstruct justice to avoid criminal penalties in an ongoing judicial proceeding, as Poulsen is accused of doing. Poulsen's involvement in seeking to tamper with his own case suggests that

9

he poses both a greater risk of flight and a greater risk of again engaging in improper conduct than does Demmler.

### 4. Poulsen's Character

Fourth, Poulsen argues that he is a well-regarded member of his community in Florida, with a history of civic involvement and close ties to family and friends. Poulsen proffers three letters of reference from business colleagues and friends, who attest to his good character and trustworthiness. The letters are apparently intended to assure the Court that Poulsen will abide by his conditions of release. If Poulsen's case was before the Court for an initial determination as to whether he should be detained or released, such expressions of confidence in Poulsen's integrity would be significantly more meaningful than they are now. As it is, Poulsen has forfeited whatever benefit of the doubt to which he might otherwise have been entitled. Thus, the good opinion of Poulsen's friends and colleagues is entitled to little weight in light of the present facts.

### 5. Poulsen's Capacity to Defend Himself if Detained Pretrial

Next, Poulsen contends that his ability to defend himself adequately will be adversely affected if he is detained pretrial. In particular, Poulsen says that he needs to be able to continue working to generate income so that he can retain competent counsel to represent him in the underlying criminal fraud case. No doubt a regular income would help Poulsen attract top defense counsel, but the Bail Reform Act nowhere suggests that a defendant's pecuniary needs as they relate to retaining counsel is a valid consideration in deciding whether to revoke his pretrial release. Poulsen knew that he could be sent to jail if he violated any of the conditions of his release. He would have done well to consider his financial needs vis-à-vis his legal bills

before he undertook the acts giving rise to the obstruction and witness-tampering charges against him.  Moreover, Poulsen's assets are not paltry.  In a Pretrial Services report prepared on May 22, 2006, Poulsen disclosed assets of $1 million in a retirement account, ownership of a residence valued at $1 million, and $150,000 in his bank accounts.  The Court has no trouble concluding that Poulsen will be able to secure capable counsel with these resources.

For all the reasons described above, the Court concludes that Poulsen has not overcome the presumption in favor of detention.  Moreover, as explained below, Poulsen's own statements before this Court have cemented his fate.

### B.  Pretrial Detention is Proper

#### 1.  *Poulsen's Representations to the Court About His Employment Status*

At his arraignment on November 14, 2007, and his revocation hearing the following day, Poulsen made a series of statements to the Court about his employment status that appear to be less than fully candid, if not worse.  Poulsen represented to the Court at his arraignment that he is the "managing member" of MTL Enterprises in Florida, which has a "substantial stake in a large imaging center."  Poulsen further explained that his duties included "financing, the bank relationships, and obtaining leasing of the equipment" and that he and his partners were all "very deeply involved in the cancer research that our center started approximately a year and a half ago."  The following day, at Poulsen's revocation hearing, the Government produced an October 26, 2007 corporate resolution from "Advanced Imaging of Port Charlotte, LLC," severing Poulsen as "managing member" and eliminating all his duties and responsibilities.  Poulsen disclaimed any prior knowledge of the corporate resolution and professed his belief that he still has active employment in Florida.  In response to a direct question from the Court about whether

11

Poulsen knew at his arraignment that he had been severed from Advanced Imaging, Poulsen responded, "No, sir, I did not know that."

On November 16, 2007, one day after the revocation hearing, the Government submitted a letter on Advanced Imaging letterhead, dated November 15, 2007, stating that Poulsen "has no further operational duties or responsibilities for any of the business entities which we own and operate in the State of Florida"; that "[a]t no time was Mr. Poulsen involved in 'cancer research,'" and that their business "is not 'very deeply involved' in cancer research as Mr. Poulsen falsely informed the Court"; and that "Barbara Poulsen was directly informed by us of her husband's termination from all business operational duties and responsibilities on or about October 26, 2007." Attached to the Advanced Imaging letter were a series of corporate resolutions, dated October 26, 2007, terminating Poulsen's status as a member of each of the corporate entities he and his business partners owned, including Advanced Imaging, MTL Investments, MTL Real Estate Investments, Tamiami Health Center, and Tamiami Medical Billing Services.

The Court has serious concerns that Poulsen did not accurately describe his true employment status at either his arraignment or his revocation hearing. Poulsen acknowledged that his wife represented him in connection with at least certain of his business interests in his absence. It seems almost inconceivable that he would not have learned through her of his termination. Nonetheless, Poulsen represented to the Court in response to two direct questions that he did not know about the corporate resolutions severing him as a partner. The real possibility that Poulsen may not have been entirely truthful with the Court further suggests his

contempt for judicial authority, giving the Court little reason to believe that he will respect any conditions of pretrial release.

### 2. *No Available Conditions of Release*

Given the foregoing considerations, the Court concludes that there are no conditions of release that will reasonably ensure that Poulsen will not attempt to interfere with the proceedings against him, or that he will not flee. House arrest and electronic monitoring would go a long way to ensuring Poulsen's appearance, but they are not guarantees. *See LaFontaine*, 210 F.3d at 135 ("Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.") (quotation marks and citation omitted). More importantly, there is no way that the Court can effectively monitor Poulsen's use of his telephone and cellphone to prevent him from having improper contact with other witnesses. Although Poulsen proposes that the Court subject him to restrictions on his telephone/cellphone use, the Court has no reliable way to police Poulsen's compliance with such restrictions. Even if he were not using his own telephone or cellphone to perpetrate a scheme like the one he is accused of engaging in with Demmler, he could easily borrow the cellphones of friends or family and accomplish the same result. In fact, the Government claims that Poulsen placed calls to Demmler using the cellphones of his co-defendants' attorneys. All of this, of course, says nothing about Poulsen's email, which he could also use, and allegedly has used, to contact witnesses. Simply put, in our electronic age of ubiquitous and rapid communication devices, the Court is ill-equipped to supervise Poulsen's conduct. There are thus no conditions of release that will reasonably ensure that Poulsen does not again step over the line.

## IV. CONCLUSION

The Court hereby **GRANTS** the Government's motion to revoke Poulsen's release (docket no. 389) and **ORDERS** him to remain in custody pending his trial.

**IT IS SO ORDERED.**


    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**United States District Court Judge**


**DATE: November 20, 2007**