**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. CR2-06-129** |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **Magistrate Judge Terence P. Kemp** |
| **LANCE K. POULSEN, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

## I. INTRODUCTION

Defendant James Dierker has moved to dismiss the indictment against him and for production of the testimony and documents presented to the grand jury that returned the indictment. For the reasons described below, the Court **DENIES** both of Dierker's motions.

## II. BACKGROUND

### A. The Alleged Fraud at NCFE

Dierker served as a senior executive at National Century Financial Enterprises, Inc. ("NCFE"), a now defunct healthcare financing company based in Dublin, Ohio. Dierker and several of his NCFE colleagues were indicted in May 2006 in connection with numerous charges of securities fraud, wire fraud, and money laundering, among other things. The grand jury returned a twenty-seven count superceding indictment on July 10, 2007.

NCFE financed healthcare providers by purchasing the providers' accounts receivable. NCFE raised the capital to buy the accounts receivable by selling asset-backed bonds to large institutional investors, such as pension funds and investment firms, through its subsidiaries, NPF

VI, Inc. and NPF XII, Inc. The Government alleges that NCFE told investors that the receivables served as collateral for the NPF VI and NPF XII bonds. Because the bonds were supposedly backed by the receivables, investors were led to believe that the bonds were safe and reliable. In truth, contends the Government, between 1995 and 2002, Defendants engaged in a scheme to defraud whereby they advanced investor funds to healthcare providers without getting qualified receivables in return. This converted the investors' bonds from what they believed to be highly secure assets to risky unsecured loans to the healthcare providers. The Government alleges that Defendants' scheme created shortfalls in the NPF VI and NPF XII accounts—since Defendants were outlaying cash to the healthcare providers without getting receivables in return—that Defendants concealed from investors through a variety of ploys, including falsifying their financial data. Further, the Government contends that Defendants Lance Poulsen, Donald Ayers, and Rebecca Parrett engaged in self-dealing. These three Defendants allegedly held undisclosed ownership interests in the healthcare providers funded by NCFE, and in that capacity, i.e., as owners of the healthcare providers, misappropriated the investor funds advanced by NCFE.

**B. Dierker's Alleged Role in the Fraud Scheme**

Dierker served as the Associate Director of Marketing and later Vice President of Client Development at NCFE. According to the indictment, "[h]e was responsible for developing and managing the relationship between NPF VI and NPF XII and healthcare providers." Dierker is charged in five counts of the superceding indictment for improperly advancing investor funds totalling $1.39 million to California Psychiatric Management Services ("CPMS") on two occasions without purchasing the required amount of accounts receivable. The Government

alleges that Poulsen, Ayers, and Parrett held ownership interests in CPMS.

## III. ANALYSIS

### A. Dierker's Motion to Dismiss

Dierker argues that the charges against him should be dismissed because the Government either failed to adequately investigate the facts surrounding his allegedly fraudulent conduct or deliberately ignored those facts. Had the Government let the evidence speak for itself, Dierker says that it is "virtually impossible to believe" that the grand jury would have indicted him. That evidence, he argues, shows that when he authorized the fund transfers to CPMS, he was acting pursuant to a federal bankruptcy court order which appointed NPF X, another NCFE subsidiary, as a Debtor-In-Possession ("DIP") lender for CPMS. CPMS filed a bankruptcy petition in 2000. Dierker says that consistent with the bankruptcy court's order, the DIP financing for CPMS was supposed to come from NPF X, which did not contain investor dollars, and therefore was not subject to the same use restrictions—the purchase of accounts receivable—as NPF XII.

Of course, the indictment does not charge Dierker with improperly advancing funds out of NPF X, but with improperly advancing funds out of NPF XII. Again, Dierker claims that the Government failed to put the relevant facts before the grand jury, namely, facts establishing that he served merely in a ministerial capacity in requesting the fund transfers to CPMS from NCFE's Funding Department, and that it was beyond the scope of his authority and control to verify that the transfers were made out of NPF X, rather than NPF XII. Dierker also argues that Bank One, as Trustee of NPF XII, was charged with overseeing all transactions involving NPF XII, and thus bears ultimate responsibility for failing to catch the improper transfers.

In sum, Dierker argues that the Government committed prosecutorial misconduct in

failing to present these facts—the bankruptcy court's order,[1] the limited scope of his job duties and authority, and the role of the NPF XII Trustee—to the grand jury. He therefore seeks dismissal of the indictment.

A district court may exercise its discretion to grant a motion dismissing an indictment. *United States v. Overmyer*, 899 F.2d 457, 465 (6th Cir. 1990). However, "grand jury indictments are presumed valid" and therefore are not to be lightly disturbed. *Id.*; *United States v. Powell*, 823 F.2d 996, 1000 (6th Cir. 1987) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits.") (quoting *Costello v. United States*, 350 U.S. 359, 362-63 (1956)). Further, although prosecutorial misconduct in grand jury proceedings is an exception to the deference generally owed facially valid indictments, in the Sixth Circuit a defendant must show both that "prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in [the] district" and that the defendant was actually prejudiced by the prosecution's conduct. *United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir. 1985); *accord United States v. Goldsby,* 2005 F. App'x 687, 690-91 (6th Cir. 2005).

Dierker does not even attempt to satisfy the first prong of the *Griffith* test. He does not claim that the federal prosecutors in this District are error prone in conducting grand jury proceedings. Second, Dierker cannot show that he has suffered prejudice as a result of the

---

[1]As discussed below, grand jury proceedings are secret, so the Court does not know what evidence the Government presented to the grand jury. It appears, however, that the Government made at least some mention of the bankruptcy-court order because paragraph sixty-four of the superceding indictment, pertaining to counts twenty-five and twenty-six, states that, "Dierker improperly diverted investor funds to a healthcare provider owned by Poulsen, Ayers and Parrett *to provide bankruptcy financing to that entity*" (emphasis added).

prosecutors' actions. Prejudice warranting dismissal of an indictment exists "only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (internal quotation marks and citation omitted).

Dierker premises his claim of prejudice on the theory that the Government was obligated to disclose exculpatory evidence to the grand jury. But in *United States v. Williams*, 504 U.S. 36 (1992), the Supreme Court held that federal prosecutors have no such duty. The Court reasoned that the grand jury device lies outside any of the three branches of government and that compelling prosecutors to present exculpatory information would transform the grand jury "from an accusatory to an adjudicatory body." *Id.* at 51. The purpose of the grand jury, stated the Court, is "not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Id.*; *see also Costello*, 350 U.S. at 363 (stating that allowing indictments to be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury" would have the undesirable consequence of enabling defendants to "insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury"). Thus, prosecutorial misconduct cannot be said to have occurred on the basis of the Government's alleged non-disclosure of purportedly exculpatory evidence here, including the orders of the bankruptcy court appointing NPF X the DIP lender for CPMS, information about the scope of Dierker's job responsibility and authority, and information about the supervisory duties of Bank One, as Trustee of NPF XII.

Moreover, contrary to Dierker's arguments, it is not a foregone conclusion that if the

Government had introduced to the grand jury the evidence favored by Dierker, he would not have been indicted. The grand jury still could have found probable cause to believe that Dierker knew that the fund transfers to CPMS came out of NPF XII, and that NPF XII did not receive any accounts receivable in return. The proper audience for Dierker's arguments is the trial jury in this matter, not the Court on a motion to dismiss the indictment.

Finally, to the extent Dierker relies on the "outrageous government conduct" doctrine, such reliance is misplaced. As the Government correctly points out, this doctrine has to do with law enforcement's "over-involvement" in crime, i.e., where law enforcement agents help set the conditions for criminal activity to occur. *See e.g., Hampton v. United States*, 425 U.S. 484, 495 n.7 (1976) (stating that "police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction"); *United States v. Barger*, 931 F.2d 359, 362-64 (6th Cir. 1991) (holding that the government did not engage in outrageous conduct when it used a paid informant to encourage the defendant to commit criminal acts); *United States v. Foster*, 835 F. Supp. 360, 365 (E.D. Mich. 1993) (distinguishing between the defenses of entrapment and outrageous government conduct by describing entrapment as a "defense of fact," and outrageous government conduct as a "legal defense [that] applies only if the government violated defendant's constitutional rights to such an extent that a court should not allow the government to prosecute him, regardless of his predisposition to commit a crime"). Dierker's allegations are just the opposite of what they would have to be to validly invoke the outrageous-government-conduct doctrine: He argues not that the Government was too involved in setting the stage for the criminal acts he is accused of committing, but that the Government did not do

enough to investigate the facts of his conduct and present those facts to the grand jury. Dierker's outrageous-government-conduct argument therefore fails.

For all of the foregoing reasons, Dierker's motion to dismiss the indictment is **DENIED**.

**B. Dierker's Motion for Production of Grand Jury Testimony and Documents**

Dierker also moves for disclosure of the evidence and testimony the Government presented to the grand jury to procure his indictment. Federal Rule of Criminal Procedure 6(e)(3)(E) allows courts to order the disclosure of grand jury materials upon a showing "that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." However, there is a "stong policy in favor of maintaining the secrecy of grand jury proceedings." *United States v. Azad*, 806 F.2d 291, 294 (6th Cir. 1986). To overcome this presumption is no easy task. Dierker must show "compelling necessity" such that there is "proof that without access to the grand jury materials, [his] position would be greatly prejudiced or an injustice would be done." *FDIC v. Ernst & Whinney*, 921 F.2d 83, 86 (6th Cir. 1990) (internal quotation marks and citation omitted).

Dierker sets forth in his motion the specific documents that he wants the Government to produce, documents which he concedes he already has. Dierker's purpose is to prove both a negative—that the Government did not present to the grand jury certain documents he regards as exculpatory—and the speculative—that had the Government presented this information, he would not have been indicted. Dierker's motion to produce grand jury materials thus rehashes the same arguments he advanced in his motion to dismiss the indictment. Where the Court has already denied Dierker's motion to dismiss the indictment, Dieker cannot show a "compelling

necessity" to prevail on his motion to produce grand jury documents. Accordingly, this motion too is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, Dierker's motion to dismiss the indictment (docket no. 374) and his motion for production of grand jury documents (docket no. 400) are hereby **DENIED**.

**IT IS SO ORDERED.**

**s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: January 15, 2007**