**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. CR2-06-129** |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **Magistrate Judge Terence P. Kemp** |
| **LANCE K. POULSEN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**OPINION AND ORDER ON DEFENDANTS' POST-TRIAL MOTIONS**</u>

I.  INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  DEFENDANTS' RULE 29 MOTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.  The Sufficiency of the Evidence as to Ayers, Parrett, Speer
       and Faulkenberry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        1.  National Century's Business Model . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

        2.  National Century's Representations to Investors  . . . . . . . . . . . . . . . . . .  7

        3.  The Fraud  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        4.  The Cover-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

        5.  What the Defendants Knew  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

        6.  The Demise of National Century  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

        7.  Summary of the Evidence as to Ayers, Parrett, Speer
           and Faulkenberry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

    C.  The Sufficiency of the Evidence as to Dierker  . . . . . . . . . . . . . . . . . . . . . . .  23

        1.  Undisputed Facts Established at Trial  . . . . . . . . . . . . . . . . . . . . . . . . .  25

        2.  Evidence Supporting Dierker's Acquittal . . . . . . . . . . . . . . . . . . . . . . .  29

3.  Evidence Implicating Dierker in the Fraud . . . . . . . . . . . . . . . . . . . . . . .   32

(a) Dierker's Knowledge of National Century's Practice
of Advancing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

(b) Dierker's "Under Water" Comments to Beacham . . . . . . . . . . .   35

(c) Dierker's June 7, June 11, and July 12, 2001
Funding Authorizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

(d) Gibson's Advances to Medshares  . . . . . . . . . . . . . . . . . . . . . . . .   42

(e) Dierker's September 26, 2001 Memo About the Sale
of Villa View Hospital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

(f) The Receivables Purchase Report . . . . . . . . . . . . . . . . . . . . . . . . .   44

(g) Summary of the Evidence as to Dierker  . . . . . . . . . . . . . . . . . .   45

III.  DEFENDANTS' RULE 33 MOTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

A.  Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

B.  Defendants' Motions for New Trials Based on *United States v. Santos* . . . . . .   46

C.  Ayers's Motion for a New Trial Based on Pre-Trial and Trial Publicity  . . . . .   50

D.  Dierker's Motion for a New Trial Based on Prosecutorial Misconduct  . . . . . .   54

1.  The Government's Re-Direct of Witness Terrence Glomski . . . . . . . . .   54

2.  The Government's Closing Statement  . . . . . . . . . . . . . . . . . . . . . . . . .   57

E.  Ayers's and Dierker's Motions for New Trials Based on *Brady*

Violations and Rule 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   63

1.  The SEC Trustees Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   65

2.  The SEC Auditors Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70

3.  Documents Disclosed in the Civil Litigation  . . . . . . . . . . . . . . . . . . . .   73

4.  Gibson's Letters to Demmler  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   74

-ii-

IV.  AYERS'S MOTION TO INTERVIEW THE JURORS . . . . . . . . . . . . . . . . . . . . . . . .    76

V.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    78

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. CR2-06-129** |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | **Magistrate Judge Terence P. Kemp** |
| **LANCE K. POULSEN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**OPINION AND ORDER ON DEFENDANTS' POST-TRIAL MOTIONS**</u>

## I. INTRODUCTION

This is a case about the good company that wasn't. It's about those at the helm who steered it wrong. And it's about investors who, through no fault of their own, lost billions in assets.

At the start of the new millenium, National Century Financial Enterprises, Inc. ("National Century") appeared to be a thriving financing company with a national reputation as a leader in its field. But as it turned out, that reputation was built on smoke and mirrors. When nearly a decade of fraud perpetrated by the company finally came to light in 2002, public investigations quickly followed, culminating in criminal charges brought against eleven owners and senior executives. Some of the accused pleaded guilty and cooperated with the Government's investigation and prosecution. On February 4, 2007, five Defendants—Donald H. Ayers, Rebecca S. Parrett, Randolph H. Speer, Roger S. Faulkenberry, and James E.

Dierker—proceeded to trial.[1]  After six weeks of extensive witness testimony, the jury returned guilty verdicts on all counts.

Defendants now seek relief from the jury's verdicts, arguing that the evidence presented at trial was insufficient to convict them, that the trial was hopelessly tainted by prejudicial media coverage, that the Government engaged in prosecutorial misconduct, and that the Government improperly withheld critical evidence that casts doubt on the reliability of the jury's guilty verdicts.  For the reasons described below, the Court **DENIES** each of the Defendants' motions.[2]

---

[1]Two other Defendants, Lance K. Poulsen and James K. Happ, were severed and have yet to be tried.

[2]The motions before the Court include the following: (1) Defendant Parrett's motion for judgment of acquittal (doc. no. 536); (2) Defendant Ayers's renewed motion for judgment of acquittal (doc. no. 537); (3) Defendant Dierker's motion for judgment of acquittal (doc. nos. 538 and 574); (4) Defendant Dierker's motion for new trial (doc. no. 539); (5) Defendant Speer's motion for judgment of acquittal (doc. no. 540); (6) Defendant Faulkenberry's motion for judgment of acquittal (doc. no. 541); (7) Defendant Faulkenberry's supplemental motion for judgment of acquittal (doc. no. 544); (8) Defendant Dierker's motion to conduct an oral hearing (doc. no. 631); (9) Defendant Dierker's motion for new trial (doc. no. 634); (10) Defendant Ayers's motion for a new trial (doc. no. 640); (11) Defendant Speer's motion to join Ayers's motion for a new trial (doc. no. 641); (12) Defendant Dierker's motion to compel production of withheld *Brady* material (doc. no. 647); (13) Defendant Faulkenberry's motion to join Ayers's motion for new trial (doc. no. 651); (14) Ayers's motion to request post-verdict interview with members of the jury (doc. no. 649); (15) Ayers's motion to file juror-interview motion under seal (doc. no. 678); (16) Speer's motion to join Dierker's motion to compel production of withheld *Brady* material (doc. no. 711); (17) Dierker's motion to supplement his post-conviction motions with the holding in *United States v. Santos* (doc. no. 741); (18) Speer's motion joining Dierker's *Santos* motion (doc. no. 747); (19) Ayers's motion joining Dierker's *Santos* motion (doc. no. 749); (20) Faulkenberry's motion joining Dierker's *Santos* motion (doc. no. 751); and (21) Speer's motion supplementing his motion joining Dierker's *Santos* motion (doc. no. 754).  With the exception of the joinder motions (docket nos. 641, 651, 711, 747, 749, and 751), which are **GRANTED**, all of Defendants' motions are **DENIED**.

## II. DEFENDANTS' RULE 29 MOTIONS

All the Defendants move for judgments of acquittal, claiming that the Government did not carry its burden of proof.  The Court will begin by considering the evidence against Ayers, Parrett, Speer, and Faulkenberry.  Because Dierker has filed a far more substantive motion than his Co-Defendants, the Court will separately consider the evidence concerning him.

### A. Legal Standards

Following a jury verdict of guilty, Federal Rule of Criminal Procedure 29(c) permits a defendant to move for a judgment of acquittal on the grounds that the evidence presented was insufficient to convict him.  Trial courts adjudicate Rule 29(c) motions under a standard deferential to the jury's verdict.  The court asks whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The court does not "weigh the evidence, assess the credibility of the witnesses, or substitute [its] judgment for that of the jury."  *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994).  Rather, the court will "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict."  *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001).  For these reasons, a defendant "bears a very heavy burden" in making out a sufficiency-of-the-evidence challenge to his conviction.  *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005).  Indeed, a motion for judgment of acquittal will be granted only "where the prosecution's failure is clear."  *Burks v. United States*, 437 U.S. 1, 17 (1978).

**B. The Sufficiency of the Evidence as to Ayers, Parrett, Speer and Faulkenberry**

At the close of the Government's case in chief, Defendants Ayers, Parrett, Speer and Faulkenberry moved for judgments of acquittal, as permitted by Rule 29(a).  The Court denied Defendants' motions and explained in detail the basis for its decision by citing to the documentary and witness testimony that, if credited by the jury, would support Defendants' convictions.  Defendants renewed their motions at the close of trial and the Court again denied them for the same reasons it had previously given.

Defendants now renew their motions a second time.  In their briefing, however, they do little more than recite the legal standards for assessing post-trial motions brought pursuant to Rules 29 and 33, and make unsubstantiated assertions that the evidence was insufficient to convict them.  The Court once again finds that the jury was presented with ample evidence from which it reasonably could have concluded that Ayers, Parrett, Speer and Faulkenberry committed the offenses with which they were charged.

The trial in this case lasted for six weeks.  The twenty-two volume trial transcript shows that Defendants had considerable opportunities to, and in fact did, attack the Government's evidence against them by putting on their own defenses and by extensively cross-examining the Government's witnesses and challenging its documentary evidence.  The record also shows that the evidence against Defendants was substantial.  Six former National Century employees testified and three of these—Jon Beacham, Sheri Gibson, and Jessica Bily—were senior executives with intimate knowledge of the company's operations and how it perpetrated investor fraud.  Each of these executives admitted to engaging in criminal conduct and they all implicated Defendants in the criminal conspiracy.  Besides National Century insiders, the Government put

on witness testimony from the investors whose money, unbeknowst to them, was improperly used to make unsecured loans to healthcare providers. The Government also called to the stand representatives of the healthcare providers, who confirmed that they asked for, and received, hundreds of millions of dollars in National Century loans that the providers had little ability to pay back.

The Court will not exhaustively review every witness's testimony or every piece of evidence, but will here summarize the most probative testimony and evidence that the jury reasonably could have relied upon and that support the jury's guilty verdicts.

### 1. National Century's Business Model

National Century was a healthcare-financing company based in Dublin, Ohio. Prior to its collapse in November 2002, it had been the largest privately-held healthcare-financing company in the United States.

Defendants were all principals (i.e., owners) and senior executives. Lance Poulsen, who has not yet been tried but whose actions were integral to the fraud conspiracy, was an owner and Chief Executive Officer of National Century.[3] Ayers and Parrett were the other two owners. Ayers worked as the company's Vice Chairman and Chief Operating Officer, and Parrett was Vice Chairman and Secretary/Treasurer. She also supervised National Century's Servicer

---

[3]Poulsen was separately indicted in October 2007, on charges of obstruction of justice and witness tampering based on his efforts to improperly interfere with the anticipated trial testimony of Sheri Gibson. As a result of the allegations in this indictment, Poulsen's trial counsel was disqualified from continuing his representation and Poulsen was forced to obtain new counsel. With the February 4, 2008 trial date in this matter looming, the Court severed Poulsen to give his new attorneys adequate time to prepare his defense and to ensure that the other Defendants were not prejudiced at trial by Poulsen's obstruction and witness-tampering activities.

Department.  Speer was an Executive Vice President and Chief Financial Officer and Faulkenberry was an Executive Vice President in charge of National Century's Client Development Department.

National Century financed healthcare providers, such as hospitals, clinics, and nursing homes, by purchasing the providers' medical accounts receivable for less than their full value. In exchange for selling their receivables at a discount, the providers were paid for the patient services they had rendered much sooner than if they had to wait to collect from third-party insurers, like Medicare or Blue Cross.

Purchasing medical accounts receivable was only half of National Century's business model.  The company then issued bonds to large institutional investors, such as pension funds and mutual funds, for which its pool of receivables served as collateral.  In other words, National Century's bonds were "asset-backed securities," the "asset" being the pool of medical receivables that secured the bonds.  The proceeds from the sale of the bonds were used to purchase additional receivables while the principal and interest owed to the investors was paid off through the ongoing collections on the receivables.

National Century operated its healthcare-financing programs through two subsidiaries, NPF VI and NPF XII (sometimes referred to herein as "the programs").  NPF VI and XII were governed by an Indenture, which delineated in legal terms the relationship and responsibilities among three parties: the issuer of the bonds, the servicer of the receivables, and the investment trustee.  NPF VI and XII issued the bonds to investors.  Another National Century subsidiary

called National Premier Financial Services ("National Premier"[4]), serviced the receivables, meaning that it collected pertinent data about each receivable submitted by the healthcare providers, determined which receivables were eligible for purchase, and then oversaw their collection.  Finally, JP Morgan Chase ("Chase") was the trustee for NPF VI and Bank One was the trustee for NPF XII.  The trustees' job was to monitor the VI and XII program accounts on behalf of the investors to ensure that National Century observed all program requirements regarding how the investors' money was to be used and protected against losses.

### 2. National Century's Representations to Investors

National Century depended upon investors to make its financing programs work.  It communicated its business model and marketed its NPF investment vehicles mainly through the Private Placement Memoranda that accompanied its bond offerings and, less formally, through regular investor presentations.

Consistent with the definition of an asset-backed security, National Century told investors that its bonds were secured by medical accounts receivable.  Furthermore, National Century represented that the investors' money would be used only to purchase eligible receivables.  "Eligible" receivables were restricted to those for which medical services had already been provided.  Jon Beacham, National Century's Executive Vice President of Securitizations, testified that the Private Placement Memorandum defined an "eligible receivable" as one where a "healthcare procedure has been performed that's subsequently created an account receivable."  Sheri Gibson, the Executive Vice President in charge of

---

[4]The former National Century executives who testified at trial referred to the company's Servicer Department, rather than its National Premier subsidiary, when discussing servicer operations.  For simplicity's sake, the Court will do the same.

National Century's Compliance Department, agreed.  She testified that an "eligible receivable" was one in which medical services had already been provided to a patient and the bill to the insurer had been submitted.  The only thing that remained was for the insurer to pay the receivable.  To underscore this "services-already-rendered" requirement of an eligible receivable, National Century told investors that the receivables it purchased were patient specific, meaning that, according to Gibson, they identified a specific patient, a specific date of service, and a specific dollar amount.

The specific date of service was important because another eligibility requirement concerned the age of the receivable.  National Century told investors that any receivables older than 180 days (i.e., the medical procedure giving rise to the receivable had been performed more than 180 days earlier) were ineligible for purchase, and that any purchased receivables that did not collect within 180 days were returned to the healthcare providers where they originated.  This temporal feature of what constituted an eligible receivable was meant to minimize the risk of non-collection.  As both Beacham and Gibson explained, the older the receivable, the less likely it was to pay out.

The fully secured nature of the bonds and the strict criteria governing what counted as eligible collateral were just two of the attributes that National Century touted as evidence of the reliability of its bonds.  In addition, National Century talked up certain "credit enhancements" embedded in its NPF programs.  These included "over-collateralization" and reserve accounts, both of which were intended to protect investors from losses resulting from receivables that did not pay out.  "Over-collateralization" meant that the value of the receivables exceeded the value of the outstanding bonds, so that a $97 bond was backed by a $100 receivable.  The reserves

8

consisted of funding withheld from the providers and set aside in cash accounts.  Gibson and

Jessica Bily, a senior executive in National Century's Funding Department, testified about how

these two safeguards worked in practice by describing National Century's process for

determining the amount of funding healthcare providers received in exchange for their accounts

receivable.  Gibson and Bily testified to the following:

A healthcare provider that entered into a financing agreement (called a sales and

subservicing agreement) with either NPF VI or NPF VII sent its accounts-receivable data to

National Century's Servicer Department each week.  The Servicer Department reviewed the

data, determined which receivables were eligible for purchase, and reported the total value of the

eligible receivables to National Century's Funding Department.  The Funding Department then

performed a series of calculations to figure out how much money the provider was entitled to

receive, based on the total amount of eligible receivables it had submitted.  Gibson and Bily

described these calculations by giving an example of an eligible receivable totaling $100.

First, the Funding Department applied a 97 percent "advance rate" to the $100

receivable, resulting in a net eligible receivable of $97.  The 3 percent withheld in funding to the

provider constituted the "over-collateralization."

Next, National Century deducted approximately 17 percent of the total value of the

receivable and held it in cash accounts called "reserves."  The reserves functioned as a cushion

against the risk of non-collection of a receivable.  In other words, if a receivable did not pay out

as expected, National Century could draw on the reserves to offset the loss, and the investors

would not be out any money.

Thus, after subtracting the 3 percent in over-collateralization and the 17 percent in reserves, a provider could expect to receive about $80 in funding for submitting a $100 receivable.[5]

Thanks to these credit enhancements, National Century's bonds were given a "AAA" rating. This meant that they entailed the least amount of risk of any investment instrument, and were similar to Government Treasury bonds in reliability. Unsurprisingly, National Century highlighted its AAA rating as another reason investors should buy its bonds.

Beacham testified that National Century held monthly day-long presentations to woo investors. The day typically began with an overview by one of the principals. Following that, the presentation was structured into multiple half-hour segments during which the other owners and senior executives described the operations of their particular departments. All Defendants regularly participated in investor presentations. Besides explaining the mechanics of National Century's receivables-financing programs, Defendants boasted that their company was a market leader in securitizing healthcare receivables and that they had a depth of knowledge and experience in the healthcare industry worthy of investors' confidence.

Amy Boothe-Fuentes and Terrence Glomski were asset managers at Alliance Capital and Lincoln Capital, respectively, whose clients were large institutional investors. Both testified at trial that they reviewed the Private Placement Memoranda that accompanied National Century's note offerings, that they attended one or more presentations by National Century's executives, and that they performed their own independent research and analysis before deciding to invest

_____

[5]National Century also deducted "program costs" from the funding allocation due to the providers. The program costs were similar to interest and accounted for how National Century made its money in the transaction.

millions of dollars of their clients' money in National Century's bonds.  Both also testified that

they relied on National Century's representations regarding how its NPF programs worked,

including its promises to the effect that (1) the bonds were backed by medical accounts

receivable; (2) investors' money would be used only to purchase "eligible" receivables, meaning

receivables generated in connection with completed medical services that had already been billed

to the insurer and that were less than 180 days old; (3) the investors were protected by the over-

collateralization of their bonds and cash reserves; and (4) the bonds were AAA rated and

therefore entailed little risk.  All of these things, said Boothe-Fuentes and Glomski, were critical

to their positive investment decisions, and the absence of any of them would have affected how

they viewed National Century's bonds.

### 3. The Fraud

The former National Century employees who testified at trial believed that the

company's business model was a good one.  At various points, however, each of them came to

realize that the way National Century explained its operations to investors was not the way it

actually operated.  As already described, National Century represented that it financed healthcare

providers—using investors' money—based strictly on the providers' submission of eligible

accounts receivable.  But this was not the case.  Instead, the evidence at trial showed that

National Century financed certain providers in whatever amounts were necessary to satisfy the

providers' budgetary needs.  So, if a provider needed two million dollars one week to pay its

operating expenses, National Century wired it two million dollars, irrespective of the total

amount of receivables the provider submitted, whether those receivables were "eligible," or

whether the provider submitted any receivables at all.  This practice was known within the walls

of National Century as "advancing," and it was kept carefully hidden from investors for many years.  The most important effect of advancing was to convert the investors' bonds from what they believed were secured investments, backed by medical receivables, into risky unsecured loans to the healthcare providers.

Former executives at three of the "advanced to" healthcare providers testified that National Century's principals (Poulsen, Ayers, and Parrett) held ownership interests in these providers.  The Government's summary witness corroborated their testimony and added to it by explaining that National Century had ownership stakes, sometimes as much as 100 percent, in at least four other providers that regularly received advances.  Just as troubling, the providers who received advances were teetering on the edge of insolvency and thus were in no position to pay National Century back.[6]  This instability, coupled with their inability to secure other forms of financing, was why the providers were borrowing from National Century in the first place.  The implication created by this testimony was that National Century's principals corrupted the company's operations, and a good business model, in order to keep their other business ventures afloat.[7]

The Government produced substantial evidence inculpating each Defendant.  Indeed, the jury reasonably could have concluded that each of the Defendants participated in the alleged

_____

[6]Since the loans they received from National Century were not backed by receivables, National Century could not collect on the loans by collecting on the receivables.

[7]The Government also introduced evidence showing that the senior executives' compensation was tied to the amount of financing National Century provided, irrespective of whether it got eligible receivables in return.  The senior executives therefore had an incentive to go along with the principals' scheme because they stood to benefit if National Century met its financing targets, even if that financing was in the form of unsecured loans, rather than based on eligible receivables, as it was supposed to be.

fraud conspiracy: (1) by actually authorizing unsecured advances to healthcare providers; (2) by concealing the advances from investors, as well as the disastrous effect advancing had on the NPF VI and NPF XII programs; and (3) by representing these securitized programs to be something other than what they were.

Originally, only Poulsen, Ayers, and Parrett could authorize advances.  By 2001, however, the authority to approve advances had been extended to the Executive Vice Presidents (including Faulkenberry and Speer) and Dierker, though Dierker's authority was limited to one entity.  Bily testified about the internal procedures National Century implemented to track information about advances, including who had authorized them.  The requesting executive would typically call or email Bily (or her Funding Department staff) to convey instructions to make an advance.  The Funding Department staff would then prepare an "advance request form" documenting the date, amount, and recipient of the advance, as well as the authorizing executive. Once completed, the advance request forms were forwarded to the authorizing executive for his or her signature.  Bily testified that she sometimes had difficulty collecting the required signatures, but that this was not an obstacle to actually effectuating the advances.  In fact, the normal procedure was for the funding to go out the door before the authorizing executive had signed the advance request form.

Bily testified that each of the Defendants had authorized numerous advances.  She further identified advance request forms covering the period of 1999 through 2002 that documented approximately forty advances authorized by Ayers, eighty advances authorized by Parrett, eighty authorized by Poulsen, four hundred authorized by Speer, and twenty-five authorized by Faulkenberry.  Not only do the advance request forms show which Defendant approved the

13

particular advance, but they also show that other Defendants were carbon-copied so that they too knew what was going on.  Bily testified that beginning in 2002, she began keeping copies of the advance request forms in her home "[t]o protect [her]self and other individuals in the [F]unding and [A]ccounting [D]epartments who were involved with processing the advances."  Donna Talbott and Stanley Haines, executives with healthcare providers that had financing agreements with National Century, both confirmed at trial that their respective organizations (Doctors Community Health Care Corporation ("Doctors Community") and PhyAmerica, Inc.) had received millions of dollars in funding from National Century well above their submission of eligible receivables.  Talbott testified that by 2002, Doctors Community owed National Century $500 million and that it was incapable of paying National Century back in the normal course of business.  Likewise, Haines testified that PhyAmerica's total debt obligation to National Century ultimately climbed to $200 million and that it too had poor prospects for paying this money back.

### 4. The Cover-Up

National Century went to extraordinary lengths to conceal what it was really doing with investors' money.  The evidence adduced at trial showed that in its monthly reports on the status of the NPF programs, in its presentations to investors, and in its dealings with outside professionals (such as auditors), National Century executives routinely falsified data and disguised the true nature of its affairs.  Indeed, the jurors could well have been left with the impression that the purpose of an entire National Century department—the Compliance Department—was to cover up the fraud by distorting and inventing information for the outside world that would make the company appear to be a proven success.

14

Before detailing the elaborate efforts that went into maintaining the illusion that was National Century, a bit more background about the NPF programs is necessary.

NPF VI and XII each consisted of three different accounts that were supervised by the independent trustees (Chase and Bank One, respectively) that monitored both programs. These included the collection account, purchase account, and reserve account, and were intended for the very purposes that their names suggest: The collection account collected payments on the accounts receivable National Century had bought from the providers[8]; the purchase account was funded with investors' money and was supposed to be used to purchase more eligible receivables; and the reserve accounts held the nearly 17 percent in reserves deducted from the providers' weekly funding wires as a way to offset any losses incurred through non-payment of a receivable. The testimony at trial established that, as one might expect, National Century's ongoing advances to healthcare providers without receiving a commensurate amount of eligible receivables in return wreaked havoc on the VI and XII program accounts. This was a big problem, one that National Century took great pains to conceal, lest the investors catch on to the fraud scheme.

The Indenture governing the VI and XII programs required National Century to prepare monthly investor reports, one for each program. The investors used the reports to monitor the performance of the programs and make sure that they were functioning as they were supposed to.

---

[8]The healthcare providers, rather than National Century, initially collected the payments on the receivables and then forwarded them to the NPF collection account. This fact will be important later in the opinion, during a discussion of testimony concerning Poulsen's warning to the investors that an immediate wind down of the VI and XII programs could prompt the providers to keep the collections for their own use, rather than send them to National Century, as they were obligated to do.

To that end, the reports provided a snapshot of the status of the three accounts comprising each program as of the monthly "determination date," i.e., the reports were based on information gathered from the accounts on a fixed date each month.  If any of the accounts were out of balance—for instance, if the reserve accounts did not meet the specified level of approximately 17 percent—that would be treated as "an event of default" and the entire NPF VI or XII program would come crashing down.  The investor reports also provided information about the age of the purchased receivables and how quickly the pool of receivables was "turning over," i.e., how long it took for the receivables to collect.  As Beacham testified, how old the receivables were was an important metric to investors, because the older the receivables were, the less likely they were to pay down.  Thus, if a report showed that the collateral pool contained receivables older than 180 days, that too could trigger a default, bringing down the defaulted program, and possibly National Century along with it.

The investor reports were prepared by the Compliance Department, at the direction of Sheri Gibson, who headed up that department.  Gibson testified that if National Century had operated the NPF VI and XII programs as it represented to investors, generating the investor reports would "have been a push button process" of gathering the relevant data and pushing a button.  Due to National Century's regular advances to healthcare providers, however, compiling the investor reports was anything but a "push button process."  The purchase, collection, and reserve accounts were all too low relative to the amount of eligible receivables National Century had actually purchased, but Gibson testified that the deficiencies in the reserve accounts were especially acute.  This fact had to be hidden.

16

One way that National Century did so was by moving money between program accounts before the determination date, which was initially at month's end, and then moving the money back after the determination date. At first, National Century moved money from a program's purchase account into its reserve accounts. But, as the practice of advancing continued unabated, the magitude of the problem grew, and intra-program transfers were not enough to make up the shortages. As a result, National Century decided to stagger the determination dates for NPF VI and XII. Rather than hold them on the same day at the end of each month, as it had been doing, National Century chose the last day of one month as the determination date for one NPF program, and the first day of the next month as the determination date for the other NPF program. That way, money could be moved back and forth between the NPF VI and XII program accounts.

Another way that National Century manipulated the preparation of the investor reports was simply to falsify their data. This was done at Poulsen's direction. He instructed Gibson never to issue an investor report that showed any sort of non-compliance. Consequently, she testified that "[t]he data would be manipulated in any way necessary to make compliance on the report." Gibson was so creative in her preparation of the investor reports that she told the FBI in a pre-trial interview that the reports merited inclusion on the *New York Times* bestseller list for fiction. She further testified that from the inception of NPF VI in May 1995, every single one of its investor reports contained false and fabricated data. The same was true for each and every one of the investor reports issued for NPF XII, which opened in March 1999. The investor reports had to be signed by a National Century principal before they could be issued. According to Gibson, only Poulsen ever did so because Ayers and Parrett refused.

17

The manipulation of investor-report data did not stop with the reports themselves.  The VI and XII program accounts were reviewed by outside auditors.  To cover its tracks with them, National Century, per Gibson, had to create all the backup data that went into producing the investor reports.  This data was also necessarily false because it had to match the false data shown in the investor reports.

Another way National Century concealed its fraudulent activities was by inputting ineligible and non-existent collateral into the Servicer Department's computer tracking system to make it appear as though there was collateral to support National Century's advances.  This was necessary to mislead the outside auditors who performed the company's annual financial audit.  These auditors did not confirm that the collateral reflected in the computer database actually consisted of eligible medical accounts receivable, but simply compared the providers' total amount of liabilities with the total amount of collateral they had submitted.  National Century therefore worked to identify any other asset that a healthcare provider had—including real estate, stock, and settlements in lawsuits—and then included these assets as collateral supporting the funding advances in its computer tracking system.  Donna Talbott at Doctors Community, one of the over-funded healthcare providers, testified that in the summer of 2002, Parrett asked her to submit information about additional types of assets that could be used to offset the advances Doctors Community had received.  Of course, this additional collateral did not consist of eligible accounts receivable and no mention was made to either the outside auditors or the investors that National Century was counting such non-receivables assets as collateral.

National Century also loaded ineligible accounts receivable onto its computer system. Talbott testified that Parrett asked her to submit receivables that were older than 180 days,

receivables that were anticipated but had not yet been generated (such as patients who were still in the hospital) and receivables that had not yet been billed to the third-party insurer. When the counting of ineligible collateral was still not enough to account for the advances, Gibson testified that National Century inserted a "plug number" into the computer-tracking system. This "plug number" represented the difference between all the eligible and ineligible collateral National Century loaded on the system for a particular provider and the total amount of funding the provider had received.

Finally, the investor presentations. As already described, all the Defendants participated in presentations to current and prospective investors, at which they explained National Century's business model and marketed its financing programs. Former executives Beacham, Gibson, and Bily testified that in their interactions with investors, including during their segments of the investor presentations, they did not reveal anything about National Century's practice of advancing, the effects that advancing had on the NPF program accounts, or how National Century forged its investor reports and the collateral data on its computer database. Bily testified that Parrett instructed her not to discuss things like "under-collateralization" and "overfunding" with investors. Gibson testified that she told investors "absolutely nothing" about how their money was actually being used, and that she never heard any other senior executive disclose anything about what was really going on. At one point, Gibson saw to it that certain information in Parrett's portion of the presentation was removed so that investors did not catch wind of the fraud. Gibson testified that Parrett was telling investors the true amount of payments on the receivables coming into the collection account. This had to stop, said Gibson, because the "volume of collections . . . were [sic] very low compared to the monthly funding going to the

19

sellers [i.e., healthcare providers]" and there was a risk that the investors would notice the discrepancy.

5. <u>What the Defendants Knew</u>

The evidence adduced at trial established that the principals and senior executives knew how their funding advances were eating away at the NPF program accounts, and further knew what Gibson was doing to keep the fraud under wraps.  Gibson testified that the problems caused by advancing were discussed in National Century's executive committee meetings, which were attended by the principals and executive vice presidents.  She testified that she specifically spoke with Ayers, Parrett, Speer, and Faulkenberry about what she had to do each month to manipulate the data presented in the investor reports.  For example, Gibson explained that "[w]ith Becky Parrett, I specifically walked through the investor report and the manipulations that were done with the aging [of the receivables], the manipulations that were done with the concentration limits, the fact that data had to be adjusted line by line.  I went over the investor report very detailed with Becky Parrett."  Similarly, Gibson testified that she complained to Faulkenberry about the amount of work entailed in producing the fraudulent reports.  Gibson also testified that the Compliance Department maintained both the fraudulent investor reports that were actually issued and accurate reports based on the true data, and circulated memos to National Century's principals comparing the two reports to show the nature and extent of the "manipulations."

Corroborating Gibson's testimony are numerous memos and emails she and others in the Compliance Department authored, addressed to the principals and Speer and Faulkenberry, advising them about the shortages in the NPF program accounts and the nature of the data manipulations that had to be performed to produce a fully compliant investor report.  On

20

February 17, 1999, for example, Gibson wrote Parrett a memo telling her that the "status of NPF VI reserves is dismal," a situation she attributed to the "continued pillage of reserves for funding."  Shortly thereafter, in a February 25, 1999 memo, Gibson wrote Ayers and Parrett that "NPF VI is $45,000,000 SHORT in reserves" as a result of funding healthcare providers without purchasing the requisite amount of eligible receivables.  Gibson's memo went on, "Please advise—how can we have an investor report . . . with a $45,000,000 shortage in reserves? . . . We are creative with month end and the investor reports—but this is beyond our capability to create.  This is a crisis—we need help!"  In yet another example, on December 20, 1999, Gibson emailed Speer and Faulkenberry, and carbon copied Poulsen, Ayers, and Parrett, notifying them that "[a]s of December 20, 1999, the combined balances in the Purchase and Collection accounts for NPF XII is $5,644,795.  When you factor in the SHORTAGES in reserves, say $4.2 million, the excess cash remaining in NPF XII is approximately $1.4 million."  Gibson went on to say that despite the lack of cash in NPF XII, two funding wires totaling $36 million were scheduled to go out.  She concluded her email by asking, "We are staring at month end/year end and the book is short now in reserves—how do we explain being $40 million short?"

### 6. The Demise of National Century

By October 2002, National Century was no longer able to stay ahead of the problems caused by advancing.  At that time, Poulsen contacted the investors to ask them for a waiver of the program compliance requirements.  He explained that $350 million had been taken from NPF XII's reserve accounts to fund healthcare providers.  According to Terrence Glomski at Lincoln Capital, Poulsen claimed that National Century had obtained accounts receivable for the funding.  Glomski characterized the expenditure of the reserves as "a big problem" that constituted a

violation of the governing documents, including the Indenture and the Private Placement Memorandum.  He regarded the non-compliance as a straight-up "event of default."  Amy Boothe-Fuentes of Alliance Capital testified similarly about the gravity of the situation.  She said that Poulsen's notice to the investors signaled to them that "everything wasn't performing like it was supposed to."  After investigating further, Boothe-Fuentes told her boss that she "thought we had a very serious problem."

The investors began organizing among themselves to try to get to the bottom of what was happening at National Century.  Within a few days of Poulsen's request for a waiver, the investors had formed an ad hoc committee, hired forensic accountants and attorneys, and flew to Ohio to meet in person with Poulsen and the senior executives at National Century's headquarters.  At that meeting, Boothe-Fuentes testified that she learned for the first time that National Century had been funding healthcare providers without purchasing the requisite amount of eligible receivables in return.  National Century's funding programs came to an immediate halt and within a matter of weeks the company had declared bankruptcy and was under investigation by the federal government.  The Defendants were indicted on multiple charges of fraud and money laundering in May 2006.

At the time of National Century's collapse in November 2002, NPF VI had outstanding bonds totalling approximately $900 million, while the outstanding bonds in NPF XII equalled about $2 billion.  Glomski testified that at the time of National Century's unraveling, Lincoln Capital's investment in National Century's bonds totalled nearly $50 million, of which it has recovered six cents on the dollar to date.  Bernard Wolfley, the Government's summary witness, testified about the extent of National Century's over-funding of the healthcare providers.  Doing

22

his calculations of National Century's data just as the company would have, Wolfley concluded that in the four-year period between January 1, 1999, and December 31, 2002, National Century made $1.3 billion in unsecured loans to eight healthcare providers. Further, Wolfley found that National Century had an ownership stake in seven of the eight providers.

### 7. Summary of the Evidence as to Ayers, Parrett, Speer and Faulkenberry

Defendants do not explain why or how they believe that the evidence was insufficient for the jury to have concluded beyond a reasonable doubt that they committed the charged offenses. On this basis alone, the Court could have denied Defendants' Rule 29 motions. Nonetheless, the Court deemed it worthwhile to lay out, in some detail, the testimony and evidence that, if believed by the jurors, would have been sufficient to convict Defendants. As described above, the Government's case against Defendants was not thin. The testimony of Beacham, Gibson, and Bily was particularly probative, as all three admitted to their own criminal behavior while employed at National Century and implicated Defendants in the same wrongdoing. The healthcare-provider witnesses confirmed that they received millions of dollars in advances from National Century without submitting eligible receivables in return. The investor witnesses testified that they were effectively duped into believing that National Century's bonds were safe and secured, when in fact they were just the opposite. Taken together, this evidence was more than sufficient for the jury to have concluded that Defendants were guilty. The motions of Defendants Ayers, Parrett, Speer, and Faulkenberry are therefore denied.

### C. The Sufficiency of the Evidence as to Dierker

Defendant Dierker was charged in four counts of the superceding indictment, including Count 1 (conspiracy), Count 17 (money-laundering conspiracy), and Counts 25 and 26

23

(concealment of money laundering).  The Government alleged that Dierker committed these offenses by advancing funds to a National Century client, California Psychiatric Management Services ("California Psychiatric"), on two occasions, without purchasing the required amount of eligible receivables.  According to the facts set forth in the indictment, Dierker advanced $670,000 to California Psychiatric on August 3, 2001, and $720,000 on September 28, 2001. Following trial, the jury convicted Dierker on all four counts.[9]

As he did at the close of the Government's case-in-chief, and at the close of all the evidence, Dierker once again moves for a judgment of acquittal pursuant to Rule 29 on the grounds that the evidence adduced was insufficient to support his conviction.  For the reasons explained in detail below, Dierker's motion is not well-founded, and it is therefore denied.

The discussion below begins by laying out the undisputed facts established at trial relative to Dierker's employment at National Century and the conduct leading to his conviction. The Court then turns to the evidence which, if believed by the jury, could have formed the basis for acquitting him.  Finally, the Court considers the evidence implicating Dierker as a co-conspirator in the fraud, and concludes that this inculpatory evidence readily lends itself to a finding of guilt.  Simply put, the jury was presented with substantial proof on both sides of the question.  Because the jury's verdict was rational in light of this record evidence, the Court is obligated to give due deference to the jury's considered judgment as the finder of fact and the judge of witnesses'—including Dierker's—credibility.  *See e.g. United States v. Arnold*, 486 F.3d 177, 182 (6th Cir. 2007) (en banc).

---

[9]Dierker also was indicted in Count 27, dealing with forfeiture of the Defendants' assets, but that count was not before the jury.

1. <u>Undisputed Facts Established at Trial</u>

Dierker began working at National Century in 1999 as Associate Director of Marketing. Two years later, he was promoted to the position of Vice President of Client Development. The purpose of the Client Development Department was to assist National Century's healthcare-provider clients in acquiring operating capital from sources other than National Century's accounts-receivable funding programs. The Client Development Department was not totally removed from the operations of the receivables-based programs, however. In fact, one of Dierker's job duties involved "debt restructuring and recapitalization" of healthcare providers in the NPF VI and XII programs who were in breach of their financing agreements with National Century. "Breach" in this case meant that a provider had been over-funded relative to the amount of eligible receivables it had submitted. Dierker's job was to investigate and cure these instances of non-compliance by working with the over-extended providers.

California Psychiatric had a financing agreement with NPF XII to fund its two psychiatric hospitals, Bay View and Villa View, located in San Diego, California. National Century (through a subsidiary) held a fifty percent ownership stake in California Psychiatric.

On June 9, 2000, California Psychiatric filed a bankruptcy petition in the United States Bankruptcy Court for the Central District of California. On June 15, 2000, the bankruptcy court entered an interim order, which became final on October 6, 2000, appointing National Century the Debtor-In-Possession ("DIP") financier for California Psychiatric, thereby enabling California Psychiatric to remain up and running. The Indenture governing NPF VI and XII prohibited these programs from using their investor dollars to fund bankrupt healthcare providers. California Psychiatric's bankruptcy therefore meant that its financing relationship

25

with NPF XII had to terminate. Accordingly, NPF XII assigned its interest in California Psychiatric's accounts receivable to another program sponsored by National Century, namely, NPF X. The money in NPF X was National Century's own, not investors', and therefore could be used for any purpose to which National Century saw fit to devote it. The assignment of California Psychiatric's financing relationship from NPF XII to X meant that the latter would finance California Psychiatric by purchasing its receivables. The bankruptcy court approved of this arrangement, specifically noting the transfer of interest from NPF XII to X, and further approved the establishment of a management committee to oversee California Psychiatric's post-petition operations.

Dierker had not had much involvement with California Psychiatric prior to its bankruptcy filing on June 9, 2000. On that day, Dierker was summoned to sit in on a conference call already in progress in which the participants, including Defendant Ayers and National Century's lawyers, were discussing how to respond to California Psychiatric's bankruptcy filing. Ayers and the lawyers decided that National Century would seek the court order, subsequently issued on June 15, naming it California Psychiatric's DIP lender. Because Dierker had a good working relationship with the two minority owners of California Psychiatric (National Century being the majority stakeholder), Ayers and company tapped him to serve as National Century's liason to California Psychiatric's post-petition management committee.

Dierker testified that one of his responsibilities entailed evaluating any third-party bids to acquire California Psychiatric. But his most immediate and important duty as liason was to oversee National Century's DIP financing commitment by arranging for California Psychiatric to

26

receive weekly funding wires based on its budgetary needs.  Each week, Brian Weiss[10], a member of California Psychiatric's post-petition management committee, emailed Dierker an operating budget setting forth the amount of money California Psychiatric would need to cover its costs that week.  Dierker reviewed the budget to make sure that it contained only those expenses approved by the bankruptcy court and necessary to keep California Psychiatric in business.  If Dierker was satisfied with the budget, he forwarded Weiss's email to National Century's Funding Department to process the funding transfer.  California Psychiatric submitted its accounts receivable to National Century in exchange for the funding, but at least on payroll weeks, California Psychiatric did not generate sufficient receivables to cover the funding that National Century was providing.  This gap between the incoming receivables and the outgoing funding should have been immaterial (except for whatever costs it imposed on National Century that the company wished to recover) because California Psychiatric was supposed to be funded out of NPF X.  And NPF X money, as noted above, was not investor money and so was not subject to the restrictions of the VI and XII programs.  In other words, there was nothing wrong with "advancing" out of NPF X.

Unlike the securitized programs, which were managed by National Century's Funding Department, NPF X fell under the control of the Accounting Department.  Gibson testified (without controversy) that if she had wanted to release a funding wire from NPF X, she would have gone to that department to make it happen.  Dierker nonetheless forwarded Weiss's weekly

---

[10]Weiss did not work for California Psychiatric, but was the financial manager for another California healthcare provider owned by National Century.  Presumably, that is how he ended up being appointed to California Psychiatric's management committee.

emails, along with instructions to send the requested funding, to National Century's Funding Department.

Even though the bankruptcy court order specified that the DIP financing was to come out of NPF X, and even though NPF XII had assigned its interest in California Psychiatric's receivables to X and was altogether precluded from funding bankrupt healthcare providers, the weekly funding National Century advanced to California Psychiatric actually came out of XII, not X. National Century stopped funding California Psychiatric in November 2001, because at that time California Psychiatric was sold to another entity.

As described in Part III.B.3 above, Jessica Bily testified that the Funding Department documented each advance by preparing an "advance request form," which noted the amount of the advance, the date it was sent, the provider to which it was sent, and the National Century executive who approved it. These advance request forms were used only when National Century deliberately funded its healthcare-provider clients in excess of their accounts receivable. They were not used to track regular receivables funding, that is, funding tied to the provider's submission of eligible receivables.

Between June 29, 2001, and October 26, 2001, Dierker authorized seventeen funding advances to California Psychiatric, including the two advances (on August 3 and September 28) that gave rise to the charges against him. Dierker's authorization is memorialized in a memo sent to him by Jessica Bily on November 13, 2001. The memo itemized each of the seventeen advances Dierker approved, and listed their amounts and the dates they were wired to California Psychiatric. Dierker signed the memo on November 14, 2001. In so doing, he circled the memo's "requested by" column that listed him as the executive who requested the advances, and

28

wrote next to it "[p]ursuant to National Century commitment to provide DIP financing."  This memo nowhere states out of which NPF program—X or XII—the funds were transferred. Dierker also signed a standard advance request form dated November 9, 2001, that documented another funding transfer to California Psychiatric.  Once again, Dierker wrote "pursuant to National Century commitment to provide DIP financing" on the form.  It too did not state the source of the funding, whether NPF X or XII or some other program.  In fact, the Government did not introduce any documentary evidence or witness testimony showing that Dierker ever signed any National Century paperwork in connection with the DIP financing to California Psychiatric that had "NPF XII" written on it.

### 2. Evidence Supporting Dierker's Acquittal

Throughout these proceedings, Dierker has maintained his innocence.  He does not deny that he authorized the two fund transfers to California Psychiatric for which he has been found criminally liable.  Rather, he insists that he did not instruct anyone to transfer the funds out of NPF XII, that he did not know the funding was coming out of NPF XII, and that he had no reason to know this because he did not work in the Funding Department or prepare any of the paperwork necessary to actually initiate the wire transfers.  Dierker argues that he performed the merely ministerial duty of reviewing the weekly budget requests from Weiss for reasonableness and, provided they passed this test, directing the Funding Department to transfer the amounts requested.  Dierker says that the evidence presented at trial substantiates his claims and that no reasonable jury could have found him guilty beyond a reasonble doubt.

As an initial matter, Dierker correctly points out that his signature approving a funding request for California Psychiatric does not appear on any document expressly identifying NPF

29

XII as the source of the funds.  On the only two documents memorializing the transfers that Dierker signed—the November 9, 2001 advance request form, and the November 13, 2001 memo from Bily—he penned in the note "pursuant to National Century's commitment to provide DIP financing."  Dierker testified that by making these notations, he intended to link the funding to the bankruptcy court order, which specified NPF X as the funding source.  Bily's testimony corroborates Dierker's claim of ignorance insofar as she admitted that she was not aware of any paperwork Dierker signed designating NPF XII as California Psychiatric's DIP lender.  Bily further admitted that Dierker did not have a hand in preparing, nor did he sign, the "receivables purchase report," which was the document sent to the trustee (Bank One) instructing it to wire the money to California Psychiatric.  The Funding Department prepared the receivables purchase reports and Poulsen signed the ones authorizing the funding wires to California Psychiatric for which Dierker was indicted.  Dierker therefore did not play any direct part in the communications between National Century and the trustee about actually releasing the funding.

Dierker took the stand in his defense, insisting that he had nothing to do with the decisions that led to California Psychiatric's DIP financing coming out of the wrong program account.  He testified that just the opposite was true in that he informed "the processing staff" that they needed to internally re-orient California Psychiatric from an NPF XII client to an NPF X client.  According to Dierker, he "communicated very early on with the processing staff that this bankrutpcy order was in place, that its key provisions were that what once was an NPF XII funding relationship is now an NPF X funding relationship, and the necessary steps and all of those processing and clerical functions needed to follow to sort of make that happen."

30

Dierker further testified that besides not instructing anyone to fund California Psychiatric out of NPF XII, "[t]here [were] a number of reasons [he] wouldn't want it to come from XII." He explained that these included the prohibition barring NPF XII from funding bankrupt healthcare providers, and the assignment of XII's interest in California Psychiatric's receivables to X, which was consistent with the prohibition and protected the interests of XII's investors. Dierker insisted that "I, to this day, don't know how money came out of NPF XII to go to California Psychiatric."

Finally, Dierker's own contemporaneous description of National Century's funding relationship with California Psychiatric supports his claim of innocence. In an email dated August 2, 2001, Dierker asked Defendant Faulkenberry to cover his California Psychiatric duties while he was on vacation. Dierker explained the situation and what needed to be done, as follows:

> As you may or may not be aware, National Century through NPF X has been providing California Psychiatric with its post-petition financing. The procedure by which this occurs is that on every Thursday Bryan Weiss submits a weekly funding request to me with a file attached that contains the uses of cash as submitted to the bankruptcy court. Assuming that this submission looks reasonable, I forward the funding file to Jeff Martin and copy Jessica as Jeff's backup . . . . [¶] If you would be so kind to review the file attachment for reasonableness and, assuming it passes the test, forward the file to Jeff Martin I would be most grateful.

Dierker's reference to NPF X certainly supports his assertion that he intended the DIP financing to come from that program and that he believed that this is precisely what was happening. It would be reasonable to infer that in an internal communication to a colleague—and an alleged co-conspirator to boot—Dierker would not have felt it necessary to

31

pretend that the California Psychiatric funding was coming from X, when he knew it was actually coming from XII.

The evidence described above was not trifling. As is often the case, the question before the jury came down to whose version of events was the more credible: Dierker's or that of his former colleagues (see below) who implicated him in the fraud scheme? The jury was free to credit Dierker's testimony and find persuasive the documentary evidence supporting him. At the same time, the jury was free to go the other way, putting more stock in the witness testimony and documentary evidence suggesting that Dierker knowingly participated in the fraud. As discussed below, this evidence was also not trifling, and the jury quite reasonably relied upon it to conclude that Dierker had indeed committed the charged offenses.

### 3. Evidence Implicating Dierker in the Fraud

#### (a) Dierker's Knowledge of National Century's Practice of Advancing

Both Bily and Gibson fingered Dierker as a participant in the fraud scheme. Both testified that he knew about National Century's practice of advancing and both also testified that he was one of the senior executives who was given the authority to approve advances, although his authority was limited to California Psychiatric. Bily also asserted that Dierker knew that the DIP financing for California Psychiatric was taken out of NPF XII, not X. She said that he engaged in criminal behavior by "sign[ing] advance request forms knowing that the funds were coming out of XII." Given Gibson's uncontroverted testimony that the Accounting Department, not the Funding Department, was in charge of NPF X, the question inevitably arises as to why Dierker was communicating with Bily at all—including sending her Weiss's emails and signing

32

advance request forms—about funding California Psychiatric. The Court merely flags this

question now, but will return to it shortly.

Gibson added to the picture of what Dierker knew about National Century's true business

practices by relaying a conversation she had with him following an investor presentation.

According to her, she and Dierker expressed mutual contempt for the seemingly know-it-all

investors who National Century successfully deceived:

> After an investor presentation where the investors were all from
> Ivy League schools, Jim Dierker and I were in the hallway talking
> about how smart they thought they were and that they didn't think
> that those of us from Ohio that had gone to Ohio schools knew
> anything, and that they should—weren't asking questions and they
> weren't getting any answers and yet they were Ivy League; they
> knew everything.

Gibson further testified that the "questions" the investors were not asking and were not

getting answers to pertained to "the funding program as it actually worked."

The evidence presented at trial also showed that Dierker contributed to and received

internal memos that arguably would have alerted him to the fact that National Century was not

operating its securitized funding programs as advertised. For instance, on July 20, 2001, Bily

prepared and circulated to the senior executives a memo entitled "Overview of Special Funding

Arrangements." Bily testified that she drafted the memo in response to a directive from Poulsen,

who told her "to contact the people who were working with the accounts that were receiving

advances and see if we could eliminate any of the special arrangements we had with them to

provide advances." One of the people Bily contacted was Dierker, since he was the point person

on California Psychiatric. It would not be a far leap to conclude that Bily's explanation to

Dierker about the nature of the information she was compiling necessarily would have

33

encompassed references to National Century's numerous over-funded clients.  But, in fairness to Dierker, the status report he gave Bily about California Psychiatric did not disclose one way or the other what he knew about the rampant advancing at National Century.  At trial, however, Dierker confirmed that he received Bily's final memo discussing the status of each of National Century's over-funded clients.  Bily's memo repeatedly noted, for nearly every listed client, that the recommended method of recovering over-funding was to "apply reserve overages."  As to at least five clients, Bily's memo explained that they were to receive funding based on their budgetary needs.  For example, for PhyAmerica, Bily's memo read: "Seller [i.e., the healthcare-provider client] receives advances to meet budgetary needs.  Apply reserve overages."  Thus, it could be inferred that if Dierker did not already know what was happening at National Century, this memo would have clued him in.  Dierker testified, however, that he did not recall reviewing the information Bily presented as to all the other clients because his exposure to them "was minimal and typically not in the accounts receivable category."

An October 9, 2001 memo further suggests that Dierker was aware of the fraud scheme. In this memo, Bily informed Speer (carbon copying Dierker and others) that PhyAmerica had received a total funding amount of $305 million through September 30, 2001, but its eligible receivables totaled only $118 million.  Bily added that, "[a]lthough PhyAmerica has required fewer advances up front, their collections still don't support the funding they receive. [T]he collateral base continues to erode while the Outstanding Purchase [that is, the total amount of money sent to the provider] increases."  When confronted with this memo at trial, Dierker testified that he remembered reading it, and that he talked with both Defendants Speer and James

34

Happ[11] about it.  He claimed that he was told "that there were tens of millions, if not hundreds of millions, of dollars of claims that had not been loaded because of their multiple billing company issues that they had been having."

How the jury viewed Bily's July 20 and October 9, 2001 memos, and what weight it assigned them, if any, was entirely up to it.  The jury could have credited Dierker's testimony that he did not pay much attention to the July 20 memo and his testimony that he inquired about the situation at PhyAmerica discussed in the October 9 memo and received a satisfactory answer.  On the other hand, another reasonable conclusion is that the proof of fraud revealed by these memos is so obvious and overwhelming that Dierker could not possibly have failed to understand their import.  We cannot know what was in the jurors' minds, but when the evidence is such that it reasonably could have supported the defendant's conviction, as here, this Court has no choice but to uphold the jury's verdict.

Of course, Dierker's mere awareness of the fraud and of the actions taken by his National Century colleagues in furtherance of that fraud is not sufficient to support his conviction.  But this awareness, if credited by the jury, bolsters Bily's and Gibson's testimony that he participated in the fraud by knowingly authorizing advances to California Psychiatric out of NPF XII.

### (b) Dierker's "Under Water" Comments to Beacham

As described in section II.B.2 above, Jon Beacham was National Century's Director of Securitizations.  He testified that in the summer of 2001, he learned for the first time that

---

[11]Happ was a senior executive in the Servicer Department.  He was not indicted until July 2007, more than a year after the other Defendants and therefore will not be tried until December 2008.

contrary to National Century's representations, its funding of healthcare providers was not tethered to the providers' submission of eligible receivables. One of Beacham's sources for this revelation was Dierker. Beacham testified that Dierker "indicated that some of the clients that he was working with in client development were over-advanced, had been advanced to." Beacham went on to say that, "I think what [Dierker] specifically said is you don't want to hear this, but I'm working with clients that are under water, and they were within the securitized programs."

At trial, Dierker did not deny that he told Beacham that he was working with clients who were "under water," nor did he deny that those clients were in the securitized programs. Instead, Dierker minimized the incriminating significance of his comments, explaining that there was nothing unusual about the fact that he worked with clients who were "under water" because that was an ordinary and expected part of his job duties. Dierker explained that "under water," in the context of his conversation with Beacham, referred to healthcare providers in the NPF VI and XII programs who had been overfunded relative to their submission of eligible receivables, and therefore were out of compliance with their National Century financing agreements. He testified that "[e]very finance company in the world is going to have customers who are not in compliance with their financing agreements," and that at any given time he was aware of noncompliance issues affecting about one to two percent of the NPF investor portfolios. Dierker thus readily acknowledged that National Century had overfunded clients, and that part of his job was to investigate these situations and help "[b]ring [the providers] back above water." But, according to Dierker, as far as he knew the problem was limited in scope and was a typical cost of doing business in the financing industry; it was not attributable to any fraudulent activities committed by National Century executives, let alone him, and it was not on a grand scale.

36

Beacham's and Dierker's testimony gives rise to two alternative interpretations of what Dierker meant by his "under water" comments.  The jury certainly could have found that Dierker was credible and that he was merely referring to his legitimate "debt restructuring and recapitalization" responsibilities.  On the other hand, the jury could have credited Beacham's testimony, and reasonably inferred from it that Dierker's cautionary, "you don't want to hear this," demonstrated that Dierker knew he was doing something improper.  Further, even though Beacham did not identify which clients Dierker was speaking about (and perhaps Dierker did not tell him), the jury could have inferred, again quite reasonably, that Dierker's choice of the expression "under water" naturally referred to California Psychiatric, since California Psychiatric had declared bankruptcy.  The metaphorical link between being "under water" and in bankruptcy hardly stretches the imagination.  In any event, both accounts of what Dierker's comments to Beacham meant are plausible in light of the record evidence.  Dierker had ample opportunity to explain what he intended to communicate and to rebut any incriminating inferences that could be drawn from Beacham's testimony.  Whether or not he successfully did so was entirely up to the jury.

Dierker also argues that the jury should have disregarded Beacham's testimony because Beacham said that he did not intend to commit any criminal acts while working at National Century and that he learned that he had done so only after he consulted a lawyer following his indictment.  Dierker overlooks the fact that Beacham plainly admitted on the stand that he broke the law by concealing from investors what he learned in the summer of 2001 about National Century's true operations, and how those operations diverged from the publically represented business model.  Beacham's recognition of the criminal nature of his conduct might have come

37

late, but it was up to the jury to decide what effect that had on their impression of him and the truthfulness of his testimony.

*(c) Dierker's June 7, June 11, and July 12, 2001 Funding Authorizations*

The Government introduced into evidence certain emails Dierker sent directing the funding of California Psychiatric. The jury could well have taken these emails as convincing circumstantial proof that Dierker knew the DIP financing for California Psychiatric was coming out of NPF XII and that he intended nothing different.

On June 7, 2001, Dierker forwarded to Bily an email from Weiss requesting $620,000 in funding to meet California Psychiatric's budgetary needs for the next week. In his email to Bily, Dierker instructed her: "Please fund $530 thousand to California Psychiatric rather than the $620 thousand referenced below. The $84 thousand difference will be funded via another affiliate." Bily testified that the "other affiliate" to which Dierker referred was NPF X. Sure enough, on June 11, 2001, just four days after Dierker emailed Bily, he signed a wire request form calling for $84,024.12 to be wired out of NPF X to California Psychiatric. Bily testified that Dierker's June 7 email and the June 11 wire request form were linked; that is, the $84,000 (plus change) in the wire request form was the same $84,000 referred to in Dierker's email.

The June 11 wire request form is different in appearance and content from the "advance request forms" that Bily and the Funding Department staff prepared. Most obviously, it has "Wire Request" and "NPF X, Inc." written in bold letters at the top. None of the advance request forms that Dierker signed identified what program the funding was coming out of, but the June 11 wire request form most assuredly does. The implication created by Bily's testimony is that Dierker knew that California Psychiatric's weekly funding wires were coming out of NPF

38

XII.  When he wanted funding to come out of X, Dierker completed an altogether different form—one specifically captioned "NPF X"—than the advance request forms that Bily sent him.

Dierker sought to eliminate any incriminating inferences that could be drawn from his separate treatment of the $84,000 funding wire.  He testified that this money went toward payment of California Psychiatric's monthly mortgage.  The mortgagee was a secured creditor in California Psychiatric's bankruptcy, who threatened to foreclose on the Villa View property (one of the two psychiatric hospitals owned by California Psychiatric).  To prevent that from happening, Dierker said that California Psychiatric asked National Century "to supplement the funding to include the $84,000 monthly mortgage payment."  He testified that he initially contemplated funding the mortgage payment out of NPF Capital, a real-estate-lending program, and that this was the other affiliate to which he referred in his email to Bily: "My thought was well, maybe we'll continue to fund the DIP piece out of NPF X, as we had been, but fund the $84,000 out of NPF Capital, this other affiliate."  After thinking it over though, Dierker concluded that funding out of NPF Capital was not advisable.  He therefore signed the NPF X wire request form so that the funding would come out of that program.  Dierker acknowledged that the wire request form for the $84,000 was different from the advance request forms he signed.  He attributed this to the fact that the wire request form "went directly to the [A]ccounting [D]epartment rather than to the [F]unding [D]epartment as the receivables financing had been going."

Dierker thus testified to the following three things: (1) he intended the $84,000 he instructed Bily to withhold from California Psychiatric's weekly funding wire to come out of NPF X; (2) he prepared an NPF X wire request form to accomplish that purpose; and (3) he

forwarded the wire request form to National Century's Accounting Department.  Curiously

perhaps (or at least the jurors could have found it curious), Dierker did not do any of the things

he normally did when authorizing funding for California Psychiatric.  He did not email Bily or

any of her Funding Department staff to instruct them to send the $84,000, and he did not sign an

advance request form, nor apparently, was one even prepared for his signature.  If Dierker

always intended all funding for California Psychiatric to come out of NPF X, and if he believed

that was so, why did he follow two different processes—one through the Accounting Department

and another through the Funding Department—to effectuate that purpose?

There is yet more and it is not helpful to Dierker.  Recall the question the Court flagged

earlier in connection with Gibson's uncontroverted testimony that the Accounting Department,

not the Funding Department, managed NPF X, and that if she wanted to arrange a wire transfer

out of X, she would have contacted Accounting.  In light of Gibson's testimony, the jurors could

have concluded that the only rational explanation for why Dierker completed the June 11 NPF X

wire request form, but apparently did not follow that same procedure for any of the other funding

sent to California Psychiatric, was because he intended the $84,000 mortgage payment to come

out of NPF X, but intended the rest of the funding to come out of NPF XII.

Matters for Dierker get bleaker still.  The Government confronted Dierker on cross-

examination with a November 29, 2001 email from a National Century employee named Glenna

McVey.  Dierker testified that he believed that McVey worked in the Accounting Department.

Her email to Dierker noted that "[o]n Jun[e] 11th you processed a wire for $84,024.12 from NPF

X" for California Psychiatric.  McVey asked Dierker to "advise Accounting on how these funds

are to be repaid to NPF X."  Dierker responded on the same day that altogether there had been "5

such payments of $84,012.12 [to California Psychiatric], although the first one may have been the only one to have originated from NPF X." Such a statement is certainly inconsistent with Dierker's assertion that he intended and believed that *all* the funding sent to California Psychiatric came out of X. The jury could have construed his response to McVey to mean that the other four $84,000 funding wires to California Psychiatric must have come out of NPF XII. No other funding program was identified as a possible source of the funds and Dierker testified that he had excluded NPF Capital as a possible lender for this piece of California Psychiatric's budget needs by June 11, 2001, concurrent with the first $84,000 wire. Although Dierker attempted to explain his statement to McVey as simply a result of memory loss—that at the time he responded to her email he did not recall whether the four other $84,000 funding wires had come out of NPF X, but that they certainly could have—the jury may not have been persuaded. Of course, if the jurors determined that Dierker's email proved that California Psychiatric's mortgage payments were coming out of NPF XII, and that Dierker knew this, they easily could have deduced from that fact that Dierker knew that all the funding to California Psychiatric came out of NPF XII.

An email from Dierker to Bily, dated July 12, 2001, also lends itself to the conclusion that Dierker knowingly authorized the funding for California Psychiatric to come out of NPF XII. In that email, Dierker forwarded Weiss's weekly budget request and instructed the Funding Department to

> fund $330M to California Psychiatric this week. However, please check with John Snoble [National Century's Comptroller and head of National Century's Accounting Department] regarding the $84M for DVI [i.e., California Psychiatric's monthly mortgage payment]. He may want to send that component from NPF X leaving $246M to come from funding.

41

Once again, the jury reasonably could have found that Dierker's parsing of the funding allocation into two parts, one to come out of NPF X and the other to come "from funding," showed that he deliberately authorized the California Psychiatric funding to come out of NPF XII. Bily's testimony could have added weight to this conclusion. She testified that Dierker's reference to the $246,000 coming "from funding" meant NPF XII.

### (d) Gibson's Advances to Medshares

California Psychiatric was not the only bankrupt healthcare provider that National Century funded. Gibson testified that she authorized advances out of NPF VI for a provider called Medshares, while Medshares was in bankruptcy proceedings. The story of Medshares follows a familiar arc.

Medshares filed its bankruptcy petition in July 1999 and National Century, specifically NPF X, was named its DIP lender. Prior to its bankruptcy, Medshares had a financing agreement with NPF VI. Gibson testified that the relevant paperwork was completed to reassign Medshares from NPF VI to X, consistent with the bankruptcy court order and the prohibition on funding healthcare providers out of the securitized programs. Gibson was put in charge of administering the DIP financing, which was to cover Medshares's weekly operating requirements. She testified that she went to John Snoble in National Century's Accounting Department to arrange for the funding to come out of X, but Snoble told her that X did not have the capital to satisfy Medshares's needs. As a result, Poulsen and Ayers decided to fund Medshares out of NPF VI and Gibson was left to supervise the regular transfers.

The similarities between Gibson's funding of Medshares and Dierker's funding of California Psychiatric are difficult to miss. Gibson straightforwardly acknowledged that she

knew the funding for Medshares was improperly taken from NPF VI. The jury reasonably could have treated Gibson's testimony on this subject as probative of what Dierker knew about NPF XII's funding of California Psychiatric. In other words, the jury could have found that where Gibson and Dierker performed the identical task of overseeing DIP financing for two bankrupt clients, Gibson's awareness of where the money was actually coming from was reliable evidence of Dierker's awareness of the same. This is especially true when considering that Gibson testified that she and Dierker discussed with one another their work with these two bankrupt entities.

    (e) *Dierker's September 26, 2001 Memo About the Sale of Villa View Hospital*

Gibson testified that NPF X did not maintain reserve accounts. In his own testimony, Dierker agreed, at least initially. Since X was not an investor program, the fact that it did not have reserves (or a collection or purchase account, for that matter) is not surprising.

On cross-examination, the Government asked Dierker about a September 26, 2001 memo he wrote to Poulsen and other senior executives describing the proposed sale of Villa View Hospital, one of California Psychiatric's two psychiatric hospitals, and recommending that the sale be consummated. Attached to Dierker's memo was a balance-sheet summary of the amount of money California Psychiatric owed National Century. This showed that during the period in which National Century served as DIP lender, reserves had been deducted from California Psychiatric's weekly funding wire. The implication created by the Government's questioning was that there would have been no reason for reserves to come out of the DIP financing to California Psychiatric if NPF X had been the source for that financing. Further, since Dierker admitted that he authored the memo and compiled the attached balance-sheet summary, the jury

reasonably could have inferred that he knew the DIP financing came out of NPF XII.  Dierker tried to back away from his earlier statement that NPF X did not maintain reserves by amending his testimony to say that NPF X was not "required" to maintain reserves, but that it could do so "at our discretion depending on the transaction."  As always, the jurors were free to endorse either of two opposing conclusions about this evidence: They could have believed Gibson and Dierker's original testimony that NPF X did not have reserve accounts and therefore treated Dierker's report on California Psychiatric's reserves as evidence of his guilt.  On the other hand, they could have credited Dierker's explanation that National Century could elect to maintain reserves on funding wired out of NPF X, and that is what he believed had been decided.

### (f) The Receivables Purchase Report

As described above, Dierker did not prepare or sign the receivables purchase report that directed the trustee to wire funding to California Psychiatric out of NPF VII.  Bily testified that the receivables purchase reports were the mechanism by which National Century conveyed instructions to the trustee banks to wire funding to the healthcare providers.  The Funding Department prepared the receivables purchase reports, which were then signed by an authorized National Century executive, and sent to the trustee.  Poulsen, not Dierker, signed the two reports directing the improper wire transfers to California Psychiatric.  Dierker says that this shows that he did not do anything wrong.

Dierker's argument misses the mark.  His lack of involvement with the receivables purchase reports shows only that he did not play a role in the final steps necessary to actually trigger a funding wire; it does not mean that he played no role whatsoever in the sequence of events that culminated in the transmission of the receivables purchase reports to the trustee.  The

44

evidence shows that while it was in bankruptcy, no money at all went to California Psychiatric unless and until Dierker told Bily (or her Funding Department staff) to arrange a wire transfer, pursuant to Weiss's weekly emails.  As already described in detail above, there was evidence in the record from which the jury could have concluded that Dierker knew this funding came out of NPF XII, not X.  So long as Dierker knew this, it is immaterial that he did not perform the administrative tasks necessary to make it so.  To put it bluntly, those who give the orders cannot escape the consequences by blaming subordinates who carried them out.

### (g) Summary of the Evidence as to Dierker

The evidence in this case was not so one-sided as to automatically compel the conclusion that Dierker was guilty of the charged offenses.  Indeed, as discussed above, Dierker met virtually every bit of incriminating testimony and evidence with an alternative explanation that the jury could well have deemed both plausible and convincing.  Or not.  The point is that it was the province of the jury, not the Court during trial, and not the Court on a post-conviction motion, to weigh the evidence and assess the credibility of the witnesses.  Where the evidence gave rise to opposing inferences, as was often the case where Dierker was concerned, it was up to the jury to decide which of those inferences best fit the facts and their evaluations of the witnesses' trustworthiness.  In sum, the jury rationally could have found Dierker guilty beyond a reasonable doubt.  Because that is the case, the Court's duty is to uphold the jury's verdict.

### III. DEFENDANTS' RULE 33 MOTIONS

Defendants assert several arguments on behalf of new trials.  First, all Defendants argue that their money-laundering convictions should be vacated in light of the Supreme Court's recent decision in *United States v. Santos*, __ U.S. __; 128 S. Ct. 2020 (2008).  Second, Ayers moves

45

for a new trial on the grounds that media coverage both before and during the trial deprived him

of an unbiased jury.  Third, Dierker seeks a new trial claiming that the Government committed

prosecutorial misconduct.  Finally, both Ayers and Dierker argue that the Government withheld

exculpatory evidence that would have altered the outcome of the trial had it been properly

disclosed.  Each of these contentions will be discussed in turn.

### A. Legal Standards

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires."

Whether to grant a Rule 33 motion is left to the sound discretion of the district court.  *United

States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008).

### B.  Defendants' Motions for New Trials Based on *United States v. Santos*

Defendants were convicted of conspiracy to engage in money laundering, in violation of

18 U.S.C. § 1956(h).  Speer, Faulkenberry, and Dierker were also convicted of substantive

counts of money laundering, in violation of § 1956(a)(1)(B)(i).  Defendants argue that the

Supreme Court's recent decision in *Santos*, issued after they were tried, requires that their

money-laundering convictions be vacated.

Section 1956(a)(1)(B)(i) of the federal money-laundering statute prohibits persons from

knowingly engaging in financial transactions designed to "conceal or disguise . . . the proceeds

of specified unlawful activity."[12]  The statute identifies "more than 250 predicate offenses,"

---

[12]The statute reads: "Whoever, knowing that the property involved in a financial
transaction represents the proceeds of some form of unlawful activity, conducts or attempts to
conduct such a financial transaction which in fact involves the proceeds of specified unlawful
activity . . . knowing that the transaction is designed in whole or in part to conceal or disguise the
nature, the location, the source, the ownership, or the control of the proceeds of specified

*Santos*, 128 S. Ct. at 2027, as "specified unlawful activity," including securities fraud and wire fraud.

The question in *Santos* was whether the term "proceeds" in the statute means the "gross receipts" of specified unlawful activity, or the "profits" of such activity.  Santos had been convicted of operating an illegal gambling business in violation of 18 U.S.C. § 1955, as well as one count of conspiracy to launder money and two counts of money laundering.  *Santos*, 128 S. Ct. at 2023.  The illegal gambling operation was thus the "specified unlawful activity" that gave rise to the money-laundering charges against Santos.  The transactions on which Santos's money-laundering conviction was based involved his payments to those who helped him run his lottery, as well as payments to the winners.  *Id.*

The Supreme Court affirmed the Seventh Circuit's decision to vacate Santos's money-laundering conviction.  Led by Justice Scalia, a plurality of the Court determined that the term "proceeds" is ambiguous and could reasonably mean either "receipts" or "profits" in the context of the statute as a whole.  *Id.* at 2024-25.  The plurality explained that it was obligated to break the tie, so to speak, between the competing definitions by applying the rule of lenity to give "proceeds" the construction most favorable to criminal defendants: The Court stated that "[b]ecause the 'profits' definition of 'proceeds' is always more defendant-friendly than the 'receipts' definition, the rule of lenity dictates that it should be adopted."  *Id.* at 2025.

---

unlawful activity . . .  shall be sentenced to a fine of not more than $ 500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both."

Justice Stevens concurred in the judgment, but reasoned that the definition of "proceeds" could vary depending upon the "specified unlawful activity" forming the predicate for the money-laundering charges. *Id.* at 2031-32. In other words, he concluded that "proceeds" could mean either "receipts" or "profits," depending upon the Congressional intent manifested in the particular predicate offense underlying the money-laundering charges. Because he agreed with the plurality that "proceeds" means "profits" when an illegal gambling operation is the "specified unlawful activity" giving rise to the money-laundering charges, Justice Stevens provided the necessary fifth vote to affirm the Seventh Circuit and reverse Santos's conviction. *Id.* at 2033-34.

The Government argues that *Santos* is inapplicable to this case because, given the divided opinions of the Supreme Court, *Santos* stands only for the proposition that "proceeds" means "profits" when the predicate offense is operating an illegal gambling business. The Government says that this is the only holding that garnered a majority of five justices. Although Justice Scalia's plurality opinion insists that "proceeds" means "profits" all the time, no matter what "specified unlawful activity" is involved, Justice Stevens was unwilling to go that far. Accordingly, the Government argues that *Santos* does not demand that this Court treat "proceeds" as "profits," because the "specified unlawful activity" giving rise to the money-laundering charges here is wire fraud and securities fraud, not an illegal gambling business.

The Court need not decipher the conflicting opinions in *Santos* and assay their applicability (or not) to this case. This is so because the Court agrees with the Government's second argument against reversing the Defendants' convictions: Even if "proceeds" means "profits" here, the transactions forming the basis for the Defendants' money-laundering

48

convictions did indeed involve the "profits" of their securities and wire fraud activities, not the gross receipts.

As described above, the transactions that gave rise to Santos's money-laundering convictions involved the payment of his costs of doing business, namely, paying his employees and the winners of his lottery. Logically, then, these were not transactions in the "profits" of Santos's illegal gambling business, but transactions in the expenses of that business. Had the transactions involved the money left over *after* Santos paid his employees and the winners (and any other expenses he accrued), such transactions would have involved the "profits" of his gambling business and his conviction would have been sustained. As the Supreme Court plurality concluded, "a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid." *Santos*, 128 S. Ct. at 2027.

In this case, the billions of dollars National Century collected from investors constituted the "gross receipts" of Defendants' "specified unlawful activity," i.e., their securities and wire fraud. Unlike in *Santos*, the transactions that formed the basis for Defendants' money-laundering convictions had nothing to do with paying their expenses. The Government did not allege that Defendants laundered money by paying their employees or paying costs associated with marketing their NPF programs or the services of outside professionals, like the indenture trustees and auditors. If the Government's theory of money laundering depended upon these kinds of transactions, then under *Santos*, Defendants' convictions would have to be vacated.

Instead, the Government's theory, proved at trial, was that Defendants laundered money by making unsecured loans (i.e., "advances") to financially shaky healthcare providers, many of

49

which National Century's principals had a separate ownership stake in.  The advances were not

"expenses" of Defendants' securities and wire fraud; rather, they were separate transactions

designed to prop up the principals' other business interests.

At trial, the Government did not attempt to comprehensively identify and quantify all

National Century's expenses that would need to be deducted to determine the "profits" generated

by Defendants' illegal wire and securities fraud activities.  However, the Court agrees with the

Government that these expenses would have consisted of such things as marketing the NPF

programs to investors and paying outside professionals (such as the auditors and trustees), and

that these expenses would have been small compared to the billions of dollars in investors'

money that National Century collected.

For these reasons, the Court determines that Defendants' money-laundering convictions

were based upon their transactions in the "profits" of their illegal securities and wire fraud

activities.  Defendants' money-laundering convictions shall therefore stand.

### C. Ayers's Motion for a New Trial Based on Pre-Trial and Trial Publicity

Defendant Ayers contends that the pre-trial and trial publicity surrounding this case was

so "pervasive" that he could not have received a fair trial.  He relies on the fact that the day

before jury selection began, the Columbus *Dispatch* ran a lengthy front-page article describing

the case and comparing the magnitude of the National Century fraud to Enron and Worldcom.

He also points out that over the course of the six-week trial, fourteen other articles covering the

proceedings appeared in the *Dispatch* and other publications.

A criminal defendant is entitled to "a fair trial by a panel of impartial, 'indifferent'

jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  A defendant who claims that media coverage

tainted the jury may prevail by showing either "presumptive prejudice" or "actual prejudice." *Joseph v. Coyle*, 469 F.3d 441, 468 (6th Cir. 2006). Rarely will circumstances justify a finding of presumptive prejudice. *Foley v. Parker*, 488 F.3d 377, 389 (6th Cir. 2007); *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (stating that "[i]ndeed, the few cases in which the [Supreme] Court has presumed prejudice can only be termed extraordinary . . . ."). Only when "an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community" will prejudice be presumed. *Foley*, 488 F.3d at 387.

If presumptive prejudice does not apply, courts must then consider whether the defendant was actually prejudiced. In this regard, the court examines the voir dire transcript and the extent and nature of the publicity to determine whether a fair trial was impossible. *White v. Mitchell*, 431 F.3d 517, 532 (6th Cir. 2005). Just because prospective jurors are familiar with the facts and issues in the case does not disqualify them as biased. *Foley*, 488 F.3d at 387. "The relevant question is 'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Id.* (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).

Ayers does not identify which type of prejudice—presumed or actual—he believes himself to have suffered, and he does not give any reasons or offer any evidence substantiating his claim. Ayers's argument amounts to no more than speculation that the mere existence of media coverage of this case interfered with his right to a fair trial. Such a bare assertion is simply not enough.

As an initial matter, there is no basis for presuming prejudice here. There was nothing "circus-like" about either the proceedings themselves or the community reaction to the case or

the Defendants.  It cannot be said that the "trial atmosphere [was] utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 302 (1977), or that there was a "wave of public passion that would have made a fair trial unlikely by the jury."  *Patton v. Yount*, 467 U.S. 1025, 1040 (1984).

Similarly, the record is devoid of evidence giving rise to actual prejudice.  Ayers nearly concedes as much when he acknowledges that the Court "exercised careful diligence in excluding prospective jurors who were willing to admit prejudicial feelings towards the case and/or Defendant Ayers . . . ."

The voir dire transcript shows that the Court repeatedly instructed the venire members that if selected to sit as jurors they would be required to set aside any information they had obtained about the case from any outside source, to decide the case solely on the facts and evidence presented at trial, and to accord the Defendants the presumption of innocence until such time, if ever, that they believed the Government had proven them guilty beyond a reasonable doubt.  The Court asked venire members to identify themselves by raising their hands if they had obtained any information about the case or the Defendants through any media source, including newspapers, television, radio, or the Internet.  Given the prominence of the Columbus *Dispatch* coverage, the Court singled out the article that appeared the day before the start of trial and a second article that appeared during the course of the voir dire proceedings to determine if they had a disabling influence upon any prospective juror.  The Court further asked venire members who had performed independent Internet searches in connection with the case, or who had talked with fellow venire members about the case, to identify themselves.  Anyone who indicated that he or she would be incapable of carrying out the duties of an impartial juror, as those duties were

repeatedly explained by the Court, was asked to step forward and was painstakingly questioned by both the Court and counsel at sidebar. Those who proved themselves unable to set aside preconceived ideas or who could not be trusted to rely exclusively on the evidence presented at trial were excused.

Short of individually questioning each of the three-hundred members of the venire, which would have been both excessively time consuming and unnecessary, the Court cannot imagine how it could have been more thorough in seeking to weed out those who had been irrevocably influenced by media coverage of the case. Although many members of the venire had previously been exposed to at least some information about the case, the overwhelming majority indicated that they were not ill-disposed to either side as a result. Those few who did express such a concern were dismissed. Further, the Court has no reason to disbelieve those venire members who assured the Court that they could fairly perform their duties. The media coverage was not so overwhelming or one-sided as to make their assurances of impartiality doubtful.

Finally, in response to Ayers's reliance on the media coverage that occurred throughout the trial, the Court notes that each day before adjourning it admonished the jurors not to discuss the case with anyone and not to consult any media reports or outside sources. The Court has no reason to think that the jurors did not comply with this instruction.

For these reasons, Ayers's motion for a new trial is denied.

### D. Dierker's Motion for a New Trial Based on Prosecutorial Misconduct

Dierker moves for a new trial on the grounds that the Government committed prosecutorial misconduct through a question posed to a witness by one of its prosecutors, and through statements another of its prosecutors made in closing. In determining whether a

defendant is entitled to a new trial due to prosecutorial misconduct, the court first analyzes whether the prosecutor's challenged conduct was improper, and if so, asks whether that conduct was flagrant. If the statement was improper but not flagrant, a new trial is appropriate only when "(1) proof of defendant's guilt is not overwhelming, and (2) defense counsel objected, and (3) the trial court failed to cure the error with an admonishment to the jury." *United States v. Carroll*, 26 F.3d 1380, 1385-86 (6th Cir. 1994). "Improper remarks that are flagrant amount to per se reversible error." *United States v. Hargrove*, 416 F.3d 486, 493 (6th Cir. 2005). The court considers four factors in determining whether improper remarks are flagrant: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Id.*

### 1. The Government's Re-Direct of Witness Terrence Glomski

Dierker first challenges a question that Assistant United States Attorney ("AUSA") Kathleen McGovern posed to investor Terrence Glomski while questioning him on re-direct. To understand the dispute, some background on Glomski's direct examination testimony is necessary.

On direct, Glomski testified about the events surrounding National Century's November 2002 meltdown. According to Glomski, Poulsen contacted the investors in October 2002 to inform them that a "technical default" had occurred, owing to what Poulsen said was the use of reserves to purchase receivables. Poulsen wanted the investors to agree to a waiver of the reserves compliance requirements, rather than demand the immediate return of their money, which would bring the NPF programs to an end. In an apparent attempt to convince them to do

so, Poulsen wrote the investors a letter, warning them that an "immediate wind down of NPF XII

. . . will have a catastrophic impact on the investors' investment."  Poulsen explained that if NPF

XII was immediately shut down without giving the healthcare providers an opportunity to find

alternative sources of financing, the providers would take the payments on the receivables that

National Century had already purchased and use those payments to fund their continued

operations, rather than send them to National Century, as they were required to do in accordance

with their financing agreements.  Glomski interpreted Poulsen's letter as meaning that the

providers would keep the receivables payments "out of desperation," and that Poulsen was

advising the investors that they had "better go along with the waiver of default" so as to avoid

losing their investments.

Glomski was cross-examined by Defendants about this subject.  In response, on re-direct,

AUSA McGovern posed the following questions:

> Q: Do you recall being asked a number of questions on cross-
> examination with regard to the sellers diverting funds from the
> lockboxes [i.e., the healthcare providers diverting payments on the
> receivables that were supposed to be sent to National Century]?
>
> A.  Yes.
>
> Q: And did you know that Mr. Poulsen actually told the sellers to
> divert the funds?

At this point, an objection was interposed on the grounds that AUSA McGovern's question

mischaracterized the trial testimony.  At sidebar, McGovern contended that her question was

proper because it was based on the testimony of Brian Weiss who, according to McGovern, said

that Poulsen told the healthcare providers "to do what they had to do with regard to the

lockboxes and the funds."  Speer's counsel, who made the objection, agreed with McGovern's

characterization of Weiss's testimony. The Court sustained Speer's objection, but gave McGovern an opportunity to rephrase her question based on what Weiss actually said. The Court instructed the jurors that "the previous question posed by Ms. McGovern is stricken. The objection is sustained and Ms. McGovern may now pose her next question." Consistent with the Court's ruling, AUSA McGovern then asked witness Glomski, "were you aware that Mr. Poulsen instructed at least one healthcare provider to do what he had to do insofar as it was with regard to lockboxes?" No Defendant objected to that question.

A review of the record shows that the Court and counsel were mistaken when they attributed the "do what you have to do" statement to Weiss. It was actually witness Donna Talbott, of Doctors Community, who testified that Poulsen's letter to the healthcare providers advised them that "the trustees were not releasing the funding, and that [Doctors Community] should do what they have to do at this point." Although the "do what [you] have to do" language was Talbott's, not Weiss's, the substance of Weiss's testimony was not much different. He testified that Poulsen's letter told the providers to "take whatever means necessary to find other financing" and that one of the steps he took was "to have the money that was going to the lockboxes come to the hospitals until we could figure out another funding means."

AUSA McGovern's original question was improper insofar as she said that Poulsen instructed the healthcare providers to divert the payments on the receivables away from National Century. This impropriety does not necessitate a new trial, however, because defense counsel objected to the question and the Court struck it. No Defendant objected to AUSA McGovern's re-phrased question.

56

Moreover, AUSA McGovern's original question was not flagrant. Granted, it should not have been posed in quite the manner that it was, but it was just a single question and it may well have been unintentional. When challenged, after all, McGovern gave a basis for her question, namely Weiss's testimony. The question had the tendency to mislead the jury in that it assumed as fact one possible interpretation (and the most damaging at that) of Poulsen's advice to the healthcare providers—that they should divert the payments on the receivables that National Century had already purchased for their own use—but its propensity to mislead was not so great as to require a new trial. Indeed, the meaning that McGovern gave Poulsen's statements was apparently the same as Talbott, Weiss, and Glomski gave them, and while she should have left the interpreting up to the jury, her question did not stray so far from the record evidence as to rise to the level of "flagrancy."

## 2. The Government's Closing Statement

Dierker also complains about three statements AUSA Wesley Porter made in his closing, including: (1) Porter's characterization of Weiss's testimony regarding where Weiss understood the California Psychiatric funding to come from; (2) Porter's comparison of Dierker's funding of California Psychiatric with Gibson's funding of Medshares; and (3) Porter's statements to the jury about the meaning of Dierker's "under water" comments to Beacham. None of these statements is improper, let alone flagrant, and Dierker did not even object to the first two.

First, Dierker contends that AUSA Porter misled the jury about Weiss's testimony. Recall that Weiss sat on the post-petition management committee for California Psychiatric and emailed Dierker the weekly funding requests. Porter had the following to say about Weiss's testimony:

Brian Weiss would contact Mr. Dierker and say, this is what we
need, [$]670,000 here, [$]720,000 there.  And you heard from Mr.
Weiss.  Now remember, he's all the way out in California
operating on behalf of California Psychiatric.  All the way out
there in California operating on behalf of California Psychiatric.
All the way out there, he told you from the witness stand, and the
money that was provided to me, the money that was funded to me,
at California, came out of NPF XII.

Let me repeat that.  Brian Weiss, who's in California, understands
that the money funded to him came out of NPF XII.

Defendant Dierker, who's down the hall at an office in Dublin,
[Ohio] claims that he doesn't know that the money was coming out
of XII.

Dierker argues that contrary to Porter's statements, Weiss testified that he believed that

NPF X was the source of the post-petition financing for California Psychiatric.  In fact, Weiss's

testimony was not so clear-cut.

To begin with, the basis for Dierker's contention that Weiss knew the funding was

coming from NPF X was Weiss's answers to cross-examination questions about an internal

National Century spreadsheet.  Weiss sent Dierker an email on September 13, 2001, asking

Dierker for information about California Psychiatric's total outstanding debt obligation to

National Century.  Dierker sent Weiss's email to Bily, asking her to update their funding

spreadsheet for California Psychiatric.  On cross-examination, Dierker's counsel showed Weiss

the spreadsheet, which was entitled "California Psychiatric Management Services Debtor-In-

Possession Case NPF X Advances."  In response to a question about whether Bily sent him the

spreadsheet, Weiss said, "I imagine so, yes."  He also agreed that based on the spreadsheet, it

appeared as though the funding came out of NPF X, stating that "[t]hat's my understanding what

I'm seeing here, yes."  Thus, Weiss did not unambiguously testify that he knew the post-petition

financing for California Psychiatric came from NPF X at the time he requested it, but the jury could have so inferred based on Dierker's cross-examination.

On the other hand, Weiss's testimony supports another inference.  During the Government's direct examination, Weiss testified that National Century sent regular statements documenting California Psychiatric's submission of receivables and the amount of financing California Psychiatric received in return.  Weiss identified these statements on the stand and all thirty-seven of them, covering the period of September 1, 2000, through October 26, 2001 (which corresponds to the period of California Psychiatric's bankruptcy), were introduced into evidence.  Each one says at the top "NPF XII, Inc. Accounts Receivable Funding Program." Weiss was not asked, and he did not say, that he "understood" (to use AUSA Porter's words) the source of the funding to be NPF XII.  Nonetheless, he testified that each of the statements he received from National Century was identified as an account statement issued by the NPF XII program.  The jury therefore could have inferred that Weiss believed or "understood" that the funding came from NPF XII.

Given the lack of clarity in Weiss's testimony in relation to precisely what he knew during California Psychiatric's bankruptcy about the source of its DIP financing, it was perhaps a bit of a reach for AUSA Porter to declare that, "Brian Weiss, who's in California, *understands* that the money funded to him came out of NPF XII" (emphasis added).  Then again, Dierker did not object at trial to Porter's characterization, but instead emphasized in his own closing statement Weiss's cross-examination testimony going the other way.  Moreover, even if Porter's statement went somewhat beyond what a strict reading of the evidence would support, it was a fair inference, based on the thirty-seven NPF XII account statements that Weiss testified about,

to say that Weiss "understood" that California Psychiatric's funding was coming from NPF XII, and Porter was entitled to put this interpretation of the evidence before the jury. The Court therefore finds that Porter's characterization of Weiss's testimony was not improper.

Next, Dierker argues that AUSA Porter engaged in misconduct by comparing Gibson's advances to Medshares to Dierker's advances to California Psychiatric. Porter said the following in his closing:

> When Ms. Gibson took the stand, she told you about her bankrupt entity, Medshares. They had the same bankruptcy orders, they had the same sales and subservicing agreement, they had the same UCC's filings, same exact everything as Mr. Dierker with California Psychiatric.

Porter went on to summarize Gibson's testimony about how she approached Snoble, the head of the Accounting Department at National Century, to advise him that the Medshares bankruptcy court order named NPF X as its DIP lender. Snoble told her that NPF X did not have the money to provide the financing.

Once again, Dierker did not object to AUSA Porter's statements. Nor did he attempt to debunk Porter's Medshares analogy in his own closing, or even address it. Now, however, Dierker complains that these statements misled the jury because the Government did not present any evidence establishing that there had been a transfer of interest from NPF VI (the program that funded Medshares prior to its bankruptcy) to NPF X, as there had been a transfer of interest from NPF XII to NPF X in the case of California Psychiatric.

As an initial matter, Dierker's argument amounts to little more than the proverbial splitting of hairs. Irrespective of the thoroughness of the Government's evidentiary showing with respect to the Medshares assignment from NPF VI to X (more on that in a moment), AUSA

60

Porter was entitled to argue to the jury that they should pay attention to the parallels between the DIP financing of Medshares and California Psychiatric. Both Gibson and Dierker were put in charge of overseeing National Century's DIP financing of these two healthcare providers. Both were aware of federal court orders designating NPF X, not VI or XII, the source of the financing. And in both cases, the funding actually came from one of the securitized programs. There was nothing untoward about AUSA Porter pointing out these overarching similarities and implicitly suggesting that, where Gibson acknowledged that she knew all along that Medshares was not funded out of NPF X, Dierker must have known that the same was true for California Psychiatric.

This alone is sufficient to dispose of Dierker's challenge, but it is important to mention that Dierker's contention that the Government offered no proof of an assignment of interest in the Medshares case is simply not true. No, the Government did not offer into evidence the documents memorializing the assignment, but Gibson testified that these documents were prepared and put in place. Gibson's testimony may not satisfy Dierker, but the record was not silent on this point.

For all of these reasons, Dierker's argument that AUSA Porter committed prosecutorial misconduct in his comparison of Medshares and California Psychiatric fails.

Finally, Dierker challenges Porter's statements about his "under water" remarks to Beacham. Porter said in closing:

> Jon Beacham told you, based on his discussions with Defendant Dierker, that he knew what went on. He was chief credit officer and he worked in client development. He worked with the clients that were underwater. He worked with the clients that had problems. When Defendant Dierker took the stand, he actually said, all finance companies have clients that are not in compliance.

61

> They're not supposed to at this company.  Not when they're using
> securitizations.  Not when they're using entrusted investor money
> to purchase their accounts receivable.  They shouldn't have clients
> that are underwater.

Unlike Porter's other statements in closing, Dierker did object to this one and asked the Court to correct the record.  Dierker argued that the evidence showed that National Century recognized that a risk of loss was inherent in its operations and that it sought to minimize this risk through overcollateralization of the investors' bonds and reserve accounts.  Dierker thus contended that Porter's statements to the effect that National Century was never supposed to have out-of-compliance clients was insupportable.  The Court, however, declined to strike AUSA Porter's comments, finding that they constituted fair comment about the evidence.

The Court stands by its trial ruling.  It was Dierker who, during his own testimony, advanced the notion that there was nothing unusual about finance companies, like National Century, occasionally experiencing compliance difficulties with their clients.  Dierker's apparent goal in so testifying was to normalize his comments to Beacham about working with clients that were "under water."  The Government was entitled in its closing statement to rebut Dierker's defense theory.  It was also entitled to argue to the jury its own theory that Dierker's "under water" comments referred not to minor compliance issues, but to funding bankrupt healthcare providers out of the securitized programs, which even Dierker admitted was prohibited under the NPF governing documents.  Accordingly, there is no basis for finding AUSA Porter's statements improper.

In summary, the Court finds that AUSA McGovern's re-direct question to witness Glomski about Poulsen's "diverting-funds" instructions was improper, but it was hardly flagrant.  This isolated impropriety was likely inadvertent, McGovern offered an evidentiary basis for her

question, and no party objected to her re-phrased question.  As to AUSA Porter's statements in

closing, the Court concludes that none of these was improper and notes that Dierker did not even

interpose a contemporaneous objection to two out of the three.  Accordingly, Dierker's motion

for a new trial on the grounds of prosecutorial misconduct is denied.

**E.  Ayers's and Dierker's Motions for New Trials Based on *Brady* Violations and Rule 33**

Ayers and Dierker assert that they are entitled to new trials because the Government

withheld material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

They also contend that this newly discovered evidence entitles them to a new trial under Rule

33(b).[13]

To establish a *Brady* violation, a defendant has the burden of showing that "the

Government suppressed evidence, that such evidence was favorable to the defense, and that the

suppressed evidence was material."  *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).

"Material" means "that there is a reasonable probability that, had the evidence been disclosed to

the defense, the outcome would have been different."  *United States v. Jones*, 399 F.3d 640, 648

(6th Cir. 2005) (internal quotation marks and citation omitted).  "Reasonable probability means a

probability sufficient to undermine confidence in the outcome."  *Id.* (internal quotation marks

and citation omitted).  "[T]he question is not whether the defendant would more likely than not

have received a different verdict with the evidence, but whether in its absence he received a fair

trial, understood as a trial resulting in a verdict worthy of confidence."  *Strickler v. Greene*, 527

U.S. 263, 289-90 (1999).  "Further, there is no *Brady* violation if the defendant knew or should

---

[13]Defendants Speer and Faulkenberry have moved to join Ayers's motion for a new trial.
The Court grants their requests.

have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Graham*, 484 F.3d at 417 (internal quotation marks and citation omitted).

To obtain a new trial on the basis of newly discovered evidence under Rule 33(b), a defendant must show: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *United States v. O'Dell*, 805 F.2d 637, 640 (6th Cir. 1986). The Rule 33 standard is therefore more stringent than the *Brady* standard. Under the former, a defendant must show that the newly discovered evidence "would likely produce an acquittal," whereas under the latter, the defendant need only show that the withheld evidence at issue is "material." *See United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (noting the different degrees of burdensomeness entailed in the two standards); *Jones*, 399 F.3d at 648 (noting that defendants may frame their requests for new trials under both *Brady* and Rule 33).

There are four categories of documents that Ayers and Dierker contend the Government improperly withheld from them. First, both Defendants assert that the Government wrongly failed to produce documents underlying a March 27, 2008 order issued by the Securities and Exchange Commission ("SEC") finding that the NPF trustees—Chase for NPF VI and Bank One for NPF XII—were negligent in failing to detect that the programs were not in compliance with the Indenture (the "SEC Trustees Order"). Second, Dierker argues that the Government withheld two other categories of documents, namely (1) documents in connection with the SEC's September 19, 2007 orders finding that outside accountants performed negligently in signing off

64

on unqualified audit reports for National Century (the "SEC Auditors Orders"), and (2)

documents disclosed in civil litigation against certain of the Defendants that bear on what third

parties, such as the NPF bond underwriter, knew about National Century's business practices

prior to its demise.  Finally, Ayers argues that the Government improperly failed to produce

certain letters that Sherry Gibson wrote to a longtime friend from jail.  Each of these alleged

*Brady* violations will be discussed in turn.

### 1.  The SEC Trustees Order

On March 27, 2008, just a few weeks after the Defendants were found guilty in this case,

the SEC issued a "cease-and-desist order" finding that the Chase and Bank One trustees had

been negligent in administering the NPF investment programs.  Specifically, the SEC found that

lower-level employees at Chase and Bank One "raised questions internally about [National

Century's] conduct to more senior-level indenture trustee employees," but that the senior-level

employees failed to respond adequately.  The SEC concluded, for example, that Chase should

have noticed the "woefully deficient" NPF VI reserve accounts in February 1999, and the false

investor report issued the same month, and informed the investors that an event of default had

occurred.  As to Bank One's oversight of NPF XII, the SEC found that a lower-level employee

alerted an account executive to the large cash transfers National Century made between the VI

and XII programs on August 31, 2000, and September 1, 2000, but the account executive took no

action.  The SEC order requires Chase (which merged with Bank One subsequent to National

Century's collapse) to pay nearly $1.3 million in disgorgement to the NPF investors and more

than $700 thousand in pre-judgment interest.

Ayers and Dierker argue that the documents underlying the SEC order, including internal Chase and Bank One communications revealing concerns about National Century's business practices, were exculpatory and also could have been used to impeach key Government witnesses.

The trustees owed a fiduciary duty to the investors to make sure that the investors' money was used only to purchase eligible receivables and that the NPF programs were functioning in line with the requirements of the Indenture.  It was the trustees who actually maintained the program accounts and who, at National Century's direction, transferred funding to the healthcare providers.  Given that it was the trustees who exercised immediate control over the investors' money, Ayers and Dierker say that evidence showing that the trustees knew, or should have known, about the compliance problems in the programs, but nonetheless continued to release funding, shows that the trustees were responsible for the investors' losses, not them. Dierker adds that this evidence would have served to independently corroborate the testimony of his bankruptcy expert, Kathryn Williams.  Williams testified that once the rights to California Psychiatric's receivables had been assigned from NPF XII to X, the Bank One trustee "should have made sure that no . . . distributions out of NPF XII [went] to [California Psychiatric]" and that the trustee was "[a]t best negligent" in failing to do this.

Thus, Ayers and Dierker insist that the evidence giving rise to the SEC Trustees Order would have exculpated them by pointing the finger at the trustees.  Ayers says that if the trustees were merely negligent, than *his* "actions could not have amounted to more than negligen[ce]." Dierker likewise says that the evidence of the trustees' negligence supports his claim of innocence.

66

Besides being exculpatory, Ayers and Dierker argue that had the documents underlying the SEC Trustees Order been disclosed, they would have used them to impeach the Government's witnesses, especially Gibson and Bily, who testified that they took steps to conceal National Century's fraud from the trustees.

The Government maintains that it produced all *Brady* material in connection with the SEC Trustees Order. Ayers disagrees and Dierker appears uncertain, but still argues that even if the information was disclosed, he had no practical means of locating it amidst the millions of pages of documents produced in this case. Even assuming that the documents were not produced, the Government's non-disclosure did not amount to a *Brady* violation necessitating a new trial. Certainly such evidence would have been "favorable" to Defendants, but the Court cannot say it was "material," such that its non-disclosure undermines confidence in the jury's guilty verdicts. Just because the SEC found—through a civil, not a criminal, investigation no less—that the trustees contributed to the fraud at National Century by failing to pay adequate attention to certain warning signs, hardly relieves any Defendant of responsibility for perpetrating the fraud in the first place. The evidence at trial established, and Defendants do not dispute, that the trustees were not authorized to move money out of the NPF program accounts unless National Century executives instructed them to do so, and they certainly were not involved in actually operating the programs. It was thus not the trustees who conceived of the scheme, put it into motion, and sustained it; rather, it was the Defendants. Put differently, the trustees' complicity, according to the SEC, amounted to a negligent failure to investigate certain red flags that might have revealed National Century as the house of cards that it was. Even had Defendants been able to introduce this evidence at trial, there is no reason to think that it would

67

have swayed the jurors or even given them any pause.  The negligence of the trustees is not inconsistent with Defendants' criminal culpability and there is no merit to Defendants' assertion that the trustees were somehow more at fault than them.

Moreover, evidence of the trustees' negligence would have had limited impeachment value.  Defendants say that this evidence could have been used to show that Gibson and Bily did not tell the truth when they testified that National Century deceived the trustees.  The way Defendants put it, one might think that Gibson and Bily testified that the trustees were *actually* duped, but of course, such information was not within the personal knowledge of either witness. Gibson and Bily simply testified that they participated in the cover-up at National Century, including taking steps to conceal the fraud from the trustees, and that they believed they had succeeded.[14]  The point is that the SEC's finding of negligence on the part of the trustees does nothing to diminish the force of Gibson's and Bily's testimony about what they did to hide the company's true business practices from the trustees.  Even if the trustees knew or should have known more about what was really going on at National Century, that does not render incredible, or even doubtful, Gibson's and Bily's testimony that they worked to prevent the trustees from gaining any such knowledge.  For this reason too then, the evidence underlying the SEC Trustees Order does not satisfy *Brady*'s materiality standard.  Neither does it satisfy the more exacting

---

[14]Ironically, the very thing that Defendants rely upon to suggest that Gibson and Bily testified falsely—the SEC Trustees Order—actually supports Gibson and Bily's testimony that they worked to mask National Century's true operations from the trustees.  Recall that National Century transferred money at the end of each month between the two NPF programs to shore up the depleted reserve accounts in time for their compliance test dates.  The SEC noted that National Century sought to disguise these month-end transfers by making it appear to the trustees that they were legitimate purchases of receivables between the programs.

standard of Rule 33 because Defendants cannot establish that it likely would have resulted in an acquittal.

Finally, the Court notes that there is nothing contradictory about its ruling here denying Defendants' *Brady* claims and its earlier ruling directing the Government to produce the SEC documents concerning the trustees to Poulsen and Happ prior to their trials.  The Court granted Poulsen's and Happ's motions for discovery because it concluded that such discovery was proper under Federal Rule of Criminal Procedure 16.  But just because information is discoverable pre-trial does not mean its non-production constitutes a *Brady* violation after trial. Both Rule 16 and *Brady* incorporate a materiality standard, but "materiality" means something different under each.  Information is material under Rule 16 if it "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."  *United States v. Lloyd*, 992 F.2d 348, 351 (D.D.C. 1993). Information is material under *Brady*, on the other hand, if its non-disclosure undermined the fairness of the trial, such that we cannot be confident in the verdict reached.  To put it simply, "the disclosure required by Rule 16 is much broader than that required by the due process standards of *Brady*."  *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970); *United States v. Messerlian*, 832 F.2d 778, 795 (3d Cir. 1987).

### 2.  The SEC Auditors Orders

Dierker (but no other Defendant) complains that the Government further violated *Brady* and Rule 33 when it failed to turn over information concerning what National Century's outside auditors knew about the company's challenged business practices.  In support, Dierker cites a pair of SEC orders dated September 19, 2007, finding that auditors with

69

PricewaterhouseCoopers LLP ("Pricewaterhouse") and Deloitte & Touche ("Deloitte") did not adhere to professional accounting standards when they prepared and signed off on unqualified audit reports for the years 1998 and 2000 (the "SEC Auditors Orders").  Both reports, concluded the SEC, contained false and misleading statements.

Pricewaterhouse prepared the 1998 audit.  The SEC found that the Pricewaterhouse auditor in charge of the report knew that National Century was using investors' money to make unsecured and improperly secured loans to the healthcare providers, but failed to adequately disclose these loans (and how they violated the NPF Indenture) in the audit report.  The SEC also faulted the Pricewaterhouse auditor for not investigating National Century for possible fraud when he learned that the company was reporting inacurrately aged receivables and ineligible receivables in its investor reports.

Deloitte auditors prepared the 2000 report.  The SEC found that these auditors failed to adhere to prevailing accounting standards when they did not verify that National Century's collateral base consisted of eligible receivables, when they ignored red flags that would have tipped them off to National Century's unsecured lending, and when they failed to discover that the company engaged in prohibited related-party transactions.

At trial, Dierker testified that one of the things that led him to believe that National Century was a "very solid" company was the fact that the company earned "unqualified audit opinions from the biggest and highest profile external auditors."  Dierker contends that had the Government not withheld them, he would have used the documents underlying the SEC Auditors Orders to bolster his testimony about relying on the auditors' endorsement of National Century's financial health.

70

The Government once again contends that it fully disclosed all documents involving the auditors' role in National Century's fraud.  Irrespective of whether it did, there are no grounds under either *Brady* or Rule 33 for setting aside the verdict and granting Dierker a new trial. Even if the auditors were insufficiently diligent in reviewing National Century's books and records, and insufficiently skeptical of explanations from the company, evidence to this effect would not have tipped the scales in Dierker's favor enough to raise concerns about the fairness of the trial.  Just as with the trustees, the auditors' negligence is irrelevant to Dierker's culpability.  In other words, both of the following could be true at once: The auditors could have failed to discharge their duties and Dierker could have participated in the fraud by authorizing the advances to California Psychiatric.  One does not negate the other.[15]

More fundamentally, the problem with Dierker's argument is that the Auditors Orders were issued on September 19, 2007, nearly four-and-a-half months before trial.  These Orders are public documents and through the exercise of reasonable diligence Dierker would have learned about them.  Indeed, it is virtually inconceivable to think that Dierker would not have been monitoring public pronouncements from the SEC about its National Century investigation, or would not have heard about the Auditors Orders from one or more of his Co-Defendants more attuned to the SEC.  Because the Auditors Orders were fully available to Dierker well in advance of trial, he cannot prevail on his *Brady* or Rule 33 claims.  *See Graham*, 484 F.3d at 417 ("Further, there is no *Brady* violation if the defendant knew or should have known the essential

---

[15]It should be noted that on July 17, 2008, Dierker supplemented his post-trial motions by filing a declaration detailing the contents of the auditors' internal communications, which suggest that the auditors had serious concerns about National Century's business practices.  For all the reasons described above, Dierker's declaration does not change the Court's conclusion that he is not entitled to a new trial.

facts permitting him to take advantage of the information in question, or if the information was available to him from another source.") (internal quotation marks and citation omitted); *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir. 1992) (holding that a lawsuit settlement did not constitute newly discovered evidence because the defendants knew about it prior to trial); *United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980) ("When information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no Brady claim.").  Had he reviewed the Auditors Orders last fall, Dierker could have ascertained whether the Government had in fact made a complete production of relevant documents, as the Government insists, and could have sought the intervention of the Court, if necessary.

### 3.  Documents Disclosed in the Civil Litigation

In his final *Brady* claim, Dierker asserts that the Government failed to produce relevant evidence from the civil Multi-District Litigation ("MDL") proceedings stemming from National Century's collapse.  One of the defendants in the MDL case is Credit Suisse First Boston LLC ("Credit Suisse"), the underwriter for National Century's bonds.  Certain MDL plaintiffs have pleaded that Credit Suisse was aware of National Century's dubious business practices and that despite this knowledge, Credit Suisse misrepresented the company's securities programs to the investors.  Dierker says that he has only "recently" become aware of the MDL claims against Credit Suisse (apparently through an order issued by the MDL court denying Credit Suisse's motion to dismiss).  Further, Dierker explains that he would have used documents implicating Credit Suisse in wrongdoing the same way he would have used other, allegedly withheld

72

information, about the role of third parties in National Century's fraud: By arguing that it was those people who were to blame, not him.

Assuming that the Government even has any documents concerning Credit Suisse that support the MDL plaintiffs' claims, the non-production of such documents does not require a new trial under either *Brady* or Rule 33. Once again, whatever responsibility third parties may bear for failing to detect the fraud or furthering its ends, does not diminish Dierker's culpability as a National Century co-conspirator. More importantly, the MDL order of which Dierker has only "recently been made aware," was issued on December 19, 2007, more than a month before the trial in this matter. The complaint against Credit Suisse and the briefing on Credit Suisse's motion to dismiss would have been filed far in advance of that date. The MDL proceedings are open to the public and nothing would have prevented Dierker from monitoring the filings in that case to see if they pointed the way to any information helpful to his defense. He cannot now claim an entitlement to a new trial based on his failure to do so.[16]

### 4. Gibson's Letters to Demmler

Defendant Ayers (joined by Speer and Faulkenberry) argues that the Government improperly withheld certain letters written by Sheri Gibson.

As already noted, Defendant Lance Poulsen was not tried with the other Defendants here because he was separately indicted on charges of witness tampering and obstruction of justice. Poulsen was therefore severed to ensure that the other Defendants were not prejudiced at trial by his alleged obstruction activities.

---

[16]Because he cannot succeed on any of his *Brady* claims, Dierker's motion to compel the Government to produce the allegedly withheld documents is denied.

73

Poulsen's obstruction trial took place in March 2008.  The evidence in that trial included letters that Gibson wrote to Karl Demmler, Poulsen's co-defendant and a longtime friend of both Gibson and Poulsen.  Gibson wrote the letters while serving her sentence for securities fraud in connection with National Century's downfall (Gibson began cooperating with the Government almost immediately and pleaded guilty early on).  As part of her sentence, Gibson was forced to liquidate all her assets and pay restitution to National Century's defrauded investors.  In a letter dated January 18, 2007, Demmler wrote her that he believed that she could recover the financial losses she had incurred in connection with the restitution order.  On January 25, 2007, Gibson wrote back:

> If there was a way to reclaim my assets WITHOUT NULLIFYING, VOIDING OR IN ANY WAY IMPERILING my plea agreement that would be something to check out.  I have no intention of starting a fight over my current sentence because the alternative is much worse.  I do not want a score or two of indictments to fight which is why I made a deal in the first place. How can I make you understand that I just want this whole situation behind me so that I can get on with my life?

Ayers argues that the Government should have produced these letters prior to trial because they are relevant to the question of why Gibson pleaded guilty.  Ayers says that the letters could have been used to impeach Gibson because they suggest that she pleaded guilty not because she believed that she actually was guilty, but because she wanted to avoid the specter of an even more onerous sentence, which she risked by taking her chances at trial.

Ayers's argument is meritless.  At trial, Gibson made it clear that she was instrumental to the fraud scheme.  She testified extensively about how she falsified data, authorized advances, lied to investors and third parties, and communicated with other National Century executives about all these things.  Gibson was on the stand for three days and no reasonable person could

74

have interpreted her testimony as anything other than a straightforward admission of guilt. Gibson even said how, beginning in November 2003, shortly after the fraud came to light, she went into "full disclosure mode" and revealed the fraud to the crisis management team that took over what was left of National Century.

All of this is to say that contrary to Ayers's assertions, his access to the correspondence between Gibson and Demmler would have been of minimal help indeed. True, Ayers could have attempted to show that Gibson's plea deal was really about lenience and not about a genuinely held conviction that her behavior was criminal, but the few sentences from Gibson's letter would have looked painfully slim next to her three days on the stand, and her admissions about how she participated in the fraud. Moreover, as the Government correctly points out, there is nothing inconsistent about Gibson's pleading guilty to avoid a harsher sentence and her belief that she actually committed securities fraud. Gibson said as much at Poulsen's obstruction trial: "I made a deal in the first place because why be sentenced twenty or thirty years for something? I did do it. So I entered into a plea agreement."

Because Ayers cannot satisfy the *Brady* or Rule 33 standards, his request for a new trial is denied.

### IV.  AYERS'S MOTION TO INTERVIEW THE JURORS

Defendant Ayers seeks an order from the Court allowing him to interview the jurors who convicted him. Ayers wants to ascertain whether media coverage, both before and during the trial, influenced them. He further wants to determine whether the jurors discussed the case among themselves prior to the start of their deliberations. As support for this latter line of juror questioning, Ayers says that he observed jurors talking with one another during sidebars, and

that outside the courtroom, two jurors were overheard discussing their impression of defense counsel and commenting on the number and length of sidebars and recesses.

Courts seldom permit litigants to "invade the province of the jury room" through post-trial interrogation of jurors. *Holmes v. Telecheck Int'l, Inc.*, No. 05-0633, 2008 U.S. Dist. LEXIS 18789, *2 (M.D. Tenn. Mar. 10, 2008). In fact, Federal Rule of Evidence 606(b) only allows such questioning where a litigant establishes that some external force may have improperly influenced the jury's consideration of the case. Fed. R. Evid. 606(b); *United States v. Lawrence*, 477 F. Supp. 2d 864, 873-74 (S.D. Ohio Nov. 16, 2006). The Rule prohibits questioning about "internal" influences on the jury, such as the behavior of the jurors during deliberations and statements made by jurors. *Lawrence*, 477 F. Supp. 2d at 873-74.

Ayers's request to interview the jurors is denied. As an initial matter, any discussion among the jurors about defense counsel or the conduct of the proceedings is an internal factor and therefore not a proper subject of post-trial juror interrogation. As the *Lawrence* Court stated, "communication solely between jurors prior to deliberation is an inherently internal process because it does not involve any extraneous sources of information." 447 F. Supp. 2d at 874 (treating as "internal," information suggesting that the jurors may have discussed the case and formed an opinion about the defendant's guilt prior to the start of their deliberations).

Unlike juror discussions, media coverage is an external influence. As the Court concluded in section III.B. above, however, Ayers's due process right to a trial free of juror bias was adequtely protected through the searching voir dire process. His concerns that jurors may have been swayed by news accounts of the case amount to no more than conjecture that is not worthy of the extraordinary intrusion into the jury's deliberations that he proposes. *See*

76

*Lawrence*, 447 F. Supp. 2d at 873 ("The proof of extraneous prejudicial information under Rule 606(b) cannot be speculative.").

The Court notes that Ayers filed his motion under seal and then belatedly moved for an order permitting him to do so.  Ayers explained in his motion to seal that he believes sealing is appropriate to protect the jurors from "harassment or embarrassment."  The Court appreciates Ayers's concern, but finds that sealing is not necessary here.  Court records are "presumptively public," *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir. 1983), and "only the most compelling reasosn can justify sealing" them.  *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 476 (6th Cir. 1983).  Ayers is instructed to redact any identifying information about the jurors contained in his motion (including juror numbers) and re-file it as a public document.


## V.  CONCLUSION

The Court concludes that none of Defendants' arguments on behalf of vacating the jury's verdicts and granting them new trials has any merit.  Defendants were tried by an impartial jury of their peers and accorded all the procedural protections to which they are entitled.  This matter therefore is at an end.  Defendants' motions are hereby **DENIED**.

**IT IS SO ORDERED.**


    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**

**DATE: August 1, 2008**

78