IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LANCE K. POULSEN,

     Petitioner,

                         Civ. No. 2:13-cv-259
                         Crim. No. 2:06-cr-00129(1)
     v.                       Civ. No. 2: 13-cv-00261
                         Crim. No. 2:07-cr-00209
                         Judge Marbley
UNITED STATES OF AMERICA,     Magistrate Judge King

     Respondent.


## REPORT AND RECOMMENDATION

Petitioner Lance K. Poulsen brings these consolidated motions to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255. This matter is before the Court on the amended motions to vacate sentence and supplemental memoranda in support, Case. No. 2:06-cr-129, ECF 1224, 1225; Case No. 2:07-cr-209, ECF 192, 193, Respondent's *Response in Opposition*, Case No. 2:06-cr-129, ECF 1233; Case No. 2:07-cr-209, ECF 197, Petitioner's *Traverse*, Case No. 2:09-cr-209, ECF 200; and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**Facts and Procedural History**

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of the case as follows:

> This consolidated case, involving both a securities fraud conviction (the "Securities Case") and an obstruction of justice conviction (the "Obstruction Case"), chronicles the rise and fall of National Century Financial Enterprises, Inc. ("NCFE") and, with it, defendant-appellant Lance K. Poulsen ("Poulsen").
>
> ***

1

I.

National Century Financial Enterprises, Inc. ("NCFE"), headquartered in Dublin, Ohio, was incorporated at the end of 1990 and became one of the largest healthcare finance companies in the United States. Defendant-appellant, Lance Poulsen was a co-founder of NCFE and served as its owner, chairman, and chief executive officer. Under NCFE's business model, NCFE primarily financed healthcare providers by purchasing their accounts receivable that were payable to private insurers and public healthcare programs. NCFE purchased specific accounts receivable from healthcare providers and issued bonds to investors that were backed by the accounts receivable as collateral. Subsidiaries of NCFE purchased those receivables with borrowed funds, monies obtained through securities that were backed by the receivables. NCFE and its representatives reported that those obligations were supported by adequate reserves and consistently maintained investment grade, primarily triple-A ratings. NCFE and its subsidiaries generated profits from fees charged to the healthcare providers for the advances as well as gains from the spread between the discounted costs of the receivables and the collections on the receivables.

In reality NCFE used investors' money to advance funds to certain providers who did not submit any accounts receivable in return, including those owned in whole or in part by Poulsen and other principals of NCFE. Funds were advanced to providers without acquiring any receivables or in amounts in excess of the receivables purchased, when NCFE was required to purchase solely eligible accounts receivable. Poulsen was involved in advancing funds in this manner that violated the rules of the agreements in place with NCAFE's investors; he approved numerous such advances and the majority of advanced funds were to six providers owned by Poulsen through his stakes in NCFE and other entities. Monthly reports were issued to indenture trustees to verify that minimum reserve account balances were met. In order to meet the minimum required reserve balances, NCFE devised a system to transfer funds between the reserve accounts to meet minimum reserve levels. Poulsen was active in the decisions to transfer money between the funding programs, to change the reporting dates, and to falsify figures in investor reports. The Presentence Report ("PSR") found that "[a]s one of the principals, Poulsen possessed the most knowledge of the ongoing criminal activity in this conspiracy."

In the spring of 2002, NCFE's auditing firm began to question discrepancies in several accounts, so it continued to request documentation and did not complete an audit report. In the fall of 2002, when NCFE attempted to shift funds between the programs, one of the trustee banks denied the transfer. The following week, at a meeting with Poulsen and others, investors first learned that NCFE insiders had been funding certain providers without acquiring accounts receivable in return. NCFE prepared an investor report in late October 2002 disclosing actual balances in its reserve accounts, and NCFE fund ratings for two of its subsidiary programs were downgraded from triple-A ratings to junk-bond status.

2

On November 8, 2002, Poulsen was forced to resign from his positions as director of NCFE's board and chief executive officer. Days later, the FBI searched NCFE's office, seizing computer and document records. On November 18, 2002, NCFE sought Chapter 11 protection in bankruptcy court.

On May 19, 2006, the first indictment in the Securities Case was returned against Poulsen, Rebecca S. Parrett, Donald H. Ayers, Roger S. Faulkenberry, Randolph H. Speer, James Dierker, and Jon A. Beacham.

After the collapse of NCFE and Poulsen's initial indictment in the Securities Case, conversations between a friend of Poulsen, Karl Demmler, and a former employee of Poulsen, Sherry Gibson, formed the basis of the Obstruction Case. Karl Demmler was a close friend of Poulsen's from the mid–1980s when Poulsen first moved to Dublin, Ohio. Sherry Gibson was one of NCFE's first twelve employees, and she rose in the ranks at NCFE to executive vice president of compliance.

After the collapse of NCFE, in late 2003, Gibson pled guilty to conspiracy charges related to her employment at NCFE and faced an initial sentence of four years' imprisonment and forfeiture of $420,000. Her plea agreement, which listed Poulsen as an unindicted co-conspirator, required her to meet with prosecutors and truthfully answer all questions about her own and others' involvement with NCFE. In light of her cooperation in the investigation, Gibson's sentence was shortened to thirty months.

While Gibson was incarcerated, she and Demmler stayed in contact. After Gibson was released from prison, she contacted Demmler on June 19, 2007, and they met. Demmler informed Gibson that Poulsen intended to make her "whole." In this conversation, Demmler also suggested that Gibson ask Poulsen to pay her for what she lost while incarcerated; Demmler suggested that they meet on a weekly basis; and Demmler stated that Poulsen asked him to contact Gibson to help him "win his case."

On June 20, 2007, Gibson contacted the FBI. From this point on, Gibson was working with the FBI. She was "given instructions on a continual basis about when to respond to a voicemail, when to initiate a telephone call, when to arrange a meeting," and she wore a concealed recording device when meeting with Demmler.

On July 10, 2007, while the FBI was still investigating the Obstruction Case and over a year after the first indictment in the Securities Case, the government obtained the final, operative Superseding Indictment, adding defendant James K. Happ. Poulsen was not yet arrested in either case at this time.

On July 13, 2007, Demmler and Gibson met again, and their conversation was recorded. Demmler suggested that she not "change her story" at trial but rather

conveniently forget things and "prevaricate." On July 18, 2007, Demmler informed Gibson that he had called Poulsen's cellular telephone and indicated that he had informed Poulsen about their conversations. On July 25, 2007, Demmler informed Gibson that Poulsen wanted to "sit down and talk to" her, but he wanted to do so under the right circumstances.

The FBI issued subpoenas for Demmler's telephone records. The telephone records revealed that Demmler and Poulsen had spoken more than thirty times between January and June of 2007. The FBI then obtained a pen register on Demmler's cellular telephone. On August 6, 2007, Special Agent Jeffrey Williams of the FBI submitted an affidavit in support of the application for the interception of wire communications from Demmler's cellular telephone. The wiretap was authorized on that same day.

From August 20, 2007, until October 18, 2007, the government monitored Poulsen's activity through the wiretap on Demmler's telephone, the recorded conversations between Gibson and Demmler, and Gibson's cooperation with the FBI. These conversations provided the following evidence: discussions between Poulsen and Demmler about getting Gibson a new attorney who was preapproved by Poulsen; multiple conversations between Poulsen and Demmler and Demmler and Gibson about how Gibson would be paid; instructions on how Gibson should answer prosecutors' questions and how she should testify; and Poulsen's and Demmler's concerns about discussing Gibson over the telephone.

On October 18, 2007, Demmler and Gibson met pursuant to an agreement that Gibson would drive Demmler to the airport because Demmler was planning a trip to Venezuela. At this meeting, Demmler gave Gibson a signed, blank check that she would eventually be able to use to procure her payment. Demmler was arrested that day at the Columbus airport. The same day, Poulsen was arrested in Florida in relation to his involvement in the Obstruction Case and has remained in custody since that date.

Poulsen was indicted for conspiracy to obstruct justice and to tamper with a witness in October 2007. A superseding indictment, returned in 2007, and a second superseding indictment, returned in 2008, added a count of substantive obstruction of justice and two counts of witness tampering.

Poulsen filed a number of motions in the Obstruction Case. Among these was a motion filed on January 10, 2008, to suppress electronic surveillance evidence. Poulsen argued the affidavit supporting telephone wiretaps failed to establish probable cause or necessity and argued the affidavit contained misleading statements and omissions entitling Poulsen to a Franks hearing. The district court denied Poulsen's motion to suppress on March 17, 2008.

On March 10, 2008, Poulsen filed a motion in limine requesting an entrapment instruction. The district court denied this request at trial.

The government brought the Obstruction Case to trial first. On March 26, 2008, a jury found Poulsen guilty of conspiracy, in violation of 18 U.S.C. § 371; witness tampering, in violation of 18 U.S.C. § 1512(b)(2)(A); witness tampering by influencing testimony, in violation of 18 U.S.C. § 1512(b)(1); and obstruction of justice, in violation of 18 U.S.C. § 1503(a). In May 2008, Poulsen moved to continue and consolidate the sentencing proceedings in the Securities and Obstruction Cases, but this motion was denied. The district court sentenced Poulsen to 120 months in prison, three years of supervised release, a $17,500.00 fine, and the required special assessments. Poulsen appealed.

In the Securities Case, the district court granted Poulsen's motion for severance from the other defendants on January 4, 2008, and his trial began in October 2008.

Prior to trial, Poulsen filed a motion in limine to exclude several types of evidence in his Securities Case. Specifically, the motion sought to exclude evidence referencing the Obstruction Case or the underlying facts of that case as improper propensity evidence and as unfairly prejudicial. The motion was denied. At trial, evidence from the Obstruction Case was presented through the testimony of Sherry Gibson. Gibson testified for five days, two of which contained direct and cross examination on the facts of the Obstruction Case.

Poulsen also moved to exclude evidence of the dollar amount purportedly lost by investors or other third parties as a result of NCFE's bankruptcy, and this request was denied. Finally, Poulsen filed a motion to transfer venue in his Securities Case "because pretrial publicity has, and will, irreparably and unfairly prejudice any jury against Mr. Poulsen." The district court also denied this motion.

On October 31, 2008, a jury found Poulsen guilty of conspiracy, in violation of 18 U.S.C. § 374; securities fraud, in violation of 15 U.S.C. §§ 77q(a), 77x; wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956; and concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(1). The PSR in Poulsen's Securities Case estimated the loss amount at $2,894,150,500. Poulsen filed a written objection to the PSR based on the government's failure to prove the specific loss amount at trial. At Poulsen's sentencing, the district court overruled Poulsen's objections and found that the loss amount estimated by the government in the PSR was a fair estimate. Poulsen was sentenced to 360 months in prison to run concurrently with the sentence in the Obstruction Case, three years of supervised release, and restitution in the amount of $2,384,147,105.09.

Poulsen's Obstruction and Securities Cases were consolidated on appeal.

II.

On appeal of the Obstruction Case, Poulsen argues (1) the district court erred in denying his request to give an entrapment instruction; (2) the district court erred in denying his motion to suppress wiretap evidence; (3) the district court erred in allowing into evidence the amount of loss for the purpose of calculating his sentence. We affirm the district court's decision on each of these issues.

***

On appeal of the Securities Case, Poulsen argues (1) the district court erred in denying his motion to transfer venue; (2) the district court improperly admitted evidence from the Obstruction Case; (3) the district court erred in allowing into evidence of the amount of loss without also admitting evidence of other causes of that loss; (4) his sentence was procedurally and substantively unreasonable. We affirm the district court on each of these issues.

*United States v. Poulsen*, 655 F.3d 492, 497-506 (6th Cir. 2011).

On August 25, 2011, the United States Court of Appeals for the Sixth Circuit affirmed the *Judgment* of this Court. *Id.* On March 19, 2012, the United States Supreme Court denied Petitioner's petition for a writ of *certiorari.  Poulsen v. United States*, 132 S.Ct. 1772 (2012).

Petitioner seeks relief under 28 U.S.C. § 2255.  He asserts that he was denied due process because he is legally innocent on the money laundering-related convictions charged in Counts 17 -20 of the *Superseding Indictment* in view of *Cuellar v. United States*, 553 U.S. 550 (2008); that he was denied the effective assistance of trial counsel and was denied the counsel of his choice; and that he was denied a fair trial based on prosecutorial misconduct.  He raises these same claims in connection with both Case No. 2:06-cr-129 (the "Securities Fraud Case") and Case No. 2:07-cr-209 (the "Obstruction Case"), referring to the motion to vacate file in the Obstruction Case as a "companion" to the motion to vacate filed in the Securities Fraud Case.  *Amended Motion to Vacate*, Case No. 2:07-cr-209, ECF 192.  "The bedrock claim in both is that the government's actions – although possibly lawful and even routine – unjustifiably interfered with Poulsen's relationship with counsel and created circumstances in which the best of lawyers could

not have been prepared for trial." *Id.* at PageID# 3230. This Court will consider Petitioner's claims in connection with both cases.

Respondent contends that Petitioner's claims are procedurally defaulted and without merit.

**Standard of Review**

To obtain relief under 28 U.S.C. § 2255, a defendant must establish the denial of a substantive right or defect in the trial that is inconsistent with the rudimentary demands of fair procedure. *United States v. Timmreck*, 441 U.S. 780 (1979); *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (*per curiam*). Relief under 28 U.S.C. § 2255 is available when a federal sentence was imposed in violation of the Constitution or laws of the United States, when the trial court lacked jurisdiction, or when the sentence is in excess of the maximum sentence allowed by law, or is "otherwise subject to collateral attack." *United States v. Jalili*, 925 F.2d 889, 893 (6th Cir. 1991). Relief is also available where "the claimed error was a 'fundamental defect which inherently results in a complete miscarriage of justice,' " *Davis v. United States*, 417 U.S. 333, 346 (1974)(quoting *Hill v. United States*, 368 U.S. 424, 428–429 (1962); *see also Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2006).

A motion to vacate under § 2255 "is not a substitute for a direct appeal." *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013)(quoting *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *United States v. Frady*, 456 U.S. 152, 167–68 (1982)). Claims that could have been raised on direct appeal, but were not, will not be entertained through a motion under § 2255 unless the petitioner shows: (1) cause and actual prejudice to excuse his failure to raise the claims on direct appeal or (2) that he is "actually innocent" of the crime. *Ray*, 721 F.3d at 761 (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "To obtain collateral relief a prisoner

7

must clear a significantly higher hurdle than would exist on direct appeal." *Frady,* 456 U.S. at 166.

**Procedural Default**

Petitioner asserts, *inter alia*, that he is legally innocent or that the evidence is constitutionally insufficient to sustain his money laundering-related convictions in Counts 17, 18-20[1] of the *Superseding Indictment* in the Securities Fraud Case, 2:06-cr-129, ECF 257, under the Supreme Court's decision in *Cuellar;* that he was denied his right to counsel of his choice; and that he was denied a fair trial because of prosecutorial misconduct.  These claims could have been, but were not, raised in Petitioner's direct appeal. Petitioner has therefore waived this Court's consideration of these claims absent a showing of cause and prejudice. *See Massaro v. United States*, 538 U.S. 500, 504 (2003)(citing *Frady*, 456 U.S. at 167-68).  As cause for his procedural default, Petitioner asserts the denial of the effective assistance of counsel; Petitioner also asserts, alternatively, that the constitutional violations at issue were reasonably unknown to counsel during trial.  Case No. 2:07-cr-209, *Traverse,* ECF 200, PageID# 1323. The Court will consider these explanations in reverse order.

Petitioner's claims of prosecutorial misconduct, denial or interference with his right to counsel of his choice, and the ineffective assistance of counsel are issues generally known to defense attorneys and were undoubtedly known to Petitioner's attorneys at the time of his trial. These are claims that could have been raised at that time, or on direct appeal.  Petitioner refers at length to his attorneys' failure to raise an issue under *Cuellar,* and argues that this failure constitutes evidence of his claim of prosecutorial misconduct, interference with the right to counsel of his choice, and the denial of the effective assistance of counsel.  However, counsel's

---

[1]  The Court had previously granted Respondent's motion to dismiss Count 23 of the *Superseding Indictment* in the Securities Fraud Case, 2:06-cr-129, ECF 890, PageID# 19522-23.

failure to raise an issue under *Cuellar* does not support Petitioner's claim of prosecutorial misconduct or the interference of his right to counsel of his choice.  In short, Petitioner has failed to establish cause for his procedural default on the basis that these claims were unknown to his defense counsel.

That said, the Court must also determine whether Petitioner has established the denial of the effective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668 (1984), sufficient to constitute cause and prejudice for his procedural defaults.  To do so, the Court must necessarily address the merits of the underlying claims.

**Ineffective Assistance of Counsel**

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011).  The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668. *Strickland* requires that a petitioner claiming the ineffective assistance of counsel demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir. 2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness." *Poole v. MacLaren*, No. 12–1705, -- F. App'x --, 2013 WL 6284355, at *5 (6th Cir. Dec. 5, 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536 (6th Cir. 2011) (internal quotation marks omitted) and citing *Strickland*, 466 U.S. at 687).  In order to make such a showing, a petitioner "must overcome the 'strong [ ] presum[ption]' that his counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable professional

judgment." *Poole*, 2013 WL 6284355 at *5 (quoting *Strickland*, 466 U.S. at 687). "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, at 689).

The *Strickland* test also applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Appellate counsel must provide reasonable professional judgment in prosecuting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396–97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes,* 463 U.S. 745, 751–52 (1983)). When a claim was not presented on appeal, a court must assess the strength of the claim that appellate counsel failed to raise. *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). "[P]rejudice is shown if there is a reasonable probability that, but for his counsel's failings, the defendant would have prevailed on his appeal." *Simmons v. Howes*, 2012 WL 4372889, at *5 (W.D. Mich. Aug. 21, 2012)(citing *Evans v. Hudson*, 575 F.3d 560, 564 (6th Cir.2009(internal citation omitted)). "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004)(citation omitted). The Sixth Circuit has articulated a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel by reason of failure to present a claim on appeal:

> 1. Were the omitted issues significant and obvious?
> 2. Was there arguably contrary authority on the omitted issues?
> 3. Were the omitted issues clearly stronger than those presented?
> 4. Were the omitted issues objected to at trial?
> 5. Were the trial court's rulings subject to deference on appeal?

6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?
8. Did the petitioner and appellate counsel meet and go over possible issues?
9. Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 428-29 (citing *Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir.1999)).

### *Cuellar*

As cause for his procedural default, Petitioner contends that his attorneys violated *Strickland* by failing to argue that the government had not met its burden of establishing his guilt under the Supreme Court's decision in *Cuellar*.  In *Cuellar*, the United States Supreme Court interpreted the money laundering statute that forms the basis of Counts 17, 18-20 of the *Superseding Indictment*:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>
> \*\*\*
>
> (B) knowing that the transaction is designed in whole or in part--
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . . .
>
> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i).

11

The Supreme Court held in *Cuellar* that the term "designed" requires proof of purpose. *Id.* at 563–64 ("[W]hen an act is 'designed to' do something, the most natural reading is that it has that something as its purpose.").  Cuellar was arrested while driving to Mexico with $81,000 of proceeds of drug trafficking hidden under the floorboards of his car.  *Id.* at 553-54.  Evidence indicated that Cuellar was transporting the money to compensate leaders of a drug operation.  *Id.* at 566.  The Supreme Court reversed Cuellar's money laundering convictions, holding that the government had failed to prove that Cuellar did more than merely hide the money during its transport.  In other words, the evidence failed to establish that Cuellar transported the money ***for the purpose of concealing it***.

> There is a difference between concealing something to transport it, and transporting something to conceal it . . . that is, *how* one moves the money is distinct from *why* one moves the money.  Evidence of the former, standing alone, is not sufficient to prove the latter.

*Cuellar,* at 566 (citation omitted).  Thus, under *Cuellar,*

> it is not enough for the government to prove merely that a transaction had a concealing effect. Nor is it enough that the transaction was *structured* to conceal the nature of illicit funds. Concealment—even deliberate concealment—as mere facilitation of some *other* purpose, is not enough to convict. What is required, rather, is that concealment be an animating purpose of the transaction.

<u>United States v. Faulkenberry</u>, 614 F.3d 573, 586 (6th Cir. 2010)(emphasis in original)(internal citations omitted).  *See also United States v. Monea*, 376 Fed.Appx. 531, unpublished,  2010 WL 1851313, at *5 (6th Cir. May 11, 2010). [2] The United States Court of Appeals for the Sixth Circuit has made clear, however, that concealment need not be the only purpose of the transaction: "[T]he statute requires only that the transaction be designed 'in whole or *in part*' to

---

[2] *Cuellar* involved the interpretation of the neighboring provision of 18 U.S.C. § 1956(a)(2)(B)(i)(transportation money laundering), but applies with equal force to a conviction under 18 U.S.C. § 1956(a)(1)(B)(i), with which Petitioner was charged.  *Faulkenberry*, 614 F.3d at 585; *United States v. Monea*, 376 Fed.Appx. 531, 538 (6th Cir. 2010)(citing *United States v. Cedeno-Perez*, 579 F.3d 54, 61 (1st Cir. 2009)(*United States v. Brown*, 553 F.3d 768, 787 n. 56 (5th Cir. 2008)).

12

conceal." *Faulkenberry*, 614 F.3d at 586 (emphasis in original). "Moreover, 'the purpose and structure are often related, . . . and thus, depending on context, proof that a transaction was structured to conceal a listed attribute of the funds can yield an inference that concealment was a purpose of the transaction." *Id.* (citing *Cuellar*, 128 S.Ct. at 2004-05).

As noted *supra,* Petitioner argues that his attorneys were ineffective because they failed to raise an objection to the money laundering-related counts based on *Cuellar*.[3] In support of this argument, Petitioner refers to the decisions of the United States Court of Appeals for the Sixth Circuit reversing the money laundering-related convictions of three of his co-defendants, Roger Faulkenberry, Donald Ayers, and James Dierker, *United States v. Dierker*, 417 Fed.Appx. 515, unpublished, 2011 WL 1211538 (6th Cir. April 1, 2011); *United States v. Faulkenberry,* 614 F.3d 573 (6th Cir. 2010); *United States v. Ayers*, 386 Fed.Appx. 558, unpublished, 2010 WL 2925939 (6th Cir. July 28, 2010).[4] Essentially, Petitioner argues that his convictions on money laundering and conspiracy to commit money laundering must be vacated on the same basis. Case No. 2:06-cr-129, ECF 1225, PageID#26035-36.

It is important to note that the trial of Petitioner's co-defendants was concluded in March 2008, *see* Case No. 2:06-cr-129, *Transcript of Proceedings*, ECF 570, *i.e.,* months before *Cuellar* was decided in June 2008. By contrast, Petitioner's separate trial in the Securities Case

---

[3] The basis of the money laundering charges against Petitioner was the improper diversion of investor funds to satisfy a lawsuit settlement obligation or debt of an entity owned by Poulsen, Ayers, and Rebecca Parrett ("HCCA/HMA"). Count 18 involved a June 5, 2001, wire transfer of $3,255,323 from the NPF VI account to a Chartwell Diversified Services, Inc., account; Count 19 involved a June 5, 2001, wire transfer of $1,500,000 from the NPF VI account to a Lifecare Solutions West, Inc., account; Count 20 involved a June 5, 2001, wire transfer of $4,750,000 from the NPF VI account to an HMA account. Co-defendant Speer was charged with these same violations. Co-defendants Speer, Faulkenberry and Dierker were also charged with different substantive counts of money laundering. The charges of conspiracy to commit money laundering and money laundering against Poulsen, Dierker, Ayers and Faulkenberry involved the improper diversion of investor funds to satisfy a lawsuit settlement or debt.

[4] Using the same reasoning, the Sixth Circuit also reversed the money laundering-related convictions of co-defendant Randolph Speer. *United States v. Speer*, 419 Fed.Appx. 562, unpublished, 2011 WL 1211097 (6th Cir. April 1, 2011). The government made no attempt to distinguish the cases of *Speer* and *Dierker* from the grounds on which the Sixth Circuit reversed the money laundering convictions in *Faulkenberry*. *See Speer*, 2011 WL 1211097, at *7; *Dierker*, 2011 WL 1211538, at *6.

began in October 2008. *See* 2:06-cr-129, *Transcript of Proceedings*, ECF 880.  Respondent relies on these differences in responding to Petitioner's claims. Respondent specifically contends that the evidence supporting Petitioner's money laundering-related convictions differed from that presented against his co-defendants. Case No. 2:06-cr-129, *Answer,* ECF 1233, PageID# 26145. Respondent also argues that, although defense counsel did not explicitly refer to *Cuellar*, Petitioner raised the issue addressed in *Cuellar* in his *Motion for Judgment of Acquittal and for New Trial. See* Case No. 2:06-cr-129,, ECF 859. Therefore, Respondent argues, the issue has already been rejected by this Court.[5]  Respondent also contends that the failure of Petitioner's counsel to expressly raise a *Cuellar* claim on appeal must have been strategic because appellate counsel's opening brief was filed more than four months after the opening brief filed in *Faulkenberry,* which expressly raised a *Cuellar* claim*,* and was only 600 words short of the limit on briefs prescribed by the Rules of Appellate Procedure.  Further, Respondent argues that Petitioner was represented by multiple experienced attorneys, who presented a vigorous defense. *Memorandum in Opposition to Poulsen's Motion for Partial Summary Judgment,* ECF 1247, PageID# 26290.

In his *Motion for Judgment of Acquittal and for New Trial*, Petitioner's counsel argued, *inter alia,* that the evidence failed to establish that Petitioner "deliberately attempted to disguise the source of any funds transferred" because he "clearly believed he was operating within the parameters of the governing documents."  *Motion for Judgment of Acquittal and for New Trial*, Case No. 2:06-cr-129, ECF 859, PageID# 16829.  Although the *Motion for Judgment of Acquittal and for New Trial* did not explicitly refer to *Cuellar,* Petitioner raised an argument

---

[5] Alternatively, Respondent posits that the Court may decline to address Petitioner's claim under *Cuellar*, because a ruling in Petitioner's favor may not affect the ultimate sentence imposed in light of the Court's authority to increase Petitioner's sentence on the remaining charges.  PageID# 26147. Of course, the Court cannot determine at this juncture whether Petitioner's sentence would remain unchanged should *Cuellar* require the vacation of Petitioner's convictions related to money laundering.

regarding the dispositive issue considered in *Cuellar* – *i.e.*, whether the government had established that an intent to disguise or conceal was a purpose of the transactions. The Court found the evidence to be sufficient to sustain Petitioner's money laundering-related convictions:

> Turning to Poulsen's substantive money laundering conviction, the elements of a money laundering offense under 18 U.S.C. § 1956(a)(1)(b)(i) are: (1) use of funds that are proceeds of unlawful activity; (2) with the knowledge that the funds are the proceeds of unlawful activity; and (3) conducting or attempting to conduct a financial transaction, knowing that the transaction is designed at least in part, to disguise the nature, location, source, ownership or control of the proceeds. *United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000). Counts 18-20 of the Superseding Indictment allege that Poulsen diverted millions of investor dollars to satisfy the lawsuit settlement obligations of HCCA/HMA, a healthcare provider in which he held a financial interest. Those allegations were substantiated at trial through the testimony of Porter, Bily, and Williams. (Trial Tr. Vol. III, 611-14; Vol. IV, 869-77; Vol. V, 990-1010.) Porter testified that HCCA/HMA, the healthcare provider for which he worked, owed $7.75 million to the Bergen Brunswick drug company to settle a lawsuit between the companies. He explained that after April 2000, HCCA/HMA no longer generated any accounts receivables. Nevertheless, the company still needed cash to satisfy the settlement obligation to Bergen Brunswick. He further testified that he discussed the lawsuit with Poulsen, and specifically HCCA/HMA's need for cash to satisfy the settlement. Porter, Bily, and Williams testified that Poulsen held an ownership interest in HCCA/HMA at that time.

> On June 4, 2001, a chain of faxes, emails, and memos documents that Porter asked Speer to wire $7.75 million to cover the costs of the settlement, that Speer discussed the wire with Poulsen, and that Poulsen approved the wires despite the fact that HCCA/HMA had not generated any accounts receivable for over a year. (Gov. Ex. Series V-115, 116, 117; Series VI-4; Series IX-23-26.) Although the memos and faxes establish that the transaction was intended to provide HCCA/HMA with the full amount it needed to satisfy the settlement, the $7.75 million figure was broken up across three wires: a $1.5 million wire to Chartwell Diversified Services, Inc., a company owned by HCCA/HMA; a $1.5 million wire to Lifecare Solutions, another HCCA/HMA owned company; and a $4.75 wire to HMA. The Government introduced bank records showing that $7.75 million was wired from NPF VI to HCCA/HMA's (and its affiliates) accounts on June 5, 2001 and then almost immediately wired from HCCA/HMA's accounts to bank account of the law firm that was to receive the Bergen Brunswick Settlement funds. (Gov. Ex. Series IX-113, 114, and 116; Trial Tr. Vol. V. 990-1010.) From that evidence, as well as the substantial testimony about the impropriety of advances without the purchase of receivables and the concealment of such activities from investors, a rational jury could conclude that Poulsen conducted a financial transaction,

involving the proceeds of his securities fraud, and that he knew the funds were the proceeds of his unlawful activity.

**The evidence also supports a conclusion that the transaction was designed to disguise the nature, location, source, ownership or control of the proceeds. Even though the June 5, 2001 wires to HCCA/HMA and its affiliates were unsupported by any accounts receivable purchases, a normal receivables purchase report was prepared for the wires. (Gov. Ex. Series IX-26.) A receivables purchase reports was supposed to represent funding sent out in exchange for the purchase of eligible accounts receivable. Accordingly, the use of the purchase report also served to hide the fact that the wires were actually pure conversion of investor funds to satisfy the debts of a third-party company in which Poulsen had a financial stake. Therefore, the Court finds that Poulsen's money laundering conviction was based on sufficient evidence[.]**

Case No. 2:06-cr-129, *Order,* ECF 990, PageID# 22154, 22155-56 (emphasis added).

In reaching this conclusion, the Court referred to *United States v. Prince,* 214 F.3d 740 (6th Cir. 2000),[6] which expressly considered money laundering charges under 18 U.S.C. § 1956(a)(1) and which was decided years prior to *Cuellar.* In *Prince,* the Sixth Circuit found sufficient evidence to sustain a defendant's conviction where the defendant had transferred money through an elaborate scheme designed to conceal:

On some occasions, Prince directed victims to contribute money to the scheme through a third party. This arrangement involved explaining the use of a third party to the potential investor, soliciting the assistance of a trusted third party, requiring the third party to go to their bank or to a Western Union office to obtain the money, effecting the transfer to Prince, and then arranging the transfer from Prince to White.  This elaborate arrangement protected Defendants from a potential paper trail. Prince usually instructed the third parties to whom money had been transferred, to give him cash. . . . At times, these instructions required the third parties to go to their bank and withdraw the money rather than simply writing a check payable to Prince, White, or the bankruptcy court for which the money was allegedly collected. Again, this prevented a paper trail.

The government presented testimony which suggested that Prince structured transactions so that a third party would never withdraw more than $10,000 from their bank account in one transaction. Chris Mathis, one of these third parties as well as Prince's accountant, testified that a transaction in excess of $10,000 would require the bank to send a cash transaction report to the Internal Revenue Service.

---

[6] Petitioner's counsel also cited *Prince. Motion for Judgment of Acquittal and for New Trial*, PageID# 16828.

Mrs. Bell, one of the third parties and Prince's sister, testified that on one occasion where she gave Prince $19,000, she wrote two separate checks, each for $9,500, so that the transaction would not be reported. On one occasion, $10,700 was wire transferred to Chris Mathis' account, but to withdraw the money, Mr. Mathis wrote two checks, one for $700 and one for $10,000.

The few Western Union transfers sent by victims which identified Prince as the recipient still helped conceal, as they did not identify White who, as Prince testified, was the final recipient of the proceeds of all of the transfers. By directing the transfers to himself, Prince aided White by concealing the fact that White was the true controller of the proceeds of this scheme. During the sentencing hearing, the district court found that it was "clear in this case that other people's bank accounts were being used, wires were being used in an effort to avoid a record or a trail of this money."

The government elicited testimony that Prince, on at least two occasions, stated that due to the structure of the transactions it could not be proven that he received money.  One witness, who on two occasions had received money in her account and transferred it to Prince, testified that Prince called her and told her the IRS was auditing the bank and instructed her not to mention his name. The structuring of the transactions combined with Prince's statements adequately support the theory that Prince, at the very least, aided in a scheme involving transactions conducted in an attempt to conceal the proceeds of wire fraud.

*Id*. at 752.

In *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), decided two (2) years after *Cuellar*, the Sixth Circuit again rejected an argument that the government had failed to prove a defendant's purpose and intent to conceal, as required under 18 U.S.C. § 1956(a)(1)(B)(i), based in part on the complexity of the transactions:

In this case, there was other evidence that the defendants intended to conceal the exact source of the proceeds. Specifically, the government introduced the testimony of Jerry Simpson, an FBI–Special–Agent–turned–contractor whom the government had hired to investigate Warshak's finances. Simpson testified that "[t]he transactions [involved in the case] were very complex, some of the most complex and lengthy transactions that I have ever had the occasion to examine." Simpson also testified that "there were hundreds of deposits, withdrawals, transfers, debits, credits; it was very, very complicated, very voluminous, and this is only for, you know, roughly a year and eight months of the period of the evidence." According to Simpson, the effect of the transactions, in their immense complexity, "was to conceal the commingling of business transactions and personal account transactions . . . to transfer funds to Mr. Warshak. . . ."

This evidence was sufficient to support a finding of intent to conceal. When a sequence of transactions is "sufficiently complex," a reasonable juror may infer that the transactions were made for the purpose of concealment. *United States v. Adefehinti*, 510 F.3d 319, 323 (D.C.Cir. 2007) (quoting *United States v. Esterman*, 324 F.3d 565, 572 (7th Cir. 2003)); *see United States v. Majors*, 196 F.3d 1206, 1214 (11th Cir. 1999) ("Moving money through a large number of accounts ... has also been found to support the design element of money laundering. . . ."); *United States v. Beddow*, 957 F.2d 1330, 1335 (6th Cir. 1992) ("[T]he evidence of Beddow's convoluted financial dealings with his banks and his charter boat business further support a conclusion that he intended to disguise the illegal source of his money."). Here, Simpson's testimony indicated that the transactions were quite complex, and the conclusion that they were undertaken to conceal the source of the money is not unreasonable.[FN63]

FN63. Warshak contests this conclusion, pointing to this court's recent decision in *United States v. Faulkenberry*, 614 F.3d 573 (6th Cir. 2010). There, we held that, "[t]o prove a violation of [the concealment subsection], it is not enough for the government to prove merely that a transaction had a concealing effect. Nor is it enough that the transaction was structured to conceal the nature of illicit funds." *Id.* at 586. However, the *Faulkenberry* court went on to acknowledge that, "depending on context, proof that a transaction was structured to conceal a listed attribute of the funds can yield an inference that concealment was a purpose of the transaction." *Ibid.* (emphasis added). We think that, in this case, given the complexity and numerosity of the transactions, we cannot hold that a rational juror could not infer that the transactions were undertaken with intent to conceal.

*Id.* at 320-21.

Since *Cuellar,* other federal courts have "fleshed out what 'designed to conceal' means." For example, in *United States v. Brown*, 553 F.3d 768 (5th Cir. 2008), the United States Court of Appeals for the Fifth Circuit held that the complex nature of the transaction can be evidence of an intent to conceal sufficient to support money laundering convictions. Similarly, the court in *United States v. Burroughs*, No. CR10-154, 2010 WL 4226540 (S.D. Ga. Aug. 25, 2010), held that

[c]oncealment can be shown by evidence of unusual structuring, structuring of transactions to avoid attention, highly irregular features of the transaction, using third parties to conceal the real owner, or a series of unusual financial moves cumulating in the transaction.

18

*Id.* at *3 (citing *United States v. Puerto*, 2010 WL 3191765, at * 4 (11th Cir. Aug.12, 2010)*;*

*United States v. Van Nguyen*, 602 F.3d 886, 902 (8th Cir.2010) ("A reasonable jury could find

[that defendant] was putting cash into [his son's] account to hide its true source."); *United States*

*v. Shellef*, 2010 WL 3119788, at * 28 (E.D.N.Y. Aug. 5, 2010) (even a failure to report income

can factor into a money-laundering concealment charge)).   In *Bevas v. Coakley*, No. 4:13-cv-

971, 2013 WL 5507497 (N.D. Ohio Oct. 2, 2013), the United States District Court for the

Northern District of Ohio found evidence sufficient to sustain the defendant's money laundering

conviction, distinguishing *Cuellar* as follows:

> Here, unlike [in] *Cuellar*, Petitioner's methods of transportation do not suggest the
> money was concealed only for the purposes of getting it from Point A to Point B.
> Indeed, Petitioner acknowledges the drug money was delivered to Dinero's New
> York headquarters, deposited slowly into various Dinero Bank accounts,
> transferred to the Dominican Republic using phony invoices, converted to local
> currency using a straw man, redeposited into Dinero accounts in the Dominican
> Republic, and then transferred to drug dealers in the Dominican Republic. This
> evidence suggests the transactions themselves were designed to conceal where the
> money came from, not where it was at a given moment. Consequently, *Cuellar*
> does not require a finding that Petitioner is actually innocent of money
> laundering.

*Id*. at *4 (citing *Warshak*, 631 F.3d at 322)).

The facts established by the evidence presented against Petitioner in the Securities Fraud

Case differ significantly from those in *Cuellar*. Petitioner went to "extraordinary lengths" and

engaged in a series of complex transactions that were designed to conceal what was being done

with investors' money.   *See* Case No. 2:06-cr-129, *Opinion and Order*, ECF 990, PageID#

22140.

> The evidence adduced at trial showed that in its monthly reports on the status of
> the NPF programs, in its presentations to investors, and in its dealings with
> outside professionals (such as auditors), National Century executives routinely
> falsified data and disguised the true nature of its affairs. Indeed, the jurors had an
> evidentiary basis from which they reasonably could believe that the purpose of an
> entire National Century department—the Compliance Department—was to cover

19

up the fraud by distorting and inventing information for the outside world that would make the company appear to be a proven success.

\*\*\*

One way that National Century concealed the fraud was by moving money between program accounts before the determination date, which was initially at month's end, and then moving the money back after the determination date. At first, National Century moved money from a program's purchase account into its reserve accounts. But, as the practice of advancing continued unabated, the magnitude of the problem grew, and intra-program transfers were not enough to make up the shortages.  As a result, National Century decided to stagger the determination dates for NPF VI and  XII. Rather than hold them on the same day at the end of each month, as it had been doing, National Century chose the last day of one month as the determination date for one NPF program, and the first day of the next month as the determination date for the other NPF program. That way, money could be moved back and forth between the NPF VI and XII program accounts to meet the requisite reserve balances. The trial testimony established that the change in the determination date was made at Poulsen's direction.

Another way that National Century manipulated the preparation of the investor reports was simply to falsify their data. This was done at Poulsen's direction. He instructed Gibson never to issue an investor report that showed any sort of non-compliance. Consequently, she testified that the data in the investor reports were "manipulated in whatever way necessary to show compliance on the investor report." (Trial Tr. Vol. VII, 1450.) At trial, Gibson exhaustively testified about the various ways in which she falsified investor reports. She also identified and explained manipulations in several specific investor reports. She further testified that from the inception of NPF VI in May 1995, every single one of its investor reports contained  false and fabricated data. The same was true for every single investor report issued for NPF XII, which opened in March 1999. The investor reports had to be signed by a National Century principal before they could be issued According to Gibson, only Poulsen ever did so because Ayers refused.

The manipulation of investor-report data did not stop with the reports themselves. The VI and XII program accounts were reviewed by outside auditors. To cover its tracks with them, National Century, per Gibson, had to create all the backup data that went into producing the investor reports. This data was also necessarily false because it had to match the false data shown in the investor reports. Gibson testified that she told Poulsen that she could not give auditors the actual back-up data because it didn't match the investor reports. He instructed her to "do whatever was necessary" to pass the audit. (Trial Tr. vol. VII, 1506.)

National Century also falsified the data given to the investors in the supplemental PPMs.  Gibson explained that the receivables data, "pool statistics," presented to investors in the PPMs were always manipulated and falsified. This was true for

both the NPF VI and the NPF XII PPMs. According to Gibson, "the data was manipulated as necessary to show the investors what we thought they wanted to see and what would . . . make the portfolio look as if it performed the way it was supposed to." Gibson testified that she had discussions with Poulsen about the disparity between what the receivables data in the PPMs actually looked like and how it was supposed to look. Poulsen directed her to "make the data look like the portfolio was performing properly and to keep the rating agencies and the investors from asking questions about the portfolio."  Yet another way National Century concealed its fraudulent activities was by inputting ineligible and non-existent collateral into the Servicer Department's computer tracking system to make it appear as though there was sufficient collateral to support National Century's advances.  This was necessary to mislead the outside auditors who performed the company's annual financial audit. These auditors did not confirm that the collateral appearing in the computer database actually consisted of eligible medical accounts receivable, but simply compared the providers' total amount of liabilities with the total amount of collateral they had submitted.

National Century therefore worked to identify any other asset that a healthcare provider had—including real estate, and medical equipment—and then included these assets as collateral supporting the funding advances in its computer tracking system. Of course, this additional collateral did not consist of eligible accounts receivable, and no mention was made either to the outside auditors or to the investors that National Century was counting such non-receivables assets as collateral.

National Century also kept defaulted accounts receivable on the Servicer's computer tracking system to make it appear that the company had more eligible receivables. Receivables aged over 180 days were supposed to be considered "defaulted" and removed from the system because they were unlikely to pay out. National Century, however, did not do so. Gibson testified that the company "froze" the aging of receivables on its tracking system thereby keeping defaulted receivables on the tracking system. This allowed the company to conceal the high number of superannuated receivables from investors and create the false appearance that there were more eligible receivables to back advances. Again, this practice was not revealed to investors or other National Century outsiders.

When the counting ineligible and defaulted collateral was still not enough to account for the advances, Gibson testified that National Century simply inserted a "plug number" into the computer-tracking system. This "plug number" represented the difference between all the eligible and ineligible collateral National Century loaded on the system for a particular provider and the total amount of funding the provider had received. Bily and Gibson testified that the use of the plug number began at Poulsen's direction. (Trial Tr. vol. III, 579; Vol. VII, 1520.)

Finally, the investor presentations. As already described, Poulsen and his co-defendants all participated in presentations to current and prospective investors, at which they explained National Century's business model and marketed its financing programs. Former executives Beacham, Gibson, and Bily testified that in their interactions with investors, including during their segments of the investor presentations, they did not reveal anything about National Century's practice of advancing, the effects that advancing had on the NPF program accounts, or how National Century falsified its investor reports and the collateral data on its computer database. Bily testified that she never told investors about advancing or falsifications in investor report because she "understood that [she] wasn't supposed to, and . . . was fearful that [she] would lose [her] job if [she] did." Gibson and Beacham testified that they did not tell investors anything about advancing without the purchase of receivables, reserve fluctuations, and falsifications in the investor reports and PPMs, and that they never heard any other senior executive disclose anything about what was really going on. Investors Glomski and Boothe corroborated the testimony of the National Century executives and explained that they were not informed of those fraudulent business practices until the company began to unwind in October of 2002.

*Id.* at PageID# 22140-46.  Petitioner knew "how the funding advances were dissipating at the

NPF program accounts" and "knew what Gibson was doing to keep the fraud under wraps."  *Id.*

at PageID# 22147.

Bily testified that she attended several meetings with Poulsen and Gibson where the problems caused by advancing were discussed. Gibson testified that she spoke with Poulsen on numerous occasions about what she had to do each month to manipulate the data presented in the investor reports.  Gibson also testified that the Compliance Department maintained both the fraudulent investor reports that were actually issued and accurate reports based on the true data, and circulated memos to National Century's principals comparing the two reports to show the nature and extent of the "manipulations."

Corroborating Gibson's testimony are numerous memos and emails, addressed to Poulsen and his co-defendants, advising them about the shortages in the NPF program accounts, the falsifications necessary to produce a clean audit and PPM pool statistics, and the nature of the data manipulations that had to be performed to produce a fully compliant investor report. On February 11, 1999, for example, Gibson wrote a memo to Parrett regarding the random audit.  Poulsen and Ayers are carbon copied. In that memo Gibson tells Poulsen, Parrett and Ayers:

> I know that the random audit is a necessary requirement for the securitization(s); however, due to our business practices, it takes several weeks of preparation before the audit can be scheduled. The preparation time is not due to gathering of copies of reports,

obtaining file copies, etc., the delay is due to the necessity of CREATING the backup that matches the investor report . . . It has been necessary to modify/edit/change the original receivables data from the AS400 for investor reporting. Due to advances with no collateral and high volumes of defaulted . . . we are UNDERcollateralized in all portfolios and the investor report numbers are adjusted in order to meet the default triggers. Therefore, whenever the investor reports are audited we have to create special reports that reflect the numbers reported which again differ significantly from the receivables activity actually posted and housed within the AS400.

(Gov. Ex. Series VII-32A.) Shortly thereafter, in a February 25, 1999 memo, Gibson wrote Poulsen, Ayers, and Parrett that "NPF VI is $45,000,000 SHORT in reserves" as a result of funding healthcare providers without purchasing the requisite amount of eligible receivables. Gibson's memo went on, "Please advise—how can we have an investor report . . . with a $45,000,000 shortage in reserves? . . . We are creative with month end and the investor reports—but this is beyond our capability to create. This is a crisis—we need help!" (Gov. Ex. Series VII-32B.)

In June of 1999, Cori Vogelsang, a compliance department employee, circulated a report entitled "Summary of Adjustments to the Investor Report" to Poulsen and the other principals. The report documents section-by-section the adjustments that were made to an NPF XII investor report "[t]o insure compliance." (Gov. Ex. Series VII-20.) In yet another example, on August 29, 2001 Gibson sent a memo to Poulsen informing him of her difficulty generating pool statistics for an NPF XII supplemental PPM due to the advance funding and concomitant reserve shortages. (Gov. Ex. Series VII-110.) Gibson explained that:

[d]ue to the continual shortage of cash in the reserves, the investor reports, therefore, have OVERSTATED the receivables compared to the actual balances in the AS400 and/or funding systems . . . [w]hile the actual balances in NPF XII are closer to $1.489 billion, the receivables balance in the current investor report for NPF XII is $2,000,382,873.

(Id.) She explained that the disparity between the reported and the actual figures meant that she had to "add receivables on a Seller-by-Seller basis in the static pool in order to match the current investor report for NPF XII." (Id.) She told Poulsen that she had "added receivables in a somewhat arbitrary fashion to the current Sellers in NPF XII" but was still coming up short. (Id.) She concluded the memo by asking Poulsen for ideas and advice on how to make the pool statistics appear to be in compliance.

Particularly damning to Poulsen are the "Lance Copy" investor reports that Gibson sent to Poulsen for his approval. The Lance Copy reports were draft copies of the investor reports which were sent to Poulsen for his sign-off before the official investor report was released. Gibson explained that she periodically prepared Lance Copy reports when she had "a question about how to meet compliance or to highlight areas of noncompliance" or to "advise [Poulsen] of some specific problem that [she] had of noncompliance in the report." (Trial Tr. vol. VII, 1469.)

The draft reports include Gibson's handwritten marginalia, which highlight and explain to Poulsen the specific manipulations she had made to the underlying data to fake compliance. Several of the draft reports include Poulsen's handwritten notations explicitly "ok-ing" the manipulations. For example, on the Lance Copy of the July 1995 investor report for NPF VI, Gibson noted that one section of the report contained arbitrary numbers because National Century did not track the data that had to be reported—a problem she had already discussed with Poulsen. Underneath her note, which read "Arbitrary #'s no info available," Poulsen wrote "OK" thereby approving the presentation of fictitious figures to investors. (Gov. Ex. Series I-1.) The other Lance Copy investor report drafts track Poulsen's approval of other similar fabrications and his own suggestions on how to manufacture the appearance of compliance. (Gov. Ex. Series II-101, 102.)

Similarly inculpatory was a September 23, 2002 report, prepared by Gibson, that gave a side-by-side comparison of the numbers reported to investors in the August 2002 NPF VI investor report and the actual figures in the program's accounts. (Gov. Ex. Series VI-21.) The report was circulated to Poulsen and the other senior executives. It laid out the changes that were made to each specific section of the investor report. Among other things, the report noted that 74% of NPF VI's receivables were ineligible and that advances unsupported by any receivables accounted for 55.2% of the total receivables on NPF VI's receivables tracking system.

Finally, Gibson testified in great detail about Poulsen's attempt to bribe her to change her testimony in this case. Gibson recounted how Poulsen approached her through a mutual acquaintance, Karl Demmler, and offered to pay her two million dollars to develop a "mental lapse" and "prevaricate" when testifying at Poulsen and his co-defendants trials. Her testimony was supported by extensive wire tap evidence recording the communications between Poulsen, Demmler, and Gibson. When presented with this evidence, the jury could properly conclude that Poulsen's witness tampering demonstrated his consciousness of guilt. *United States v. Mendez- Ortiz,* 810 F.2d 76, 79 (6th Cir. 1986).

Case No. 2:06-cr-129, *Opinion and Order*, ECF 990, PageID# 22147-50. As this summary makes clear, the evidence presented against Petitioner was more than sufficient to establish that he acted with a purpose to conceal the nature of the proceeds involved.

The Court will not presume that Petitioner's attorneys were unaware of *Cuellar*, and the record does not support such a conclusion. Although Petitioner's counsel did not expressly refer to *Cuellar* in the *Motion for Judgment of Acquittal and for New Trial,* Case No. 2:08-cr-129, ECF 859, the issue presented in *Cuellar – i.e.*, the mental element – was addressed in that motion. Furthermore, the fact that Petitioner's counsel did not present a *Cuellar* claim on appeal is not an indication of ineffective assistance but instead reflects the weakness of that claim. *See Smith v. Murray, supra*, 377 U.S. at 536. In short, the Court cannot conclude that Petitioner's counsel failed to provide reasonable professional assistance. Alternatively, and for the reasons outlined *supra*, the Court concludes that Petitioner has failed to establish that he suffered prejudice by reason of any deficient performance on the part of his trial and appellate counsel in this regard. Under these circumstances, Petitioner has failed to establish the ineffective assistance of counsel in connection with the failure to expressly raise a *Cuellar* claim. *See Strickland*, 466 U.S.C. 668.

Moreover, this Court is not persuaded that Petitioner's money laundering-related convictions should be vacated merely because the money laundering-related convictions of co-defendants were reversed on appeal. Petitioner was tried separately in the Securities Fraud Case from those co-defendants; the government - and Petitioner's counsel - had the benefit of the Supreme Court's decision in *Cuellar* prior to the presentation of evidence at trial. As this Court has previously determined, the evidence presented against Petitioner at his trial, and in particular

the testimony of Sherry Gibson, was sufficient to support Petitioner's money laundering-related convictions.

In sum, this Court concludes that Petitioner has not established cause and prejudice for the procedural default of his claim that his money laundering-related convictions violate *Cuellar.*

**Denial of Counsel of Choice**

Petitioner also alleges that he was denied the right to counsel of his choice because the government unjustifiably threatened Attorney Thomas Tyack as a potential target of the criminal investigation, thereby causing Tyack to withdraw from the case.  Case No. 2:06-cr-129, ECF 1225, PageID# 26038.  According to Petitioner, shortly after the government indicted him on charges of obstruction of justice for attempting to pay money to Sherry Gibson in return for her favorable testimony, "Mr. Tyack attended a meeting, at which one of the DOJ Trial Attorneys implied that Mr. Tyack was somehow complicit in the conduct leading to the obstruction indictment, and stated that Mr. Tyack could become a target of the investigation." *Id.* at PageID# 26027.  Petitioner contends that the government thereby improperly caused Tyack to withdraw from his representation of Petitioner.  In support of improper purpose on the part of the government, Petitioner refers to the government's failure to publicly identify any basis for its suggestion of complicity on Tyack's part or to charge Tyack with a crime. *Id.*  Petitioner further contends that the timing and circumstances of Tyack's withdrawal from the case prejudiced Petitioner, because replacement counsel, who lacked Tyack's knowledge of and familiarity with the bases of the charges, had insufficient time to prepare for the trials in the cases. *Id.* at PageID# 26038-9.  Petitioner also alleges that the government provided discovery in such a manner as to require an undue amount of "extensive and needless searches to locate evidence helpful" to the defense. *Id.* at PageID# 26103.

Petitioner makes similar allegations in regard to Attorney John E. Haller.  On July 27, 2006, the government issued a subpoena for Haller as a potential witness in the Securities Fraud Case.  On August 4, 2006, the government filed a *Notice Regarding Apparent Conflict of Interest and Motion for a Hearing on Disqualification of Counsel* in regard to Haller.  *See* Case No. 2:06-cr-129, ECF 82.  During that same period, Petitioner alleges, an attorney with the Department of Justice, Mark J. Yost, "made [a] seemingly reckless and unjustified threat to prosecute" Haller, so as to jeopardize Haller's role in defending Petitioner.  *Id.* at ECF 1225-17, PageID# 26100.  Haller allegedly perceived that threat as an effort to intimidate him to stop working on Petitioner's case.  *Id.* at PageID# 26071.

The Sixth Amendment right to counsel includes the "right of a defendant who does not require appointed counsel to choose who will represent him."  *United States v. Gonzalez–Lopez,* 548 U.S. 140, 144 (2006) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, a court has an "'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'"  *Id*. (quoting *Wheat*, at 159).  "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983).  The Sixth Amendment does not guarantee the defendant a "meaningful relationship" with his attorney.  *Id*. at 14.

No testimony, affidavit, or other admissible document of record supports Petitioner's allegation that a government attorney privately threatened Attorney Tyack.  On October 24, 2007, and citing a potential conflict of interest, Attorney Tyack sought leave to withdraw as Petitioner's counsel. Case No. 2:06-cr-129, *Motion for Leave to Withdraw,* ECF 391 ("[I]t has

become apparent that in fact, as a result of the allegations raised and the circumstances surrounding thereto, counsel are in a position of being in a conflict of interest with Mr. Poulsen. The conflict of interest creates a situation where if counsel continues to represent Mr. Poulsen, he would be deprived of the effective assistance of counsel as mandated by the Constitution of the United States."). *Id.* at  PageID# 4627.  Tyack also testified at the trial in the Obstruction Case as to the reasons for his withdrawal as counsel for Petitioner:

Q.  So how many years had you represented him for?

A.  I represented him for nearly – well, this was in 2007, so nearly five years.

Q.  And after five years what caused you to withdraw?

A.  Ethically, it was mandated.  Because of this situation involving and being charged with this, evolving around the circumstances and the allegations with regard to Sherry Gibson, I felt I had to withdraw ethically and, frankly, constitutionally as well.

We knew, based on our discussions with the United States government, based on what our limited information was at that time, there was a good chance that I would be called as a witness, whether by them or by Lance, it didn't matter. Either way, I can't be his lawyer at that point in time.  The Canons of Professional Responsibility here in Ohio and throughout the country say you really cannot do that.

The other thing is that if, in fact – there was a concern I had if, in fact, somehow something was said or done that was damaging to him with me sitting beside him, I'm really depriving him of the right to effective assistance of counsel and a fair trial which then would force a mistrial or a reversal and people would have to go through the whole daggone thing again.  And that's certainly something I know I didn't want to see happen and I'm sure Lance didn't and I have a suspicion the judge didn't either.

2:07-cr-209, ECF 113, PageID# 1991-92.

The United States moved to disqualify Mr. Haller and Dale Crawford, Esq., as co-counsel for Petitioner in the Securities Fraud Case based on an alleged conflict of interest.  Case No. 2:06-cr-129, ECF 82.  That motion was denied by the Court on September 1, 2006. *Id., Order,*

ECF 105. On January 29, 2007, the Court granted Attorney Crawford's motion for leave to withdraw as co-counsel for Petitioner. *Id.*, ECF 165. However, Mr. Tyack (and attorneys from his firm) continued to represent Petitioner until their motion for leave to withdraw, *id.,* ECF 391, was granted on November 2, 2007. *Id.*, *Order*, ECF 398.

Attorney Haller at no time entered an appearance on Petitioner's behalf in the Obstruction Case. In the Securities Fraud Case, Haller, who had represented NCFE and Petitioner for some time, *Affirmation of John E. Haller*, Case No. 2:06-cr-129, ECF 1225-8, ¶¶ 2, 7, "played strictly a support role, having never before been involved in any way with the defense (or prosecution) of a criminal case." *Id.* at ¶ 6. However, Mr. Haller's "deep knowledge of NCFE's operations" rendered his involvement with Petitioner's defense critically important. *Id*. Mr. Haller was subpoenaed by the government as a potential prosecution witness. *Id.,* at ¶¶ 4-5, 7. Moreover, during the course of the hearing on the government's motion to disqualify Attorneys Haller and Crawford, the Department of Justice attorney stated, "[I]t's not clear to me that Mr. Haller wasn't willfully blind or didn't know something. So the potential for him to escalate to a subject, a target, or defendant is a very real one." *Motion to Disqualify Proceedings*, Case No. 2:06-cr-129, ECF 103, PageID# 25816. Mr. Haller perceived this statement as "an unvarnished threat." *Affirmation of John E. Haller*, Case No. 2:06-cr-129, ECF 1225-8, ¶ 9. The Court concluded, following that hearing, that Mr. Haller's potential testimony "appears to be 'necessary,'" Case No. 2:06-cr-129, *Opinion and Order*, ECF 105, PageID# 620, and that his testimony could prejudice Petitioner. *Id*. at PageID# 621-22.

Nothing in the record supports Petitioner's claim that the government filed its motion to disqualify Mr. Haller or threatened Mr. Haller for the purpose of depriving Petitioner of the counsel of his choice.

Gerald Simmons, Esq., entered his appearance as local counsel for Petitioner in the Obstruction Case on November 9, 2007, Case No. 2:07-cr-209, ECF 37. On November 16, 2007, Peter Anderson, Esq., and William Terpening, Esq., were granted leave to appear *pro hac vice* on Petitioner's behalf in the Obstruction Case.  Case No. 2:07-cr-209, ECF 45. Petitioner's trial in that case began on March 17, 2008.  Case No. 2:07-cr-209, *Minute Entry (*Mar. 17, 2008). Gerald Simmons entered his appearance as local counsel for Petitioner in the Securities Fraud Case on December 11, 2007.  Case No. 2:06-cr-129, ECF 432.  Messrs. Anderson and Terpening were granted leave to appear *pro hac vice* on Petitioner's behalf in the Securities Fraud Case on March 26, 2008.  Case No. 2:06-cr-129, ECF 545.[7] Petitioner's trial in the Securities Fraud Case began on October 1, 2008.  Case No. 2:06-cr-129, *Minute Entry* (Oct. 1, 2008).

There is simply no evidence in the record that the government improperly coerced either Mr. Tyack or Mr. Haller to withdraw from their representation of Petitioner for the purpose of depriving Petitioner of the counsel of his choice. Moreover, it is not apparent that replacement counsel had insufficient time to prepare for trial on Petitioner's behalf.  Aside from his allegation that defense counsel improperly failed to raise an issue under *Cuellar*, Petitioner alleges generally only that "other failings by replacement counsel" deprived him of the representation guaranteed by the Sixth Amendment.  Case No. 2:06-cr-129, ECF 1225, PageID# 26038. Counsel's failure to raise an argument under *Cuellar* is not reflective of insufficient time to prepare for trial because of the withdrawal of either Mr. Tyack or Mr. Haller.

In sum, the Court concludes that Petitioner has failed to establish cause and prejudice for the procedural default of his claim of the denial of his right to counsel of his choice.

**Prosecutorial Misconduct**

---

[7] Their request for leave to appear *pro hac vice* on Petitioner's behalf in the Securities Fraud Case was filed on December 11, 2007. Case No. 2:06-cr-129, ECF 433.

On related grounds, Petitioner raises a claim of prosecutorial misconduct.  He alleges that the government improperly targeted Messrs. Tyack and Haller as potential targets of criminal investigation in order to effect their withdrawal from the case, thus placing Petitioner at an unfair and significant disadvantage in his attempt to secure a fair trial.  Case No. 2:06-cr-129, ECF 1225, PageID# 26038-39.  For the reasons just discussed, that claim is without support in the record.

Referring to *United States v. Stein*, 435 F.Supp.2d 330, 361-62 (S.D.N.Y. 2006), Petitioner also argues that even lawful attempts by the government to disqualify counsel require reversal of his convictions.  Case No. 2:06-129, ECF 1225-17, PageID# 26106-8.  *Stein,* which involved the prosecution's interference with defendants' right to reimbursement for legal expenses, is inapposite to the facts of this case.  *Stein*, 435 F.Supp.2d at 336.

In addition, Petitioner complains that the government consistently opposed his reasonable requests for continuances, engaged in document dumping during the course of discovery, failed to comply with discovery orders, failed to identify exculpatory material, harassed the attorney who represented co-defendant Ayers,[8] and interfered with Petitioner's ability to question Sherry Gibson regarding her testimony against Petitioner in the Obstruction Case.  When viewed collectively, Petitioner contends, these actions on the part of the prosecution denied him due process.  Case No. 2:06-cr-129, ECF 1225, PageID# 26018-26034.[9]  This Court disagrees.

Federal habeas review of a claim of prosecutorial misconduct is narrow. *Gumm v. Mitchell*, 775 F.3d 345, 376 (6th Cir. 2014)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642

---

[8] Petitioner complains that the FBI needlessly served Brian Dickerson, Esq., with a grand jury subpoena while Dickerson was conducting a deposition in Minneapolis, Minnesota, in an unrelated case.  Case No. 2:06-cr-129, ECF 1225, PageID# 26032-33.

[9] The Court declines to consider, as irrelevant, Petitioner's allegations of misconduct on the part of this Department of Justice attorney in an unrelated, case.  *See* Case No. 2:06-cr-129, ECF 1225, PageID# 26017.

(1974). It is "not enough that the prosecutor's [conduct was] undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Instead, misconduct by the prosecution will warrant habeas corpus relief only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*

The record fails to support Petitioner's claim that he was denied a fair trial on the basis of prosecutorial misconduct. The Court granted all of Petitioner's motions for continuance of the trial date, and Petitioner's trial in the Securities Fraud Case began on the date requested by him. *See, e.g.,* Case No. 2:06-cr-129, *Motion,* ECF 715; *Order,* ECF 735. The original *Indictment* in the Securities Fraud Case was returned on May 19, 2006. Case No. 2:06-cr-129, *Indictment,* ECF 3. A *Superseding Indictment* was filed in that case July 10, 2007. *Id., Superseding Indictment,* ECF 257. The trial of Petitioner's co-defendants in that case began on February 7, 2008. *Id.*, *Minute Entry* (Feb. 7, 2008). Petitioner's trial in the Securities Fraud Case began on October 1, 2008. *Id.*, *Minute Entry* (Oct. 1, 2008).

The *Complaint* in the Obstruction Case was filed on October 17, 2007, Case No. 2:07-cr-209, *Complaint,* ECF 1, the *Indictment* was returned in that case on October 23, 2007, *id.*, *Indictment,* ECF 15, the *Superseding Indictment* was returned in that case on December 4, 2007, *id., Superseding Indictment*, ECF 56, and the *Second Superseding Indictment* was returned on January 15, 2008, *id., Second Superseding Indictment*, ECF 68. Petitioner's motions for continuances were granted. *See, e.g., id., Motion*, ECF 73; *Order*, ECF 74. Trial in the Obstruction Case began on March 17, 2008. *Id., Minute Entry* (Mar. 17, 2008).

Petitioner has identified no additional preparation that could have been performed, nor does he point to any additional evidence that could have been presented at trial had he or his attorneys been given more time to prepare. The fact that the government opposed requests for

continuances of the trial date is neither improper nor evidence of improper intent.  Additionally, Petitioner has failed to specify the manner in which the government violated any discovery orders, has proffered no evidence in support of that allegation, and has wholly failed to indicate how he was prejudiced by any such violation.  Petitioner has not pointed to any even arguably exculpatory evidence that was either withheld by the government or unfairly buried in the document production.  He has offered no evidence that the defense encountered unreasonable difficulty by reason of the government's document production; the volume of discovery provided by the prosecution, particularly in light of the "complicated corporate and litigation realities" of the case, *Affirmation of John E. Haller*, ¶ 6, Case No. 2:06-129, ECF 1224-8, simply does not give rise to even an inference of prosecutorial misconduct.  Petitioner has offered no evidence that the prosecutor improperly prevented Petitioner, through his counsel, from interviewing Sherry Gibson.  Even if the government issued a subpoena to an attorney for one of Petitioner's co-defendants, Petitioner has not established prejudice to him as a result.

For all these reasons, Petitioner has failed to establish that the government denied him a fair trial, or that the combined actions of the prosecution resulted in a denial of due process.  For all of these reasons, the Court concludes that Petitioner has failed to establish a basis for relief in either Case No. 2:07-cr-209 or Case No. 2:06-cr-129 based on the denial of his right to counsel of choice or prosecutorial misconduct.

**Recommended Disposition**

It is therefore **RECOMMENDED** that this action be **DISMISSED.**

**Procedure on Objections**

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

 *s/ Norah McCann King*
Norah McCann King
United States Magistrate Judge
May 29, 2015