**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **Case No. 2:06-cr-129(1)** |
| Plaintiff, | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| v. | : | |
| | : | |
| LANCE K. POULSEN, | : | |
| | : | |
| Defendant. | : | |

**<u>OPINION & ORDER</u>**

This matter comes before the Court on Defendant Lance K. Poulsen's *pro se* letter motion

seeking a determination that his restitution obligation has been satisfied.  (ECF No. 1468 at 1).

Poulsen argues that because the ordered amount of restitution has been "largely paid by the other

parties responsible," and because a bankruptcy settlement was achieved for less than what Poulsen

believes it was worth, he should be excused from continued restitution payments.  (*Id.* at 1, 3).

The Government opposes Poulsen's Motion.  (ECF No. 1472).  Because Poulsen has not shown

that the ordered amount of restitution has been *entirely* paid, his Motion is **DENIED**.

**I.    BACKGROUND**

On March 26, 2008, in a separate case, Poulsen was found guilty by a jury for witness

tampering, and this Court sentenced him to 120 months imprisonment and 3 years of supervised

released.  *See United States v. Poulsen*, Case No. 2:07-cr-209 (ECF Nos. 109; 139).  The Sixth

Circuit succinctly summarized the facts of this case, Case No. 2:06-cr-129:

> National Century Financial Enterprises, Inc. ('NCFE'), headquartered in Dublin,
> Ohio, was incorporated at the end of 1990 and became one of the largest healthcare
> finance companies in the United States.  Defendant[] Lance Poulsen was a co-
> founder of NCFE and served as its owner, chairman, and chief executive officer.
> Under NCFE's business model, NCFE primarily financed healthcare providers by
> purchasing their accounts receivable that were payable to private insurers and

1

public healthcare programs.  NCFE purchased specific accounts receivable from healthcare providers and issued bonds to investors that were backed by the accounts receivable as collateral.  Subsidiaries of NCFE purchased those receivables with borrowed funds, monies obtained through securities that were backed by the receivables.  NCFE and its representatives reported that those obligations were supported by adequate reserves and consistently maintained investment grade, primarily triple-A ratings.  NCFE and its subsidiaries generated profits from fees charged to the healthcare providers for the advances as well as gains from the spread between the discounted costs of the receivables and the collections on the receivables.

In reality NCFE used investors' money to advance funds to certain providers who did not submit any accounts receivable in return, including those owned in whole or in part by Poulsen and other principals of NCFE.  Funds were advanced to providers without acquiring any receivables or in amounts in excess of the receivables purchased, when NCFE was required to purchase solely eligible accounts receivable.  Poulsen was involved in advancing funds in this manner that violated the rules of the agreements in place with NCFE's investors; he approved numerous such advances and the majority of advanced funds were to six providers owned by Poulsen through his stakes in NCFE and other entities.  Monthly reports were issued to indenture trustees to verify that minimum reserve account balances were met.  In order to meet the minimum required reserve balances, NCFE devised a system to transfer funds between the reserve accounts to meet minimum reserve levels.  Poulsen was active in the decisions to transfer money between the funding programs, to change the reporting dates, and to falsify figures in investor reports.  The Presentence Report [] found that '[a]s one of the principals, Poulsen possessed the most knowledge of the ongoing criminal activity in this conspiracy.'

*United States v. Poulsen*, 655 F.3d 492, 498–99 (6th Cir. 2011).  Poulsen was found guilty by a jury on several counts of money laundering, conspiracy, wire fraud, and securities fraud on October 31, 2008.[1]  (*See* ECF No. 857).  He was sentenced to 360 months imprisonment, to be served concurrently with his previous sentence. (ECF No. 1009 at 2).  He was also ordered to pay $2,384,147,105.09 in restitution.  (*Id.* at 5).  On September 21, 2020, the Court granted Poulsen compassionate release, in part due to the COVID-19 pandemic.  (*See* ECF No. 1435).  Poulsen

---

[1] Specifically, Poulsen was found guilty for violating 18 U.S.C. § 371 (conspiracy), 18 U.S.C. §§ 77q(a), 77(x) (securities fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1956 (money laundering conspiracy), and 18 U.S.C. § 1956(a)(1)(B)(1) (money laundering concealment). (ECF No. 1009 at 1).

then requested early termination of his supervised release, which the Court denied on May 22, 2023. (ECF No. 1465 at 4).

On June 18, 2025, Poulsen submitted the instant letter motion to the Court, asking the Court to find his restitution obligation is satisfied and stop the Government from "garnishing any overpayment [on his] tax return[s]" or making "deductions" from his Social Security benefits. (ECF No. 1468 at 1). His position is that further deductions or garnishments are unnecessary, as his restitution has been satisfied: he contends that "the amounts which [he] was ordered to pay in restitution have largely been paid by other parties responsible," calculating the total recovery by his victims to amount to almost $1.8 billion. (*Id.* at 1, 3). He augments his position by contending that, during bankruptcy proceedings, settlements were reached with certain companies for only $330 million, when those companies were sold two years later for $880 million. (*Id.* at 3). To Poulsen, the bankruptcy estate abandoned a "potential additional recovery of $550 million" that, when factored into Poulsen's calculated total recovery from the bankruptcy and litigation, would bring the victims' total compensation to "at least $2,327,675,436.40." (*Id.*). Thus, he argues that the Court should determine that his restitution obligation is satisfied—particularly given the personal hardships that he and his wife face due to his advanced age, Parkinson's disease, and COVID-19 complications, and his wife's hip replacement and breast cancer surgeries and recoveries. (*Id.* at 2).

The Government opposed Poulsen's motion, arguing that Poulsen has not satisfied the Court's order of restitution, and the Court should not modify its restitution order. (ECF No. 1472 at 2–6). In reply, Poulsen clarifies that he does not challenge the restitution amount ordered by the Court, but instead seeks a determination that the restitution is satisfied, and that NCFE's bondholders have abandoned seeking recovery from him. (ECF No. 1474 at 3).

3

## II.    LAW & ANALYSIS

Restitution is mandatory for certain crimes.  *See* 18 U.S.C. § 3663A(a)(1).  These crimes include offenses against property under Title 18 of the United States Code that are "committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), where identifiable victims suffered "pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B).  The Mandatory Victims Restitution Act "requires district courts to order criminal defendants to make restitution to any identifiable victim or victims who have suffered . . . a pecuniary loss."  *United States v. Agrawal*, 97 F.4th 421, 435 –36 (6th Cir. 2024) (internal quotation marks omitted).

Restitution can be offset—or reduced by other amounts recovered by the victim for the same loss—as a criminal defendant "should not have to pay a victim for the same loss twice." *United States v. Elson*, 577 F.3d 713, 734 (6th Cir. 2009), *abrogated in part on other grounds by Lagos v. United States*, 584 U.S. 577, 579–80, 585 (2018).  Still, the "burden of proving an offset should lie with the defendant."  *Elson*, 577 F.3d at 734 (quoting *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998)).  And in cases with multiple defendants, individual defendants can remain responsible until the full amount of restitution has been paid, even when the court has found that multiple defendants contributed to the victim's loss.  *United States v. Eckerd*, 2026 WL 158403, at *2 (S.D. Ohio Jan. 21, 2026) (Marbley, J.).  This makes sense, given that the purpose of restitution is to ensure that victims of crime are compensated.  *Id.* at *3.

Poulsen's argument is conclusory and insufficient.  He fails to prove that he is entitled to an offset, and his reference to the bankruptcy settlement is vague.  As the Government points out, Poulsen has failed to produce "documentary proof that any offset of his restitution balance is appropriate."  (ECF No. 1472 at 5).  More to the point, Poulsen's argument would fail even if his conclusory assertions were credited:  even assuming Poulsen is correct that his victims have

4

recovered nearly $1.8 billion toward their losses, that still leaves hundreds of millions of dollars owed in restitution.  These losses cannot be satisfied by Poulsen's proffered hypothetical:  that there was some failure to obtain additional (possibly as-of-then unrealized) value in a bankruptcy settlement with certain companies.  (*Id.* at 5–6).  That this bankruptcy settlement may not have proceeded in the way Poulsen would want has no bearing in determining whether his restitution obligation has been satisfied.[2]  Mr. Poulsen's restitution obligation is exactly what it sounds like— *his* obligation.  Until he shows that his victims have received that amount of restitution, he remains subject to the Court's order and obligated to make them whole.

### III.    CONCLUSION

The Court understands Mr. Poulsen's fiscal situation and sympathizes with the medical problems that he and his wife face.  Nevertheless, he has provided nothing to show or suggest that he has satisfied his restitution obligation.  For the foregoing reasons, his letter motion (ECF No. 1468) is **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  May 11, 2026**

---

[2] It is surprising that Poulsen, the former executive of a large healthcare financing company, would imply that no additional value was created in those companies for the two years between the $330 million bankruptcy settlement and the companies' subsequent sale for $880 million.